1

1

2          UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF TEXAS
3             BROWNSVILLE DIVISION

4    ----------------------x
                          :
5    LA UNION DEL PUEBLO      :
     ENTERO, et al.          :
6                           :
                 Plaintiffs :
7                           :
       vs.                  :    No. B:08-487 (HGT)
8                           :
     FEDERAL EMERGENCY       :    Civil Action
9    MANAGEMENT AGENCY        :
                           :
10               Defendant  :
                           :
11   ----------------------x

12                     Washington, D.C.
                       September 6, 2012
13

14   Deposition of:

15            JOHN M. CARLETON, JR.,

16   called for oral examination by counsel for

17   Plaintiffs, pursuant to notice, held at the

18   offices of the U.S. Department of Justice, 20

19   Massachusetts Avenue, N.W., Washington, D.C.,,

20   beginning at 9:22 a.m., before Lynell C.S.

21   Abbott, a Notary Public in and for the

22   District of Columbia, when were present on

              FEDER REPORTING COMPANY
          (202) 863-0000    (800) 956-8996

PLAINTIFF'S
EXHIBIT

A
_____

1    behalf of the respective parties:

2

3    On Behalf of the Plaintiffs:

4

     By:  JEROME WESEVICH, ESQ.
5    By:  TRACY FIGUEROA, ESQ.
          Texas RioGrande Legal Aid, Inc.
6         316 South Closner Boulevard
          Edinburg, Texas 78539
7         (956) 393-6200

8    On Behalf of the Defendant:

9    By:  CARLOTTA P. WELLS, ESQ.
          Federal Programs Branch, Room 7150
10        U.S. Department of Justice Civil Division
          20 Massachusetts Avenue, N.W.
11        Washington, D.C. 20530
          (202) 514-4522

12
                    and
13
     By:  BROCK PIERSON, ESQ.
14        Federal Emergency Management Agency
          500 C Street, S.W.
15        Washington, D.C. 20472
          (202) 646-3147

16

17                    + + +

18

19

20

21

22

                  FEDER REPORTING COMPANY
              (202) 863-0000    (800) 956-8996

3

1

2                    C O N T E N T S

3    WITNESS:  JOHN M. CARLETON, JR.

4    EXAMINATION BY:                          PAGE

5    MR. WESEVICH                                4

6    MS. WELLS                                 295

7

8                      EXHIBITS

9    DEPOSITION NO.      MARKED FOR IDENTIFICATION

10    1.  CD                                     13

11

12

13

14

15

16

17

18

19

20

21

22

FEDER REPORTING COMPANY
(202) 863-0000    (800) 956-8996

4

1

2    Whereupon,

3                    JOHN M. CARLETON, JR.

4    was called for examination by counsel and,

5    having been duly sworn by the Notary, was

6    examined and testified as follows:

7        EXAMINATION BY COUNSEL FOR PLAINTIFFS

8                    BY MR. WESEVICH:

9        Q.    Good morning, Mr. Carleton.  My

10    name is Jerry Wesevich, and I represent the

11    Plaintiffs who filed a lawsuit against FEMA.

12    And we served a Rule 30(b)(6) notice on you.

13                As I understand, you are the

14    person designated to testify on behalf of

15    FEMA.

16        A.    That's correct.

17        Q.    And have you ever given a

18    deposition before?

19        A.    I have not.

20        Q.    And one of the rules is that when

21    I ask a question, our court reporter needs to

22    be able to record what I say and what you say.

                FEDER REPORTING COMPANY
           (202) 863-0000    (800) 956-8996

1 So it's kind of important that we not talk

2 over one another.  I'll do my best not to talk

3 over you, and please try to do that.  Okay?

4   A. Yes.

5   Q. And another one of the rules is

6 that we have to have verbal answers.  A shake

7 of the head doesn't really work.

8   A. Okay.

9   Q. We've got to have verbal answers.

10   A. Yes.

11   Q. And the most important thing in

12 the deposition is that if you don't understand

13 one of my questions, if it's not clear to you,

14 will you please tell me so that I can try to

15 clarify it for you?

16   A. Yes.

17   Q. And if you want to take a break at

18 any time, you're welcome to do that.  Simply

19 let us know.

20   A. Very good.

21   Q. I will show you a series of

22 documents during this deposition as I ask you

1    questions.  Okay?

2           A.    Yes.

3           Q.    The documents will have a number

4    that is in green written on the very bottom of

5    the screen.  The document that you and I are

6    discussing I will flash up on the screen.

7           A.    Okay.

8           Q.    If you want to see pages before or

9    after a document, will you please just let me

10   know and I'll be happy to change it --

11          A.    Yes.

12          Q.    -- on the screen?

13          A.    Yes.

14          Q.    And I understand that you have the

15   hard copies of the documents with you, and

16   you're welcome to refer to the hard copies

17   that you brought with you at any time as well.

18          A.    Okay.

19          Q.    And of course you understand that

20   my job is to understand how FEMA conducts its

21   operations and that no one accuses you

22   personally of having done anything wrong.

1    Right?

2        A.    Yes.

3        Q.    You're just here to give the

4    Agency's testimony about what happened.

5        A.    Yes.

6        Q.    Could you please describe your

7    education?

8        A.    My education?  I have a bachelor's

9    degree in architectural engineering from

10   Wentworth, graduated in 1983.  I have an

11   associate's degree in architectural

12   engineering technology from Wentworth

13   Institute -- I mean from Roger Williams

14   College.  And that is in Rhode Island.  And I

15   graduated with an associate's degree in 1980.

16            I have been with FEMA for over 21

17   years, started out as a local hire which is a

18   person hired in support of a disaster.  I

19   became a full-time FEMA employee in December

20   of 1992.  I have since worked in the areas of

21   Individual Assistance, Public Assistance,

22   Mitigation, Operations, and I was originally

1    hired in Region 1.  And I've been at FEMA

2    Headquarters since June of 2007.

3         Q.    Are you in the Senior Executive

4    Service?

5         A.    No, I am not.

6         Q.    Are you a confirmed appointee?

7         A.    No, I am not.

8         Q.    Describe to me who is confirmed by

9    the Senate besides Administrator Fugate.

10        A.    There is the Deputy Assistant, the

11   Deputy Administrator, Richard Serino.  There

12   is Beth Zimmerman who is the Recovery

13   Assistant Administrator.  There is William

14   Carwile who is another Assistant

15   Administrator.  And there are several others

16   in my division.  They're all career employees,

17   in other words.  My supervisor, who is Mark

18   Misczak.  Then there is Mike Grimm who is my

19   Division Director.  They are career employees.

20        Q.    Some of these names have come up

21   in the documents.  Who is Buryl Jones?

22        A.    Buryl Jones used to be the

1    Division Director for Individual Assistance.

2    He is now working out at Mount Weather.  Mike

3    Grimm is now in Buryl Jones' position.

4         Q.    And Donna Dannels?

5         A.    Donna Dannels.  She had retired I

6    believe in 2008.  And she was at the time, I

7    believe she was Buryl Jones' boss.  So I

8    believe she was like the Associate Director.

9         Q.    So she was in the position that

10   Elizabeth Zimmerman now occupies?

11        A.    She's actually in the position

12   that Deb Ingram occupies.  Deb Ingram is

13   Deputy Associate Administrator for Recovery.

14        Q.    Now, you said you had worked in

15   both Public Assistance and in the Individual

16   Assistance programs?

17        A.    That's correct.

18        Q.    And is it fair to say that Public

19   Assistance provides repair resources for

20   cities, states, and government entities while

21   Individual Assistance provides disaster repair

22   assistance for individual people?

1        A.    Yes, it's fair to say that.   In

2   addition, too, Individual Assistance provides

3   a variety of other programs under Human

4   Services which also includes grants to states

5   for such things as crisis counseling, disaster

6   case management, and other programs.

7        Q.    Right.  But to keep it manageable

8   in this deposition, we're talking about home

9   repair unless we say explicitly otherwise.

10  Right?

11       A.    Yes, correct.

12       Q.    But when it comes to repair of

13  buildings, the Public Assistance is going to

14  repair public buildings and the Individual

15  Assistance program repairs private buildings.

16       A.    That's correct.

17       Q.    Now, Mrs. Zimmerman oversees both

18  the Public Assistance and the Individual

19  Assistance programs.  Correct?

20       A.    Yes.  Yes.  She is the Associate

21  Deputy Administrator for Response and

22  Recovery.  So she oversees the recovery aspect

1     which is both PA, Public Assistance, and

2     Individual Assistance.

3          Q.    We can say PA for Public

4     Assistance Program and IA for Individual

5     Assistance.  Right?

6          A.    Correct.

7          Q.    And those are commonly used within

8     FEMA?

9          A.    Yes, they are.

10          Q.    And they are basically parallel

11    administrative structures, the PA Program and

12    the IA Program.  Right?

13          A.    That is correct.

14          Q.    There is just a separate statute

15    that governs each of those programs.  Correct?

16          A.    It's under the Stafford Act.

17    There are different authorities within the

18    Stafford Act that govern the two different

19    programs.

20          Q.    Right.  And it's 406 for PA or 42

21    USC 5172.  Correct?

22          A.    It's Section 403 for the Public

1      Assistance.  Section 408 governs the

2      Individual Assistance.

3              Q.    Right.  So there are separate

4      statutes for PA and IA, and then there's a

5      separate set of regulations underneath each

6      statute by which PA is administered and by

7      which IA is administered?

8              A.    That is correct.

9              Q.    And the IA regulations are 44 CFR

10     206.110 through 120.  Is that correct?

11             A.    I believe that is correct.

12             Q.    And are there other regulations

13     besides those that govern IA?

14             A.    Not that govern the Individual

15     Assistance programs.  There are other

16     regulations that govern other type of programs

17     that assist in Individual Assistance.  But for

18     the sake of the repair program, it is under

19     Section 206 of the 44 CFR.

20             Q.    And there is a whole separate set

21     of regulations that governs operation of the

22     PA program.  Correct?

1          A.    That is correct.

2          Q.    I am going to show you what's been

3     marked as Page 5891.  And I'm going to go

4     ahead and as we look at the first document

5     here, I will ask the court reporter to please

6     mark as Exhibit Number 1 a CD, a copy of which

7     has been provided to defense counsel that has

8     all the documents that we're going to refer to

9     today.

10               (Item referred to marked

11    Deposition Exhibit No. 1 for identification

12    and subsequently returned to counsel with the

13    Deposition transcript for his retention.)

14               BY MR. WESEVICH:

15         Q.    So would you please look at

16    Document 5891?

17         A.    It's a little blurry.  Can it be

18    sharpened?

19         Q.    Sure, of course.  Better?

20         A.    Yes, better.

21               MS. WELLS:  Is it possible for you

22    to tell us how long this document is in its

1    entirety?

2              MR. WESEVICH:  It's on FEMA's

3    website.  It's 57 pages long.  We're not going

4    through the whole thing, believe me.

5              THE WITNESS:  Yes.

6              BY MR. WESEVICH:

7         Q.   Okay.  Can you please look at just

8    the first paragraph on Page 5892?

9              MS. WELLS:  The first full

10   paragraph?

11             MR. WESEVICH:  Yes, ma'am.

12             MS. WELLS:  So not the carryover

13   one at the top of the page.

14             MR. WESEVICH:  The carryover one,

15   that's right.

16             THE WITNESS:  Yes.

17             BY MR. WESEVICH:

18        Q.   Have you had a chance to look at

19   that, what's marked on 5891 and 92?

20        A.   Yes, I have.

21        Q.   My question is is IA administered

22   the same way as this describes PA being

1      administered, generally?

2              A.     Generally, yes.

3              Q.     So there is the statute governs.

4      Underneath that is the regulations.

5      Underneath that is a set of FEMA policies for

6      how to carry out the program.

7              A.     That is correct.

8              Q.     And the reason that FEMA has that

9      set of policies interpreting the regulations

10     is to ensure consistency in decisions of what

11     repair is going to be provided?

12              MS. WELLS:  I'm going to object to

13     the form of question.

14              You can answer it if you --

15              THE WITNESS:  Okay.  Yes.  It does

16     set a consistent standard.  However, we still

17     maintain flexibility where we can.  There is a

18     number of different situations that come up on

19     any given disaster that will need to be

20     addressed, and typically we will just follow

21     that policy.  But in some instances we would

22     have to modify that to fit the situation.

1                    BY MR. WESEVICH:

2            Q.    And who would modify the policies?

3            A.    It's usually, it's -- there's any

4      number of people.  It depends on what the

5      topic is.  It depends on how it's to be

6      determined.  It goes through a writing

7      process, a vetting process, of which there are

8      a number of people that look at it.  And then

9      it goes to a concurrence process.  So

10     depending upon the document, it could be

11     modified either by, for instance, Beth

12     Zimmerman or Deb Ingram.

13           Q.    But as to PA, this Document 5892

14     says that FEMA issues policies so that the

15     regulations are interpreted consistently

16     across the nation and from disaster to

17     disaster.

18           A.    That is correct.

19           Q.    And does FEMA do the same thing

20     for IA?

21           A.    That is correct.

22           Q.    I'll show you Document 29.  Would

1    you please have a look at that.

2         A.    Yes.

3         Q.    Have you had a chance to read

4    Document 29?

5         A.    Yes, I have.

6         Q.    Page 29, I should say.  What is

7    it?

8         A.    That is a policy.  It is

9    establishing a policy for the minimal amount

10   of award to be assisted for habitability

11   items.

12        Q.    This is a FEMA policy that applies

13   in IA.  Correct?

14        A.    Yes, and it's dated July of 2005.

15        Q.    And this policy states an

16   eligibility requirement for home repair

17   assistance.  Correct?

18        A.    It states a minimal amount of

19   award that could be provided, not necessarily

20   eligibility for such award.  In other words,

21   it doesn't get into the eligibility

22   requirements of what that $50 would stand for.

1    It just simply says that we would not issue

2    anything less than a $50 award assistance.

3         Q.    If someone was otherwise eligible

4    for repair assistance and the total amount was

5    $40 that they were eligible for based on this

6    policy would they be deemed ineligible?

7         A.    They would not receive assistance,

8    yes.

9         Q.    Does this policy appear in the

10   Stafford Act, 42 USC 5174?

11        A.    No, it does not.

12        Q.    Does it appear in any regulation?

13        A.    No, it does not.

14        Q.    But this is binding on everyone in

15   FEMA.  Correct?

16        A.    Yes.  This is part of the

17   processing for which individuals could be

18   eligible to receive that minimal amount of

19   award.

20        Q.    How did FEMA choose $50?

21        A.    The Stafford Act refers to minor

22   repair, of which it would be reasonable to

1     expect the applicant at the landlord to make

2     such minor repairs.  This sets the standard of

3     what would be considered the minimal award.

4     So it basically sets the threshold for what

5     that minor repair would indicate on

6     habitability items.  So it is in reference to

7     setting a standard that is reflective in the

8     regulations of which it would indicate that

9     individuals and landlords are expected to make

10    some repair to minor damage.

11          Q.   As I understand your testimony,

12    you say that the Stafford Act contains the

13    words "minor repair."

14          A.   The regulations stipulate.

15          Q.   And we're just going to have to be

16    very specific about where we are here.

17          A.   Okay.

18          Q.   So where in the regulations do the

19    words "minor repair" appear?

20          A.   I would have to doublecheck that.

21    I know that it does stipulate in the Code of

22    Federal Regulations that it is expected that

1    the landlord or the owner would make repairs.

2    I believe it says minor repairs or minimal

3    repairs.  I would have to actually look at the

4    regulation to verify the words.

5         Q.    So as I understand your testimony,

6    FEMA's decision to use $50 as a numeric

7    standard is an interpretation of the word

8    "minor repairs" that appears somewhere in the

9    regulations.

10        A.    It's an interpretation of the

11   language that appears in the 44 CFR,

12   indicating that it is expected that the

13   homeowner or the landlord can make minor

14   repairs.  I don't know if -- I would have to

15   determine whether or not actual minor repairs

16   is identified.  I do know that in -- it's

17   either "minor repairs" or "minimal repairs" is

18   used.

19        Q.    Let's see if I can help you with

20   that.  I'm showing you Page 5004.  This is a

21   document that FEMA produced and filed in Court

22   as Document 78-7.  And it's a 108-page

1    PowerPoint.

2             Do you recall this document?

3        A.    Yes, I do.

4        Q.    Describe it.

5        A.    I believe this is the information

6    material used in the training for the FEMA

7    contract inspectors.

8        Q.    Who wrote it?

9        A.    I do not know.  I believe it was

10   probably developed out at the Virginia NPSC of

11   which that is where the inspection services

12   manager and it's all coordinated through the

13   Virginia NPSC.  I don't know who the author of

14   this particular document is.

15       Q.    Now, just to clarify on the

16   hierarchy here, because there was a hierarchy

17   document that was produced but it was so small

18   we couldn't read it.  But the policy at FEMA

19   as to what repair assistance will be provided

20   is made only at Headquarters.  Correct?

21       A.    From the regulation it describes

22   what damages would be eligible and describes a

1       whole host of what could be determined

2       eligible.  The policy is written from FEMA

3       Headquarters in terms of any direction or

4       clarification required in the regulation.  And

5       then the NPSC is responsible for processing

6       based upon policy and guidance and basically

7       just processing.

8               Q.    Is it fair to say that there are

9       four physical locations for FEMA, Number 1

10      being Headquarters here in D.C., Number 2

11      being the NPSCs -- which are the N-P-S-Cs --

12      and there are several of them around the

13      nation.  There is one in Denton, Texas, and

14      there is one in Virginia, and I believe there

15      was one in Puerto Rico or something like that.

16              A.    The Puerto Rico NPSC closed.

17      There's also one in Maryland.

18              Q.    Then there is the regional offices

19      of FEMA.  And then there are the disaster

20      sites where FEMA maintains temporary offices

21      at disaster sites.

22              A.    That is correct.

1          Q.    And is that accurate that there

2     are basically four locations where FEMA does

3     business and those are them?

4          A.    In addition to those, in a

5     disaster site we'll also establish disaster

6     recovery centers or disaster joint recovery

7     centers with a state of which we would then

8     set up temporary offices during a disaster for

9     people to come in and apply and get answers to

10    their questions and also meet with other state

11    and local agencies that offer assistance in

12    the recovery effort.  And that, too, is a very

13    temporary office that's established through

14    the joint field office, established for that

15    disaster.

16         Q.    So this document that's Page 5004

17    and forward is a training presentation that

18    was written by NPSC based on FEMA policy.

19    Correct?

20         A.    I believe so.

21         Q.    But you just don't know which FEMA

22    employee at NPSC wrote this document.

1          A.    That's correct.

2          Q.    And this is the training document

3    that was used to train inspectors who worked

4    in Disaster 1780.  Correct?

5          A.    That is my knowledge, yes.

6          Q.    Please look at Page 5045.

7          A.    Yes.

8          Q.    Is that the regulation that you

9    were referring to that the $50 rule that we

10   previously discussed is based on?

11         A.    Yes, it is.

12         Q.    Is there any other regulation?

13         A.    No.  I do not believe there is.

14         Q.    And do you understand that 44 CFR

15   Section 206.101 is no longer an effective

16   regulation?

17         A.    Yes.  That has been replaced.  And

18   I do not know the new citation, but this was

19   from the 2002 Code of Federal Regulations.

20   However, it still applies that minor repairs

21   of a minor nature may not be considered

22   eligible for assistance.

1      Q.   So FEMA's $50 rule -- is that a

2   fair shorthand way of saying it, the $50 rule?

3      A.   Yes.

4      Q.   So that $50 rule is based on an

5   expired regulation.

6      A.   Yes, according to this Section

7   206.101.

8      Q.   There is not a new regulation that

9   is in force right now that says this same

10  thing.  Correct?

11     A.   I do not believe there is.  I

12  would have to verify that.

13     Q.   FEMA produced a lot of policies in

14  response to our document request about

15  individual assistance.  And I am showing you

16  one here at Page 29, and then there's another

17  one here at Page 30.

18     A.   Yes.

19     Q.   I just want to know whether or not

20  you are familiar with that format that's on

21  Page 30 for publishing FEMA policies.

22     A.   Yes, I am.

1           Q.    So where you have a DAP number

2      that is in the 9,400 range, are all of those

3      FEMA IA policies?

4           A.    I don't know if they all are.

5      That is a number that is assigned for most

6      policies.  And it's going to vary but I don't

7      know if it's all within the 9400 range.  There

8      are other policies that are in the 9500 range,

9      and I don't know how that number is actually

10     assigned.

11          Q.    Okay.  Now, I'm showing you Pages

12     5951 onward.  This lists the 95 series

13     policies.  And they will appear here in the

14     same, in the same general format with a broad

15     border around, and they all have a DAP 9521

16     policy.  Correct?

17          A.    Yes.  This is the newer format

18     that I don't know when exactly it was

19     implemented.  But throughout the years there's

20     been several different formats on policy.

21          Q.    Right.  And, again, we're looking

22     at Pages 5951 onward.  We're just scrolling

                    FEDER REPORTING COMPANY
                 (202) 863-0000    (800) 956-8996

1      through and we see a lot of these similarly

2      formatted policies.  And these are all in the

3      9500 range and they're all applied to PA.

4      Correct?

5           A.    I don't know that for sure.

6           Q.    So you're not aware that all of

7      the 9500 policies and beyond are PA policies

8      and all the 9400 and beyond are all the IA

9      policies?

10          A.    I have never really paid too much

11     attention to what the policy number is in

12     terms of whether it's a 9500 or 9400.  I do

13     know that the majority of the policies that

14     are produced in IA who have the assigned

15     numbers are the 94.  But I do not know if

16     every one of them is 94.

17          Q.    This document designated 5951, I

18     will represent to you, is all the 9500 series

19     policies and that they all apply to PA.

20               My question is is there a similar

21     book that contains all of the 9400 policies in

22     one place for IA?  Because this is a FEMA

1    document on its website --

2            A.    Right.

3            Q.    -- that has all of the 9500

4    policies on it.

5            A.    Yes.

6            Q.    The last one in this document is

7    on debris monitoring and it's marked 9580.203.

8            A.    Yes.  Yes.  I do not think there

9    is a concise listing as we see here in Public

10   Assistance as there is in Individual

11   Assistance.

12           Q.    Just so your testimony is clear,

13   your understanding is that there isn't as

14   concise a list of the IA policies as there is

15   of the PA policies that's reflected in this

16   document --

17           A.    In the way it's reflected in this

18   document.  We have a listing of the policies

19   but it's not in a concise, one binder type

20   document.  Public Assistance several years ago

21   did a redevelopment of their entire program to

22   have a digest and all their policies bound.

1    We are not at that level at this point in

2    Individual Assistance.  Individual Assistance

3    because it affects individuals, it is

4    flexible.  And we have a lot of issues that

5    come up of which we would issue guidance or

6    policy to deal with that particular situation.

7              The numbered policies are

8    typically policies that go through the entire

9    vetting process and do go through the Federal

10   Register notice for comment.  There are other

11   interim policies, draft policies that have to

12   get implemented for a particular disaster that

13   are specific to that disaster.  And they

14   typically will not carry the numbers as we see

15   here.

16             There are several fact sheets.

17   What I'm looking at now is this 9580.203,

18   which is a fact sheet.  And we do have several

19   fact sheets for Individual Assistance and

20   other programs associated with Individual

21   Assistance that are numbered as well as we

22   have several policies that are numbered

1  through the proper sequencing.

2       Q.    And you're looking at Page 6302 as

3  you say this.

4       A.    Yes, I am.

5       Q.    As I understand your testimony,

6  these numbered policies go through Notice and

7  Comment and are published in the Federal

8  Register.

9       A.    I am looking at a Public

10  Assistance one that I believe has been fully

11  integrated and vetted and through the public

12  comment period.

13       Q.    And is it your testimony that if a

14  policy appears in this format, this standard

15  format that FEMA has and it's numbered, it's

16  been through a formal process and it's been

17  through Notice and Comment and published in

18  the Federal Register?

19       A.    I believe that is accurate when it

20  has the number assigned and it's dated.  As I

21  say, with Individual Assistance, there are a

22  number of policies that get issued that are

1      disaster specific that deal with the

2      particular issue that came about during that

3      event.  And typically those do not have a full

4      scope of getting through the Federal Register

5      Notice and Public Comment period because it's

6      a situation that has to be addressed at the

7      time.

8              Q.    Let's go back to the -- we are

9      looking at Page 29 again.  This is the $50

10     policy that we've been discussing.

11             A.    Yes.

12             Q.    This does not have a number

13     assigned to it.

14             A.    No, it does not.

15             Q.    So that means it has not undergone

16     Notice and Comment publication.  Correct?

17             A.    I do not know for sure, but I

18     don't believe it has.

19             Q.    Now, this policy that's on Page 29

20     is not disaster specific.  Correct?

21             A.    That is correct.

22             Q.    It applies to all disasters.

1          A.     After the date, yes.

2          Q.     Where do we go to find a complete

3     list of the 9400 series policies for

4     Individual Assistance?

5          A.     The most complete set is located

6     on the NPSC website, Virginia NPSC website.

7     We also have several copies of listings.  I

8     don't know if it's electronically.  Over the

9     past year we are making sure that we are

10    consistent in building an electronic library

11    that will list all of the policies.

12         Q.     So this process that you described

13    earlier where PA policies were more formally

14    organized in the document that we viewed

15    earlier, is that same type of a process being

16    undertaken now as to IA?

17         A.     Electronically, yes.  We are

18    looking to make sure that we are consistently

19    applying all policies and that they will be

20    outward facing, in other words, on the

21    Internet.  We have them listed right now on

22    the Intranet and we are making a concerted

**1**      effort to make sure that these are outwardly

**2**      facing on the Internet.

**3**                  As I mentioned earlier, the Public

**4**      Assistance went through what they referred to

**5**      as a bottom-up review several years ago and

**6**      they reengineered it, and they also came out

**7**      with publications on policy digests which we

**8**      are not there yet in Individual Assistance.

**9**      We would like to undertake a publication that

**10**     lists all the policies such as what I was

**11**     seeing here earlier for Public Assistance, but

**12**     we have not completed that or we have not

**13**     engaged in that process yet.

**14**         Q.    Okay.  To be clear, what you

**15**     completed, when you said what you completed as

**16**     to Public Assistance, what you mean is the

**17**     document that begins on Page 5951.

**18**         A.    Yeah.  I'm not familiar with this

**19**     document.  I am familiar with the effort that

**20**     PA has undergone in terms of consolidating all

**21**     of their policies and putting them into a

**22**     policy digest.

1          Q.    And when you say outward-looking

2     Internet as opposed to inward-looking

3     Intranet, the distinction there is whether

4     it's available to the public.  Correct?

5          A.    That is correct.

6          Q.    So right now the FEMA IA policies

7     are not available to the public.

8          A.    As I say, there has been some work

9     within the past year in getting as many

10    policies on the Internet as possible.  I

11    haven't monitored how far along they are.  But

12    in 2008, I do not believe they were outwardly

13    facing or on the Internet.

14         Q.    So one form of an IA FEMA policy

15    that implements regulations is shown on Page

16    30.  Correct?

17         A.    That's correct.

18         Q.    And another form is shown on Page

19    29.  Correct?

20         A.    That is correct.

21         Q.    And another form is accompanied by

22    a memo like on Page 27.  Correct?

1           A.    Well, this is a memorandum and

2    it's making reference to an interim policy for

3    insurance and real property losses.  So this

4    is a memo that is simply referring to the

5    attached interim policy.

6           Q.    Okay.  And the attached interim

7    policy is on Page 26 and it's in the same form

8    as Page 29.  Right?

9           A.    That's correct.

10          Q.    I misspoke when I said 26.  I

11   meant 28.

12          A.    Okay.

13          Q.    Now we're looking at 5154.  And

14   part of that is blacked out at the top, but if

15   you look carefully you can see words up there

16   in the very top banner.  Again, I'm only

17   asking whether this is a third form of FEMA

18   policy besides the memorandum or the numbered

19   policy.

20          A.    I am not familiar with that

21   format, and I can't read what is on the top

22   banner.

1      Q.    Maybe Page 5157 is another

2   example.  And this is something that FEMA

3   filed in Court as Document 85-2, Page 5.

4      A.    If I could take a look at that,

5   because I believe this is a processing

6   guidance.  I believe what I'm looking at here

7   on Page 5157 is actually processing guidance

8   that has been developed based upon policy.  So

9   this is how the NPSC would process under this

10   particular heading of appeal processing

11   guidance, how they would process an appeal.

12   It is not something that it would have been

13   issued from Headquarters as policy.  It would

14   have been taken either from the regulations on

15   the appeal process, and this is how FEMA would

16   process such appeals.

17      Q.    Okay.  So that describes how

18   policy is taught and used and it does not set

19   policy.  Is that accurate?

20      A.    I believe it does not set policy

21   and what it does is it establishes how

22   processing would take place for requesting

1        estimates and receipts for appeal purposes.

2               Q.    And that's Document or Page 5157.

3        And this PowerPoint that includes Page 5045

4        that we discussed earlier, that's another

5        document in which policy is taught and it does

6        not set policy.

7               A.    It doesn't set policy.  What I am

8        looking at now on Page 5045 is the PowerPoint

9        on the training on how habitability and minor

10       repairs are viewed, which is either going to

11       be based upon the regulation or any clarifying

12       policy.

13              Q.    All right.  Let's read Pages 1081

14       and 1082.  Those are the same as the FEMA

15       Bates numbers.

16                    Just for clarity, Ms. Wells, Pages

17       1 through 4,291 are all the Bates-stamped

18       documents that FEMA produced.  And the page

19       numbers that I use for the deposition I'm

20       referring to are identical to those, 1 through

21       4,291.  So that if we talk about a page within

22       that range, it's the same Bates-stamped pages

1    FEMA has.

2         A.    Yes.

3         Q.    Have you had a chance to read

4    Pages 1081 and 1082?

5         A.    Yes, I have.

6         Q.    Does this indicate that in

7    addition to the numbered policies and in

8    addition to the memos that are like the one we

9    discussed on Page 29, that there are three

10   additional forms of FEMA policy that have to

11   be approved by Headquarters and that that

12   would be the inspection guidelines, the

13   disaster line items, and the habitability

14   policy?

15        A.    The line items and the Inspection

16   Services guidelines are typically not approved

17   by Headquarters.  They are reviewed by

18   Headquarters but typically not approved.  We

19   look for anything that is out of sync or out

20   of the ordinary that shouldn't belong in

21   guidelines.  They are guidelines to the

22   inspectors on how to conduct and how to look

1          at the various line items, and it's a

2          description of the line items that they are

3          going out and actually physically verifying

4          for damage.

5               Q.     But each of those documents that

6          you just discussed, there is a template for

7          each of those documents that's approved by

8          Headquarters.  Correct?

9               A.     I am not 100 percent sure about

10         that.  The reason why I say that is because we

11         produce the policies from Headquarters and

12         coordinate with the NPSCs on a regular basis.

13         And they have staff at the NPSC that we do the

14         coordination with.  I am familiar with the

15         line items and the descriptions of the line

16         items.  I am not familiar that they were

17         formally approved by Headquarters.

18              Q.     So your reading of Documents 1081

19         and 1082 does not require Headquarters

20         approval of the guidelines document?

21              A.     No.  If you turn to 1082, upon

22         full concurrence, it gives the description and

1    there are several bullets there.  And those

2    individuals reside at the NPSC.

3         Q.    And just so the record is clear,

4    when the witness says "NPSC," it will appear

5    as N-P-S-C for National Processing Services

6    Center.

7         A.    Correct.

8         Q.    So is it accurate to say that if

9    someone wants to know what the policies are

10   that are under the regulations, that you have

11   to look at all of the memoranda like Page 29,

12   you have to look at all of the numbered

13   policies that we've discussed, you have to

14   look at the IHP guidelines, you have to look

15   at the habitability document, and you have to

16   look at the line item descriptions.

17        A.    Not all of those are policy.  Some

18   of that is guidance and it's guidance based

19   upon policy.  So not all of those are formal

20   policy.

21        Q.    How do you distinguish guidance

22   and guidelines from what you call formal

1    policy?

2          A.    It would depend.  And I say that

3    because is it policy written from the

4    Headquarters level of which the NPSC would

5    then develop processing guidance based upon

6    that policy which, again, there is

7    coordination.  If Headquarters issues a policy

8    to the NPSC that would affect their

9    processing, it includes many different

10   individuals going through what effect it would

11   have on processing.  And then the NPSC would

12   develop guidelines to support the policy

13   decisions to make sure that it is processed in

14   accordance with the policy.  And those would

15   be guidelines established for processing at

16   the NPSC.

17          Similarly, it would also be the

18   same for Inspection Services.  Inspection

19   Services would write a process to support the

20   policies or the regulation in terms of getting

21   it accurate so that it does not create

22   something that is not supported by the policy

42

1      or regulation.

2          Q.    Would you agree that having all of

3      these different policies and guidelines and

4      training manuals creates a possibility of

5      inconsistencies among them?

6          A.    We work very, very hard to make

7      sure that there aren't any inconsistencies.

8      As I mentioned, we work consistently with the

9      NPSCs in terms of if we issue a policy, to

10     work with them in making sure that the

11     guidelines are accurately reflective of what

12     the policy is saying.  There are instances

13     where, we come across during a disaster, where

14     something isn't being processed correctly, of

15     which then we may have to modify the guidance

16     or even some cases policy of which we would

17     need to be reflective of an accurate direction

18     either from the 44 CFR or policy.

19         Q.    Do the policies change?

20         A.    When you say change, are you

21     talking about sweeping changes or clarifying?

22         Q.    For example, we talked about the

1    $50 limit on Page 29.

2            A.    Yes.

3            Q.    Does it ever change from $50?

4            A.    No, not for that particular

5    policy.  There may be a revision of that

6    policy of which a new policy would be issued

7    and the original policy be rescinded.  And I

8    believe that $50 one was actually for

9    processing.  It's not something that is --

10   it's issued to correct or set a limit for

11   processing.

12            If we could go back to that

13   document, I believe it even refers to it's for

14   processing purposes.

15           Q.    We are looking at Page 29.

16           A.    Page 29, yes.  And the purpose is

17   to establish a national policy concerning the

18   minimal awards to be provided under the

19   Individual Assistance programs.  And this is

20   to set a processing minimum, because a lot of

21   information that is entered into our system of

22   record, if we do not establish a business rule

1     to say that we would not pay for anything

2     under $50, we would be issuing a lot of

3     assistance below this minimal award, which

4     prior to this memo we were issuing a lot of

5     assistance, for instance, for very minor, you

6     know, elements that fell under $50.

7             So this here is actually the

8     policy that is establishing that minimum

9     threshold for assistance which affects

10    processing at the NPSC.

11        Q.   Is there any language on Page 29

12    that refers to processing only?

13        A.   No, it does not.

14        Q.   To your understanding, this rule

15    was applied in Disaster 1780?

16        A.   Yes, I believe it was.

17             MS. WELLS:  And I'd just like to

18    clarify that I'm not so sure that the witness

19    has testified that this is a rule.  I mean,

20    you know, it's a policy statement.  And that's

21    the way you've been referring to it previously

22    as well.

1          MR. WESEVICH:  And if I'm not

2     speaking loud enough, please let me know.

3     I'll be happy to speak up.

4               BY MR. WESEVICH:

5          Q.    I want to understand a little bit

6     about how this $50 policy works in practice.

7     If an inspector sees an item that is valued at

8     less than $50, are they told not to record it?

9          A.    No, they are not.  They are to

10    record all damages that they see.

11         Q.    And is the rule implemented as a

12    business rule in NEMIS?  N-E-M-I-S.

13         A.    NEMIS.  Yes.

14         Q.    Thank you.

15               MS. WELLS:  Can we just for

16    clarification identify up front what NEMIS

17    stands for?

18               THE WITNESS:  National Emergency

19    Management Information System.

20               BY MR. WESEVICH:

21         Q.    The way it works as a business

22    rule is all real property damages are recorded

1    by the inspector, but if the computer sees the

2    total damages in a house is under $50, it

3    denies assistance.  Correct?

4         A.    That is correct.  And it also

5    refers to habitability repairs.  All damages

6    are recorded as the inspector views them and

7    verifies that damage.  And then at the end of

8    reviewing all that damage, the inspector makes

9    a determination as to whether or not the house

10   is habitable.  So the $50 is to eliminate some

11   very minor payments that may or may not have

12   affected the habitability of the home.  And it

13   is a business rule that is established within

14   NEMIS.

15        Q.    You mentioned habitability.  In

16   this PowerPoint it says that habitability

17   means a house that's safe, sanitary and

18   functional.  Correct?

19        A.    That is correct, and that there is

20   no disaster-related hazards in determining

21   that habitability determination.

22        Q.    So if FEMA standards for safe,

1       sanitary and functional are not met by a

2       house, then it's not going to be habitable.

3       Correct?

4               A.      If it was disaster-related or

5       disaster-caused damages, it would not.  In

6       other words, the FEMA inspectors are to go out

7       and capture all damages and make a call as to

8       whether or not it was caused by the event.

9               Q.      So if a hurricane comes through

10      and it blows a rock into an electric outlet

11      cover and causes it to break on the outside of

12      the house, that's obviously going to create a

13      safety hazard.  Correct?

14              A.      I wouldn't know that for sure.

15              Q.      If you have an exposed electric

16      outlet?

17              A.      Was it covered or is it a simple

18      outlet that was on the outside of the house?

19              Q.      One of those outlets is on the

20      outside of the house and a hurricane blows a

21      rock into it and it cracks it and it costs

22      $3.00 to replace but it creates a safety

1    hazard.

2         A.    No.  It would not be eligible.

3    Because it's cracked, it may create a safety

4    hazard.  However, it's a $3.00 item, and it is

5    expected that the homeowner or the landlord

6    would be able to make that repair without

7    Federal assistance.

8         Q.    And that's an instance of where

9    this $50 policy would come into place, would

10   operate to deny benefits to somebody.

11   Correct?

12        A.    That is correct.

13        Q.    Now, the statute, the Stafford

14   Act, limits eligibility for assistance, for

15   repair assistance, to disaster-related

16   damages.  Correct?

17        A.    That is correct.

18        Q.    And that's all the regulations say

19   is, they just repeat this term, "disaster

20   related."  Correct?

21        A.    Yes.

22        Q.    FEMA regulations do not say what

1     FEMA considers to be disaster related.

2          A.    No, not in regulation.  I believe

3     there is some mention where it describes that

4     disaster related is damage that is a direct

5     result of the disaster.

6          Q.    But nowhere in the text or

7     regulations does it say that the disaster has

8     to be the main cause, the true cause, the

9     proximate cause, the first cause of the

10    damages.  Correct?

11         A.    I think by what it is stated that

12    it is disaster related is that it would

13    reflect what you had just indicated, that it

14    is the primary cause of that damage, the

15    disaster.

16         Q.    So FEMA's reading of the statute

17    or regulations is that the disaster must be

18    the primary cause of the damages.

19         A.    That the, yes, that the damages

20    were caused by the disaster, by the event

21    itself.  There are causes of damage that are

22    identified for each disaster declaration.

1    Whether it be wind-driven rain, hail, tornado,

2    hurricane, there are categories of causes of

3    damage of which the damage has to be reflected

4    by one of those causes of damage identified

5    for that disaster.

6            Q.    But FEMA's reading of the term

7    "disaster related" is that the disaster has to

8    be the main or the primary cause of the

9    damages.

10           A.    The disaster would have been

11   declared because of the damages associated

12   with that disaster and that it is beyond the

13   capability of recovery from the state and

14   locals.  So FEMA would only be going out there

15   looking at that disaster-related damage for

16   determining eligibility.  I don't know if I

17   answered that correctly, but it's sequential

18   the way that a disaster is declared and what

19   would be looked at for an inspector to be even

20   engaged to go out and look at damages.

21           Q.    I understand that in a disaster

22   declaration there are listed causes of damage.

1          A.     Yes.

2          Q.     But my question is when FEMA looks

3     at the term, quote, "disaster related" in

4     Section 408 of the Stafford Act, does it read

5     that term, "disaster related," to mean that

6     the disaster must be the main or the primary

7     cause of the damages?

8                MS. WELLS:  Objection; asked and

9     answered.

10               But you can answer it again.

11               THE WITNESS:  I would say yes,

12    because that disaster, that declaration has

13    identified the causes of damage and the

14    disaster of which the inspector goes out to

15    view has to have been caused by that disaster

16    based upon one of those causes of damage.

17               BY MR. WESEVICH:

18          Q.     And FEMA has policies for

19    determining which damages are disaster

20    related.

21          A.     They do not have -- they have line

22    items that are in the inspection process that

1    list out all sorts of components to a home.

2    The inspector then has to go out and determine

3    the damages to those components and determine

4    whether or not they were disaster-related

5    damages or not.

6         Q.    I am showing you Page 4584 where

7    FEMA writes that "FEMA does not publish its

8    standards for what is or is not disaster

9    related."  Do you see where it says that?

10             MS. WELLS:  Which paragraph is

11   that?

12             MR. WESEVICH:  In Paragraph 23 at

13   the very last clause, "FEMA does not publish

14   its standards for what is or is not disaster

15   related."

16             THE WITNESS:  Yes, I see that.

17             BY MR. WESEVICH:

18        Q.    What are FEMA's standards for

19   determining what is or is not disaster

20   related?

21        A.    It is done through the Inspection

22   Services, that based upon the causes of damage

1    they would go out and they would view the

2    damage and make a determination as to whether

3    or not it was caused by the event.  And that

4    is based upon the regulations that identifies

5    the elements of, components of a house that

6    could be determined eligible based upon the

7    damages received due to that event.

8            Q.    But the standards that are

9    referenced in Paragraph 23, are those the

10   inspection guidelines and the line items and

11   the habitability document that we discussed

12   earlier that are on Pages 1081 and 1082?

13           MS. WELLS:  I'm going to object to

14   this question because this is a document which

15   I believe is the answer --

16           MR. WESEVICH:  Yes, ma'am.

17           MS. WELLS:  -- of the Defendant to

18   Plaintiffs' Complaint and, therefore, it was

19   prepared by attorneys.  Without actually

20   seeing even the allegations that were in the

21   Complaint that this is responsive to, this

22   question and this line of questioning is out

                 FEDER REPORTING COMPANY
            (202) 863-0000    (800) 956-8996

1    of context, Number 1.  And, Number 2, you are

2    basically asking him his lay opinion of what

3    is in a legal document that was prepared by

4    attorneys.

5              And I don't really know -- he can

6    talk generally about the policy.  I'm not so

7    sure that he can talk about this particular

8    statement and vouch for it, because it's not

9    necessarily something that he can vouch for.

10             MR. WESEVICH:  Well, it's one of

11   the items that is listed in the Rule

12   30(b)(6)--

13             MS. WELLS:  It's not listed.

14             MR. WESEVICH:  It's all the

15   documents that were filed in the case.

16             MS. WELLS:  Well, all the

17   documents filed in the case, but as I'm

18   saying, I mean this is a particular question

19   that you are asking him about something that's

20   here.

21             MR. WESEVICH:  This was a document

22   that was filed in the case --

1          MS. WELLS:  And you can ask him

2     questions about it which would not be

3     objectionable.  I just think that the

4     particular question you asked and the way that

5     you are asking it here is objectionable.  You

6     can ask him generally about what the standards

7     are and whether they publish them.  But you

8     can't necessarily drop back to that.

9          MR. WESEVICH:  Well, that is my

10     whole question.

11          MS. WELLS:  Therefore, I think

12     that's a fair reflection of what he's been

13     asked to talk about.  He can talk about FEMA's

14     policies.  He can't vouch for this particular

15     document which is what you are asking him to

16     do.

17          MR. WESEVICH:  We have no

18     disagreement on this.  All my question is is

19     what are the standards that are referenced

20     there.

21          BY MR. WESEVICH:

22     Q.    What are the standards for what's

1    disaster related?

2         A.    It all gets started with the 44

3    CFR which identifies what could be eligible,

4    and it starts broadly.  The actual line items

5    of which we saw earlier on the screen that was

6    a description of the line items really breaks

7    down all the different components of the home.

8    It is up to the inspector to make a call as to

9    whether or not damages to that home or those

10   components of the home are disaster related.

11        Q.    When you mention the CFR, do you

12   mean 44 CFR Section 118(c) where it lists the

13   different parts of the home?  I can show you

14   the regulation if you'd like to see it.

15        A.    I would have to verify, but I do

16   know it is in the Code of Federal Regulations.

17        Q.    I am showing you --

18             MS. WELLS:  Do you mind if we go

19   off the record for a minute?

20             MR. WESEVICH:  Sure.

21             (Recessed from 10:38 to 10:42

22   a.m.)

1               BY MR. WESEVICH:

2          Q.    We're back on.  Mr. Carleton, if

3     you could look at the regulation that's

4     206.117(c), does that list the parts of the

5     home that you were referring to that would be

6     checked?

7          A.    Part C?  I don't know if I'm --

8     which one are we --

9          Q.    Yeah, (c)(2), 206.117(c)(2) under

10    "Repairs."

11               MS. WELLS:  Is it C?

12               MR. WESEVICH:  We can move on.

13               THE WITNESS:  This actually refers

14    to direct assistance.

15               MR. WESEVICH:  I've written down

16    the wrong number in my outline.  I'm sorry for

17    the confusion.  I'll come back to it.

18               BY MR. WESEVICH:

19          Q.    Is deferred maintenance one of the

20    ideas that FEMA uses to decide which damages

21    are disaster related?

22          A.    Deferred maintenance is a term

1      that's used to describe preexisting condition

2      of components or the overall home itself.  So

3      it's not necessarily a term that's used to

4      describe damages that are associated with the

5      disaster.

6              Q.    You gave a declaration in this

7      case.  Correct?

8              A.    Correct.

9              Q.    And I'll show you Page 4893 and

10     94.  And if you could look at the very last

11     sentence on Page 4893, it says, "One of the

12     factors that must naturally be considered when

13     determining what is disaster related is the

14     state of the home prior to the disaster and

15     the state of the home after the disaster."

16             A.    That is correct.

17             Q.    So this idea of deferred

18     maintenance is something that FEMA uses to

19     determine which damages are disaster related.

20             A.    It describes the condition of the

21     home.  It's something that deferred

22     maintenance is -- what FEMA inspectors are

1    supposed to do is go out and they verify what

2    is disaster-related damage.  But they also

3    have to look at the condition of the home, and

4    if there is preexisting damages or maintenance

5    that was not up-kept on the home or structure

6    or components of the home that the inspector

7    would identify that as either preexisting or

8    deferred maintenance.

9         Q.    Now, in Paragraphs 28 and 29 of

10   your declaration --

11        A.    Yes.

12        Q.    -- Paragraph 28 describes a bunch

13   of examples of deferred maintenance that were

14   just items that existed prior to the disaster,

15   pure preexisting condition.  Right?

16        A.    Yes.

17        Q.    So if somebody has a broken window

18   and then a disaster happens to come through

19   after the window was broken, they can't ask

20   FEMA to pay for that broken window.  Right?

21             MS. WELLS:  Object to the form of

22   the question.

1              You can answer it.

2              THE WITNESS:  Not unless damages

3     resulted because that window was broken.

4     However, in other words, FEMA wouldn't repair

5     the window because that was a preexisting

6     condition.  But due to the damages that

7     resulted inside of that window, they may be

8     able to be eligible for some of those

9     elements.  But the actual repair of the window

10    would not be eligible because it was a

11    preexisting condition.

12              BY MR. WESEVICH:

13         Q.    Because the window was broken

14    prior to the hurricane coming through.

15         A.    Correct.

16         Q.    And if somebody asked FEMA to pay

17    for a window that was broken prior to the

18    disaster, that's fraud.  Right?

19         A.    Well, it wouldn't be eligible for

20    assistance.  FEMA wouldn't pay it, so.

21         Q.    Well, you make every single

22    applicant sign a paper, the Form 9069.

1          A.     Yes.

2          Q.     Correct?

3          A.     Correct.

4          Q.     And that swears under criminal

5    penalties that the information that the

6    applicant has provided to FEMA is correct.

7    Correct?  Right?

8          A.     That is correct.

9          Q.     So if somebody is sitting there

10   claiming, "Hey, this window was broken by the

11   disaster" when they know it was broken prior

12   to the disaster, that's fraud.  Right?

13         A.     If we paid it out and they

14   falsified when that window was broken, it

15   could be considered fraud.

16         Q.     So when you have a deferred

17   maintenance situation that's a pure

18   preexisting condition, you are talking about

19   somebody who is trying to defraud the Agency.

20              MS. WELLS:  I am going to object

21   to the form of the question.  It's unclear

22   that -- you are equating deferred maintenance

1     with pure preexisting condition.  But I'm not

2     sure that that's an accurate reflection of

3     what Mr. Carleton, how he would define those

4     terms.

5                    BY MR. WESEVICH:

6          Q.    Well, we are going to get -- I

7     want to be very clear about how you use

8     "deferred maintenance."  And that's what we're

9     about here.

10                    One use that FEMA has for

11    "deferred maintenance" is when there was

12    something that preexisted the disaster and

13    they're asking for it to be paid for.

14         A.    Or not.  And I say that because if

15    an applicant recognizes that the window was

16    broken prior to the event and not seeking FEMA

17    to pay for it, then the inspector would also

18    be asking those type of clarifying questions

19    with the applicant.  If there is evidence that

20    that window was broken prior to the event such

21    as water damage on the inside that was

22    preexisting, the inspector would question the

1     applicant.

2          Q.    We're going to get to all that in

3     a lot of detail today.

4          A.    Okay.

5          Q.    But that's what I want.  I want to

6     be very clear about what this distinction is.

7     But one form of deferred maintenance that you

8     referred to in your declaration in Paragraph

9     28 are items that existed prior to the

10    disaster like the broken window prior to the

11    hurricane.  And if somebody asks you to pay

12    for something like that, they're trying to

13    defraud the Agency.  Right?

14              MS. WELLS:  I'm going to object to

15    the form of the question.

16              But you can go ahead.

17              THE WITNESS:  Are they not being

18    truthful in when that window was broken?

19    Absolutely.  Would we pay them based upon

20    their word of simply saying it broke during

21    the event?  No, we wouldn't.  That is

22    something that the inspector would be asking

1        more questions about.  And if there's evidence

2        that that window was broken prior to the event

3        based upon water stains, the deterioration of

4        that window and everything else, FEMA would

5        not pay it.  Therefore, the individual did not

6        commit fraud.

7                    BY MR. WESEVICH:

8            Q.    The document that's shown on Page

9        587, that's the document that all the

10       applicants sign where they say that they are

11       going to be truthful under pain of criminal

12       penalties.

13           A.    That is correct.

14           Q.    Now we're looking at Page 4466.

15       You actually put in giant print in every

16       manual that you send to people that if anybody

17       suspects anybody is lying about anything to

18       FEMA to try to get disaster assistance, then

19       they ought to report it.

20           A.    That is correct.

21           Q.    Okay.  In Paragraph 29 of your

22       declaration, you discuss another form of

                    FEDER REPORTING COMPANY
                 (202) 863-0000    (800) 956-8996

1    deferred maintenance which is when there are

2    damages that are caused by a disaster but that

3    could also be affected by deferred

4    maintenance, by some preexisting condition of

5    the home.

6              A.    Correct.

7              Q.    So --

8              A.    Correct.

9              Q.    So I want to spend a little time

10   talking about these kind of dual causation

11   situations.

12              Do you agree that damages to a

13   home can in some cases be a combination of

14   preexisting condition that is worsened by a

15   disaster?

16              A.    Yes.

17              Q.    And FEMA has to decide which

18   repairs to pay for in that situation pretty

19   regularly.  Right?

20              A.    That is correct.

21              Q.    And it is a lot more common to

22   have this dual causation scenario than it is

                   FEDER REPORTING COMPANY
              (202) 863-0000    (800) 956-8996

1     to have the situation where somebody is trying

2     to commit fraud on FEMA and ask them to pay

3     for a preexisting condition.  Right?

4                MS. WELLS:  I am going to object

5     to the form of the question.  You are

6     basically asking leading questions and

7     testifying for the witness.

8                BY MR. WESEVICH:

9          Q.    Please feel free to disagree with

10    my questions.  I'm trying to get through a lot

11    of material as quickly as possible, but please

12    feel free to ask me to clarify or disagree

13    with anything that I say.  I'm just trying to

14    give you my best understanding of it so we can

15    get through it.

16         A.    If you could clarify.

17         Q.    Okay.  You see the dual causation

18    problem all the time where FEMA has to make a

19    call between is this a result of the disaster

20    or is it the result of a preexisting condition

21    where you can't be certain, both of them could

22    have caused it, the damages.  Right?

1          A.    Yes.  However, you can typically

2     determine whether or not -- in other words, if

3     a disaster occurs and it damages the siding of

4     the house but the siding of the house -- it

5     may have put a hole or ripped off some siding,

6     you know, six square feet, ten square feet,

7     but the rest of the siding is crumbling, that,

8     yes, it could be determined that what was

9     caused by the event was the removal of that

10    six or ten square feet of siding, whereas, the

11    rest of the house may have been deferred

12    maintenance where there's a lot of dry rot or

13    rot or other holes.

14          But yes, that determination is

15    made by an inspector in the field who has to

16    make that determination as to what was

17    disaster related versus what was a preexisting

18    condition or a deferred maintenance condition.

19          Q.    But my only question at this point

20    is that scenario where an inspector has to go

21    out and discern what was caused by the

22    disaster and what was deferred maintenance,

1    that happens much more frequently than the

2    situation where an applicant is trying to

3    defraud the Agency and claim that something is

4    caused by the disaster when it wasn't.

5         A.    Yeah, I don't know if it's -- when

6    you say it happens more frequently, I don't

7    know that for sure.  Again, we rely a lot of

8    what the applicant is saying based upon the

9    experience of the inspector.  The inspector is

10   going to question the applicant and based upon

11   what the inspector is viewing, you know, is it

12   something that is taken to the point where the

13   applicant is adamant that the storm broke this

14   window and, yes, then it becomes a call on

15   behalf of the inspector to say, "No, it was

16   really broken before, because you can tell by

17   all of this damage that occurred not as a

18   result of this disaster."

19        So I don't know how frequently or

20   infrequently they're making that determination

21   between something that was preexisting or

22   something caused by the event.  The inspectors

1    are instructed to go out and capture all

2    damages as they see it and determine which is

3    disaster related and which is not if there is

4    any preexisting condition.

5         Q.   I'd like you to look at Page 104.

6    Please read that page.  Could you let me know

7    when you've had a chance to look at that?

8         A.   Yes.  Yes, I have completed.

9         Q.   This part right here where it says

10   "Deferred Maintenance," those three paragraphs

11   where it refers to deferred maintenance,

12   that's the standard that FEMA uses to decide

13   which damages are preexisting conditions and

14   which were disaster related.  Correct?

15        A.   This is describing some of the

16   instances of which deferred maintenance would

17   be applied, yes.

18        Q.   These three paragraphs under

19   "Deferred Maintenance" on Page 104, that's how

20   FEMA decides what damages are preexisting

21   conditions and which ones are disaster

22   related.  Is that correct?

1           A.    No.  No.  There is preexisting

2     condition, the preexisting condition which

3     could refer to deferred maintenance.  Deferred

4     maintenance is more accurate when it describes

5     the examples within these paragraphs where it

6     refers to rotting boards, roofs with missing

7     and/or crumbling shingles, and foundations

8     with pre-disaster cracks which allow

9     unwarranted.  It also can apply to many

10    different elements of the home which aren't

11    necessarily captured here.

12          Q.    By this language, if an inspector

13    has a question about whether something is

14    preexisting damage or whether it was caused by

15    the disaster, then this says that the default

16    is that it's called preexisting condition.

17    Correct?

18          A.    It says that it would be called

19    deferred maintenance.  Other elements that

20    aren't mentioned in here, other examples of

21    deferred maintenance could be bricks that have

22    outlasted its lifetime which are crumbling,

1    windows with sills that are rotted or panes

2    that are separated due to the caulking.  I

3    mean this is not an inclusive list of

4    everything that is considered deferred

5    maintenance.  The inspectors that go out

6    typically have a background in construction.

7           Deferred maintenance is a

8    typically used description when elements have

9    not been up-kept to a standard of which they

10   will still function for their intended

11   purpose.  So this is not inclusive of

12   everything that could be considered deferred

13   maintenance.

14        Q.    I understood you could have just

15   testified that examples are useful in defining

16   what FEMA means by "deferred maintenance."  Is

17   that accurate?

18        A.    That is accurate.

19        Q.    And I also understood you to

20   testify that the inspector's background in

21   construction is helpful in allowing the

22   inspector to distinguish between what's a

1    preexisting condition and what's caused by the

2    disaster.

3              A.    Yes, that is helpful.

4              Q.    And this language that is in these

5    first three paragraphs under "Deferred

6    Maintenance," under the heading "Deferred

7    Maintenance."  On Page 104, those three

8    paragraphs were applied in decisions that were

9    made for Disaster 1780.  Correct?

10             A.    The concept of deferred

11   maintenance as it's described here were

12   applied, to the best of my knowledge.  What

13   we're looking at is the inspection manual for

14   the FEMA inspectors.  And this gives the

15   examples and gives some reference to what

16   deferred maintenance is.

17                   And basically what it is saying

18   here is that it is real property that has been

19   neglected to the extent that it will no longer

20   adequately perform its intended function.  So

21   this is the overarching reference to where or

22   intent of what deferred maintenance is, but it

1    is not fully descriptive on everything that

2    could be identified as deferred maintenance.

3         Q.    But this text right here, it

4    appears in a document that was published by

5    PaRR, P-a-r-r.  And I'm looking at Page 98

6    now.  The deferred maintenance language we've

7    been discussing on Page 104 appears in a

8    document that was published by PaRR.  Correct?

9         A.    Correct.

10        Q.    But that language, the three

11   paragraphs under "Deferred Maintenance," every

12   single word of that language was written by

13   FEMA.  Correct?

14        A.    I don't know that for sure.

15        Q.    Now we're looking at Page 5382.

16             MS. WELLS:  Can you please

17   identify where this document comes from?

18             MR. WESEVICH:  This was provided

19   to you as Exhibit A of the written discovery

20   that we gave to you in November of 2011.

21             BY MR. WESEVICH:

22        Q.    I'm looking now at Page 5391.  And

1      this is a document that is the inspection

2      guidelines template that FEMA published, I

3      guess, in May the 8th back in 2003.  And would

4      you agree with me that on Page 5391 it shows

5      the identical language that appears in Page

6      104?

7             A.    It would appear that it's the

8      same.

9             Q.    Yes.  And when you say it's the

10     same, you mean that the language that FEMA

11     wrote on Page 5391 under the heading "Areas of

12     Deferred Maintenance" is identical to the

13     language for "deferred maintenance" that

14     appears on Page 104.

15            A.    Yes, I would assume that FEMA

16     provided this document.

17            Q.    Under the third paragraph under

18     the heading "Areas of Deferred Maintenance" on

19     Page 5391, when FEMA writes that "Disaster

20     damages to these items must be significant,

21     obvious and without question," doesn't that

22     mean that if the inspector has any doubt about

1    whether something is a preexisting condition

2    or whether the damages were caused by the

3    disaster, that they are to call the item

4    deferred maintenance?

5              MS. WELLS:  Objection to the form

6    of the question.

7              THE WITNESS:  Let me read it more

8    carefully here.

9              BY MR. WESEVICH:

10        Q.    Ms. Wells is making a record for

11    the judge to consider.  And the judge will

12    consider any of those objections later, but we

13    will just proceed.

14        A.    Okay, okay.  What that paragraph

15    is actually indicating is it's trying to

16    describe in situations where there is deferred

17    maintenance that the line item or the area

18    that's being inspected was significantly

19    worsened by the event.  And that means that it

20    must be significant, obvious and without

21    question.

22        Q.    So we're going -- were you

1    finished answering?  I don't want to interrupt

2    you.

3         A.    Yes.

4         Q.    We're going to talk about

5    "significantly worsened," but right now I want

6    to focus on this term "without question."

7    Doesn't that term on Page 5391 mean that if

8    there's any doubt, any question about whether

9    something is a preexisting condition or

10   whether it was, the damage was caused by the

11   disaster, that the default is call it deferred

12   maintenance and don't pay?

13        A.    No.  It's still left up to the

14   judgment of the inspector.  So yes, in the

15   inspector's mind and in what he is reviewing,

16   he or she is seeing, that it's obvious that to

17   that inspector that it was caused by the

18   disaster.  So I can't say for sure that what

19   it means in every instance is that it's a

20   default to deferred maintenance.  I've always

21   known inspectors to err on the side of

22   applicants.  So I mean it's a judgment call by

1    the inspector as the inspector is reviewing

2    that damage.

3           Q.    But that's not what that language

4    says.  Right?

5           A.    It's interpretive.  It's basically

6    leaving it up to the inspector in the field to

7    make that call.

8           Q.    Where does it say that?  What text

9    are you referring to when you so testify?

10          A.    I am not referring to text.  What

11   I'm referring to is I may view something one

12   way.  You may view something differently while

13   we're viewing the same thing.  And so it's a

14   call that, you know, without question.  I mean

15   the inspector may have a question whether or

16   not it was caused by the event or not.  So

17   it's -- I mean I can't say it's 100 percent of

18   the time going to be yes or no.  It's a

19   judgment call by the inspector based upon what

20   he or she is viewing at the time.

21          Q.    And how do you reconcile what you

22   just described in your testimony about the

1    question of deferred maintenance being a

2    judgment call with the text that appears on

3    Page 5391?

4         A.    The inspector has experience in

5    construction and has experience in doing

6    inspections.  Each inspector is going to

7    capture the damage.  But with each damage that

8    they capture they're making a judgment call on

9    every instance.

10            So we rely upon the experience and

11   expertise of the inspector to capture the

12   damages as they see it at the time of the

13   inspection.  So I can't -- you know, it's

14   second nature to the inspectors who have been

15   trained to go out and look at damage.  I mean

16   it's not something you can actually put down

17   in writing.  It's subjective and it's a call

18   that we rely upon the inspector to make in the

19   field.

20        Q.    You produced about 4300 pages of

21   documents in this case.

22        A.    Mmm-hmm.

1          Q.    Do any of them indicate that the

2     inspectors are told that "Whether something is

3     a preexisting condition or whether it is

4     caused by the disaster, that is a judgment

5     call that's up to you"?

6          A.    I wouldn't know.  I have not seen

7     all the documents.  However, I would say that

8     we rely upon the expertise of the inspectors

9     to be the eyes and ears of FEMA to verify and

10    validate that damage.  If the inspector made a

11    wrong call, the applicant has a right to

12    appeal FEMA's decision based upon the

13    information that was gathered.

14         Q.    We're going to get to all the

15    appeals.  But what I want to know is whether

16    you are able to point to any document that

17    shows in writing that the inspector was told

18    that "Whether something is deferred

19    maintenance is a judgment call that's up to

20    you."

21         A.    The materials that I have seen, I

22    couldn't point to it.  But I haven't seen the

1      4300 pages as you're referring to as to what's

2      been submitted.

3           Q.    That requires me to get into what

4      you did to prepare for this deposition.  I

5      need to understand that.

6           A.    Could you clarify?

7           Q.    Please tell me everything you did

8      to prepare for this deposition.

9           A.    I read through some of the

10     documentation, my testimony along with all of

11     my exhibits.  And I've read through, cursory

12     review of some of the other documents, but not

13     the full range of all documents.  I am

14     prepared based upon what I have submitted and

15     my experience with FEMA in answering any

16     questions you have.

17          Q.    Well, but because you're not

18     apparently able to answer this question about

19     whether a document exists telling inspectors

20     that it's a judgment call up to them about

21     whether something's a preexisting condition or

22     disaster related, as I understand your

1      testimony is you don't know whether FEMA has a

2      document like that.

3           A.    Correct.

4           Q.    And so what I need to know is what

5      you've done to find out.

6           A.    I haven't done anything to find

7      that out.  I have worked as an inspector back

8      in 1992, of which I was instructed at the time

9      that "We rely upon you to make your best call

10     and make those determinations for

11     disaster-related damages."

12                I've also worked with the NPSCs

13     for years and years in addressing some of the

14     concerns that have come up.  I do not oversee

15     the Inspection Services contract and I do not

16     produce the documents through Inspection

17     Services on what they say or don't say to the

18     inspectors.

19          Q.    Having worked as an inspector, you

20     can testify from personal experience then that

21     it's not always easy to tell whether something

22     was a preexisting condition or whether

1    something was caused by the disaster.

2         A.    I must also preface my response by

3    saying I was an inspector when nothing was

4    automated -- it was all manual and it was in

5    1992 -- of which I was expected to go out and

6    view damage and make a call as to what was

7    disaster related or not disaster related.

8         Q.    And you would agree that it's a

9    judgment call as to whether a damage is

10   preexisting or disaster related.

11        A.    Yes.  But at that time the

12   instruction was also to look at only

13   disaster-related damage.  So we did not

14   necessarily capture issues related to

15   preexisting damage or deferred maintenance.

16        Q.    Okay.  But would you agree that

17   it's a judgment call often; you can't be sure

18   often whether something is a preexisting

19   condition or not?

20        A.    That is correct.

21        Q.    And sometimes it takes some real

22   detective work by the inspector to really be

1      able to tell whether something is a

2      preexisting condition or --

3              A.    A lot of times it's pretty

4      obvious.  And I say obvious to the extent that

5      if you go into a basement and it's musty and

6      you can see evidence of mold and everything

7      else, you can pretty much determine whether or

8      not it's new or if it's that's been around for

9      a very long time.

10              You can also look at a roof, for

11      instance, and if the shingles have buckled,

12      cracked, shrunken, curled, chances are that

13      roof has lived its lifespan, and it has not

14      been replaced or repaired over time.  So it's

15      something that the inspector is to look at and

16      determine whether or not it was preexisting,

17      deferred maintenance or actually caused by the

18      disaster.

19              So when you say it takes a lot of

20      investigatory work, it may and it may not.  It

21      depends on the situation.  And I say depends

22      on the situation as to how obvious it is.

1              Q.    Disaster 1780, the one that we are

2      talking about, most of the questions of

3      deferred maintenance and most of the judgment

4      that had to occur involved roofs.  Correct?

5              A.    To my knowledge, yes.

6              Q.    Let's talk about roofs.  Inspector

7      goes to see a house and sees two shingles

8      missing.  How do you tell whether that's

9      deferred maintenance or whether it's -- I mean

10     preexisting condition or disaster caused?

11             A.    If it's only two shingles missing,

12     chances are it would be not considered

13     sufficient damage unless there was damage

14     beyond, damage caused by those shingles

15     missing.  If there is damage that is on the

16     inside of the house and the ceiling or on the

17     wall that would indicate that those shingles

18     had been missing for a while and had not been

19     properly flashed, then it could be determined

20     that those shingles were missing prior to the

21     event and that there was no additional damage

22     caused by the event.  And so that is a call

1      that the inspector would need to make.

2                  So by having two shingles blown

3      off the roof or missing from the roof, there

4      would be other evidence to look at to

5      determine whether or not it was something that

6      was preexisting or as a result of the

7      disaster.

8            Q.    What I want to understand is all

9      the evidence that you would look at.  You're

10     an inspector, you go to the house, two

11     shingles missing.  Tell me all the evidence

12     you'd look for.

13           A.    I couldn't tell you what every

14     inspector would do.  I know that an inspector

15     would go out and if the applicant indicates

16     that they had roof shingles blown off, the

17     inspector would look inside for any water

18     damage that may have occurred or anything.

19     They would also ask, "Well, has the roof been

20     replaced?"  They would ask a series of

21     questions.  They would go into the house.

22           Q.    So one of the things that they

1    would do would be ask the applicant.

2         A.    Yeah, that is something that is

3    typically -- every inspector does things

4    possibly differently.  But chances are if

5    there's questions, they'll have to ask.

6    That's part of their investigatory process.

7    They would be asking questions.  They would

8    also look for the evidence to support whatever

9    damages that may have occurred.  And that

10   could be looking inside the house, looking at

11   the exterior walls, looking at the ceilings,

12   looking at the condition of, you know, fascia

13   boards, you know, rake boards and all that.

14         So they would have to have a

15   better understanding as to, you know, whether

16   or not those shingles were missing before the

17   event.  They would look for new evidence of

18   damage as a result of the event.

19         Q.    Well, first I want a catalog of

20   what an inspector could look for to find out

21   whether the disaster caused those shingles to

22   come off or whether it was a preexisting

1    condition.  And I understand you to say they

2    look at the inside of the house underneath

3    where those shingles appeared and they would

4    ask the applicant.

5          A.    They would look at any vicinity

6    that those shingles are missing, and they

7    would look to see if there is any evidence of

8    new damage as a result of the applicant

9    indicating that "Those shingles are now

10   missing from my roof."

11         Q.    What new damage?  Now, I

12   understand you to be talking about right next

13   to those two shingles that were off.

14         A.    No, no.  I mean if the shingles

15   are on the roof and the shingles are now

16   missing, they would look to see if other

17   damages resulted from those shingles being

18   missing.  They would go in the house.  If they

19   see that there is a water stain or water

20   damage to the ceiling that is not browned,

21   buckled or anything else that would indicate

22   that it may have been there prior to the

1       event, then he could look at that and indicate

2       that the damages to the roof may have been

3       caused by the event.

4                   Again, if there's evidence that

5       the shingles were missing, goes in the house,

6       there's no new evidence of damage but sees

7       brown stains or water stains or buckled

8       ceiling, then the inspector could make a

9       determination that it was a preexisting

10      condition.

11          Q.    We just have a lot of ground to

12      cover and I want to go quickly, but I need to

13      get a complete catalog.

14                  I hear you saying that if you want

15      to know whether the two shingles were blown

16      off by the disaster, you go inside the house

17      to look at the condition underneath the roof

18      and you talk to the applicant.  Is there

19      anything else besides those two that the

20      inspector would do?

21          A.    Possibly.

22          Q.    What?

1          A.     If they can view the damage from

2     outside.  I mean it depends on the situation.

3     Are we talking about a one-story home that you

4     can step back and look at the roof and make a

5     determination --

6          Q.     Sure.

7          A.     -- or is it a two-story house that

8     you can't get up on the roof?

9          Q.     Let's talk about one story.

10         A.     Well, again, it's up to the

11    inspector.  The inspector is out there to

12    catalog the damage and to look at the damage

13    and make a validation as to whether or not it

14    was caused by the event.

15         Q.     I'm asking you how a very common

16    sighting by inspectors during Disaster 1780

17    could have been addressed.  And as a former

18    inspector, I want to know all the things that

19    you do to make that decision.

20         A.     I can tell you what I would do.  I

21    cannot tell you what other inspectors would

22    do.

1          Q.    Fine.

2          A.    I would try to physically view

3     that damage to the roof.

4          Q.    Okay.

5          A.    I would be talking to the

6     applicant to find out more about the damages

7     associated to that roof.

8          Q.    Okay.

9          A.    I would look to see if it's,

10    depending upon the location of where those

11    shingles are missing, if there's evidence of

12    new damage either on the exterior of the

13    house, the interior of the house, if it's a

14    single story home, is it on the corner where

15    it could run down, possibly see some damage in

16    the basement.  Water is a funny thing where it

17    can travel.

18               And so myself, with my knowledge

19    of construction, I would look to try to

20    determine whether or not that damage was a

21    result of that event.

22          Q.    Well, let's take these one by one,

1       inside the roof, outside on the roof and

2       talking to the applicants.

3                    First, let's talk about the

4       applicants.  In all the documents that you

5       produced, you have lots of training materials

6       for the inspectors.  Right?

7            A.    Yes.

8            Q.    And none of those documents

9       anywhere ever even once suggest that the

10      inspectors ask the applicant whether damage

11      was preexisting or whether it was caused by

12      the disaster.

13                   MS. WELLS:  I'm going to object to

14      the form of the question.

15                   THE WITNESS:  And I would say that

16      it's up to the inspector.  I mean the

17      inspector is out there trying to capture the

18      cause of damage, how it was damaged and the

19      amount of damage.

20                   BY MR. WESEVICH:

21           Q.    Right.

22           A.    It would be in the best interests

                    FEDER REPORTING COMPANY
                 (202) 863-0000    (800) 956-8996

1    of the inspector to question the applicant.

2            Q.    And FEMA has very detailed

3    questions that the inspectors are directed to

4    ask the applicants about ownership of the

5    home.  Correct?

6            A.    There are questions that they have

7    to verify from the applicant.

8            Q.    And there are specific documents

9    that they're supposed to verify from the

10   applicant about exactly who owns that

11   property.

12           A.    Correct.

13           Q.    But there's nothing in any of the

14   documents that says to the inspectors "When

15   you're making this judgment about whether

16   something was a preexisting condition or

17   whether it was caused by the disaster, ask the

18   applicant's view."

19           A.    No.  It has to be obvious and

20   based upon the deferred maintenance what it

21   is.  It's a judgment call.  If you had to lay

22   out every conceivable question that the

1      inspector has to ask as a mandatory question,

2      it would be impossible to do.  So we rely upon

3      the inspectors and their experience and their

4      training to be able to go out, meet with the

5      applicant.  They are required to gather

6      certain data and verify certain data, but they

7      also have to conduct an inspection.

8                   We don't necessarily come up with

9      every conceivable question that that inspector

10     needs to ask and validate to that applicant.

11     It would be an oversome burden to the

12     applicant if we listed out thousands of

13     questions.

14          Q.    But not only does FEMA not come up

15     with every conceivable question, as you just

16     stated, they actually don't even suggest

17     anywhere in the documents that you produced,

18     in the training documents or any other

19     document, that inspectors should get the

20     applicant's claim recorded as to preexisting

21     condition.

22                   MS. WELLS:  Object to the form of

1    the question.

2              THE WITNESS:  In writing, no.  In

3    writing, no.  But --

4              BY MR. WESEVICH:

5         Q.    And FEMA records exactly what

6    documents were checked to verify ownership of

7    the residence for each applicant.  Correct?

8         A.    Yes, that is correct.

9         Q.    But FEMA doesn't record anything

10   in ACE 3 -- that's A-C-E 3 -- or NEMIS about

11   the applicant's claim as to preexisting

12   damage.

13        A.    In comments.  If the inspector or

14   the applicant insists on something, that the

15   inspector has an ability to enter those into

16   comments.  Within the ACE pen tablet in the

17   software, there's an ability for the inspector

18   to capture what the applicant is stating, but

19   it's not something that FEMA requires the

20   inspector to do.

21        Q.    And at one time FEMA did require

22   comments on deferred maintenance.

1          A.     That is correct.

2          Q.     And it stopped requiring those

3     comments.

4          A.     It stopped requiring the comments

5     with the exception of anything that they want

6     to say about deferred maintenance, because

7     they now have a box in the ACE palm pad or in

8     the ACE software that refers to deferred

9     maintenance.  The reason being is because each

10    inspector would put comments on deferred

11    maintenance within their comments, and if an

12    applicant called up to ask questions about

13    their inspection, the caseworker would have to

14    sift through all of the comments to look at

15    whether or not there was that particular item

16    that the applicant was requesting information

17    on was addressed.  So they have now identified

18    it as an easier to indicate up front whether

19    or not there was deferred maintenance by

20    category of damage.

21         Q.     But there's no comments that are

22    any longer required about the basis for the

1        inspector's judgment as to deferred

2        maintenance?

3                MS. WELLS:  I'm going to object to

4        the form of the question.  You're assuming he

5        said that before there was, and that's not his

6        testimony.  You're saying there's no longer a

7        requirement that they include comments about

8        why they determine something was deferred

9        maintenance or not, and I'm not sure he

10       testified that there ever was such a

11       requirement.  He's more talking about where on

12       the form they indicated their assessment of

13       deferred maintenance.

14               BY MR. WESEVICH:

15       Q.    Maybe we can do this the short

16       way.  There used to be a requirement that

17       there was comments describing the basis for

18       deferred maintenance.  Right?

19       A.    Yes.  If the inspector viewed

20       deferred maintenance or preexisting

21       conditions, they were to place it in comments.

22       Q.    And their explanation as to why.

1       Right?

2              A.      When you say why, why they placed

3       them in comments?

4              Q.      How they made this judgment.  You

5       know, did they go out to the roof and see some

6       damage on the outside of the roof?  They used

7       to be required to give their basis for saying

8       that something was a preexisting condition as

9       opposed to being caused by the disaster.

10             A.      Yes.  And the reason being is that

11      an inspector is to go out and view all damages

12      to the house.  They are to make a

13      determination as to whether or not damages

14      were disaster related or not.  What that did

15      was that gave a complete picture of all

16      damages, whether it was deferred maintenance,

17      preexisting or caused by the disaster.

18                     So that if an applicant called up

19      and questioned that "They didn't address my

20      basement," then the caseworker could go into

21      the case file and say, "Yes, the inspector did

22      and said that it was a preexisting condition."

1    What that did was it allowed FEMA to process

2    all damages under the initial inspection as

3    opposed to having to send out another

4    inspector to verify what the applicant might

5    not be stating that wasn't captured on the

6    first inspection.

7         Q.    But the prior manner of recording

8    deferred maintenance placed in FEMA -- in

9    NEMIS, excuse me -- comments that described

10   the basis for a deferred maintenance decision.

11   Correct?

12        MS. WELLS:  I'm going to object to

13   the form of the question.  It's unclear what

14   you mean by basis for a deferred maintenance

15   decision.  And there's a lot of problems.

16   What's the decision?  I mean are you saying

17   that the inspectors are making a decision?

18   Are you saying that they're -- I mean it's

19   just unclear from your question what you are

20   asking.

21        BY MR. WESEVICH:

22        Q.    Inspectors do make a decision

1    about what is deferred maintenance and what is

2    not.  Right?

3         A.    They make a judgment call.

4         Q.    And it is a judgment call.

5         A.    It is a judgment call.

6         Q.    It's pretty hard to be certain

7    about whether it is or not.  Right?

8         A.    It's hard to make a 100 percent

9    call.  It is based upon the experience of the

10   inspector and what he or she is viewing at the

11   time.

12        Q.    But they don't write down in NEMIS

13   or in the ACE pen tablets the reason they made

14   that decision.  Right?

15        A.    No.

16        Q.    And they used to do that but they

17   don't anymore.

18        A.    I don't know if they would record

19   the reason for it.  I think what they would do

20   is say, you know, "Roof, deferred

21   maintenance."  I don't know if they would give

22   any more descriptor of what is currently in

1    the ACE software.

2         Q.    So as I understand your testimony,

3    all that was recorded in the comments in the

4    past was the areas of deferred maintenance,

5    what is now a separate screen, that was

6    changed from the comment to now being a

7    separate screen in ACE.

8         A.    I wouldn't say all.  I mean some

9    -- and the reason why I say that is because

10   right now on ACE there are categories of

11   components that could be marked as deferred

12   maintenance.  I've read comments of inspectors

13   where they might write a paragraph explaining,

14   you know, where water may have come in, where

15   water was preexisting.  It was elaborate, but

16   it would be, you know, a call of, you know,

17   "foundation, deferred maintenance."

18             So it does not capture all

19   comments.  However, the inspector can still

20   put deferred maintenance comments for

21   clarification in the comments field of the ACE

22   software.

1          Q.    But FEMA does not require them to

2     do so.

3          A.    FEMA does not require them to do

4     so, correct.

5          Q.    Now we're looking at Page 4993.

6     And if you'd look at Page 8.

7          A.    Yes.

8          Q.    Under Q & A, Number 20.

9          A.    Yes.

10         Q.    It says that they were required in

11    the past to explain their basis for their

12    deferred maintenance judgment.

13         A.    I don't know what you mean by

14    basis.  I mean there is an area in the palm

15    pad where you could put comments.  Comments

16    could come back that the roof equals deferred

17    maintenance.  There could be a lot more

18    further explanation that if they could not, if

19    they had to do more investigation to determine

20    whether or not it was a preexisting condition,

21    they may put more explanation in there.  But

22    it's not a basis.  It's a clarification.  It's

**1**     a summary of what they are describing for

**2**     deferred maintenance.

**3**          Q.   Okay.  As I understand what you

**4**     are trying to say -- and please correct me if

**5**     I'm wrong -- is that the word "details" in the

**6**     very first line in the answer to Question 20

**7**     on Page 4993, by that word "details," it could

**8**     mean simply the area of deferred maintenance

**9**     or it could mean the basis but it doesn't say

**10**    which.

**11**          MS. WELLS:  I'm going to object to

**12**    the form of the question.

**13**          THE WITNESS:  Again, with -- yes.

**14**    It could mean either one in the sense that if

**15**    the entire roof -- you know, it might be

**16**    "entire roof equals deferred maintenance."  I

**17**    don't know if that requires any more detail.

**18**    But if there's sections of the roof that are

**19**    deferred maintenance, I would have to explain

**20**    that, you know, 50 square feet of roofing

**21**    deferred maintenance, that would be more of a

**22**    detail to clarify what I am stating as

1    deferred maintenance.

2              And the inspector still has that

3    ability to clarify in comments, even though

4    now we have a separate box that will generally

5    characterize areas of deferred maintenance.

6    So it's different now, but the information

7    isn't necessarily different.  It's up to the

8    inspector to make it perfectly clear what they

9    are trying to state as deferred maintenance.

10   So it may take explanation.  It may not take

11   explanation.

12             BY MR. WESEVICH:

13        Q.   Now, you say one of the other ways

14   -- let's go back to this two shingles off the

15   roof example that we've been discussing.  You

16   say one of the ways you can tell whether it

17   was preexisting is whether there is damage to

18   the inside underneath those two shingles.

19   Correct?

20        A.   Yes, if there was water

21   infiltration coming in through that area.

22        Q.   Well, if a hurricane blew through,

                FEDER REPORTING COMPANY
             (202) 863-0000    (800) 956-8996

1      usually they have rain associated.  Right?

2              A.    Yes.

3              Q.    And so that rain would have

4      ordinarily wet the area under the two shingles

5      somehow.  Right?

6              A.    If it was wind-driven rain, it

7      could very easily, yes, as it could under

8      other shingles if the wind is blowing and the

9      rain is driving and it could penetrate other

10     areas of the shingles that aren't blown off.

11             Q.    So help me understand how it is

12     that the inside condition tells you anything

13     about the preexisting state of the shingles on

14     the roof.  What is it going to tell you that

15     allows you to tell whether it was preexisting?

16             A.    The condition, if there is water

17     stains on the ceiling.

18             Q.    But couldn't those have been

19     caused by the disaster if there's water

20     stains?

21             A.    It could have.

22             Q.    How do you know which one?

1          A.    But we get our inspectors out

2     there very quickly.  Chances are you'll be

3     able to make that difference.  I mean --

4          Q.    How is what I need to understand.

5          A.    Sheetrock does not dry out all

6     that quickly.  And is it pungy?  Is it

7     something that's new?  Does it have brown

8     stains that indicate that it's been there for

9     a while?  It's a judgment call by the

10     inspector.  Now, if there's evidence that

11     there are concentric rings which means that,

12     yeah, depending upon the different rains, you

13     may have different areas of leakage, that's

14     something that the inspector will have to make

15     that call on.

16                If there's new damage where it's

17     still wet, it's still pungy, it's still

18     dripping, that would indicate that there is

19     new damage but the damage inside -- in other

20     words, the deferred maintenance or the

21     shingles off the roof that were preexisting

22     may have worsened the damage inside.  And so

1    we're going to take care of the damage inside

2    that home.

3           Q.    So what you are saying is that

4    even if the roof was a deferred maintenance

5    roof, as you say, that if the hurricane blew

6    through and it caused additional damage to the

7    inside, then FEMA will pay for the damage

8    inside.

9           A.    It has to be made worsened by the

10   event, yes.  And it's a call by the inspector

11   as to whether or not it was worsened by the

12   event.

13          Q.    Well, it has to be significantly

14   worsened by the event --

15          A.    Yes.

16          Q.    -- for FEMA to pay for it.  Right?

17          A.    Yes.

18          Q.    Worsened is not enough.  The

19   standard says significantly worsened.

20          A.    Significantly worsened.

21          Q.    Is that correct?

22          A.    Yes.  That is what is written,

1     yes.

2              Q.    This is that same PowerPoint that

3     we began discussing earlier today.  I guess it

4     begins at Page 5004.  And right now we're

5     looking at Page 5108.

6              A.    Yes.

7              Q.    Now we're looking at Page 5109.

8              A.    Yes.  Yes.

9              Q.    This says the opposite of what you

10    just stated, what you just testified.  Right?

11             A.    No.  It's stating exactly what I

12    testified.  If we go back one page --

13             Q.    Okay.  We're looking at 5108?

14             A.    Yes.  What we are saying here is

15    that it's an old roof.  Wind-driven rain

16    caused leaks or leaked into the house and

17    damage, but the ceiling shows signs of older

18    water damage as well.  The house sustained no

19    other damage.  So the call here would be that

20    it's not a habitability issue and that there

21    were signs of no other damage.  So it's a

22    call.

1          If we go to now the next page,

2    "The inspector judged that the preexisting

3    damage to the roof was not worsened by the

4    storm and, therefore, the ceiling damage was a

5    direct result of deferred maintenance."  So it

6    was deferred maintenance, and that's what I

7    was describing earlier.  If there's evidence

8    that there was existing condition, water spots

9    and everything else, and it was not made worse

10   by the event, then there would not be -- and

11   it does not create a habitability issue, then

12   they would not be assisted for the repair of

13   that.

14        Q.    But this is talking about, this

15   whole hypothetical that we're talking about --

16   let's first take habitability off the table.

17   That's not what this PowerPoint is describing.

18   It's describing how a deferred maintenance

19   call is made.  Right?

20             MS. WELLS:  I'm going to object to

21   the form of the question.

22             BY MR. WESEVICH:

                FEDER REPORTING COMPANY
             (202) 863-0000    (800) 956-8996

1          Q.     This doesn't say anything about

2     habitability anywhere.  Right?

3          A.     FEMA provides assistance due to

4     the habitability condition of the home.  So

5     the whole premise of doing an inspection is to

6     determine the habitability of the home by

7     capturing the damage sustained by the event.

8          Q.     Doesn't this say that the ceiling,

9     doesn't it say on 5108 that the ceiling was

10    damaged by the disaster?

11         A.     But it was not made worsened.

12         Q.     Where does it say that?

13         A.     On the next page.  "Preexisting

14    roof damage was not worsened by the storm."

15         Q.     The roof was not.

16         A.     Right.

17         Q.     But the ceiling was.  It says here

18    on 5108, it says the ceiling was damaged by

19    the storm.

20         A.     But to what degree?  Was it simply

21    just, you know, filling in where the old

22    stains were?  I mean if it's a result that was

1    not worsened, significantly worsened, then it

2    wouldn't create a habitability issue.  So the

3    call here would be that there was -- and,

4    again, I have to stick with habitability

5    because FEMA only provides assistance when

6    habitability has been affected.  What this is

7    saying is that the habitability of the home

8    was not affected.  And, therefore, what was

9    happening is there may have been damage, but

10   it was caused by the preexisting condition of

11   deferred maintenance.

12        Q.   So you're testifying that the

13   deferred maintenance condition of the roof

14   allowed the disaster to damage the ceiling and

15   FEMA, therefore, will not pay for the ceiling.

16             MS. WELLS:  Object to the form of

17   the question.

18             THE WITNESS:  It allowed

19   additional water to come into the ceiling.

20   And due to the deferred maintenance of which

21   there was no other damage, then they would not

22   receive assistance, and it did not affect the

111

1    habitability of that home.

2              BY MR. WESEVICH:

3         Q.    Due to the deferred maintenance of

4    the roof --

5         A.    Yes.

6         Q.    -- they would not receive

7    assistance for the ceiling.

8         A.    Right, because the ceiling, again,

9    it did not create a significant damage.  So

10   there is no additional damage that would

11   substantiate a habitability repair item,

12   because the roof had deferred maintenance,

13   preexisting condition.

14        Q.    How can you tell, how can the

15   inspector tell if a roof is a poorly

16   maintained 30-year-old roof?

17        A.    They can usually tell by the look

18   of the shingles, if it's cracked, if they've

19   shrunken, if they've buckled, if they've

20   cracked.  It's something that would be

21   observed by the inspector.

22        Q.    I want a complete list that you

1    understand of what the inspector would

2    observe.  I hear cracked, buckled.

3         A.    You heard cracked, buckled,

4    shrunken, curled, missing shingles.  There's a

5    whole lost of things that would indicate that

6    a roof is older.

7         Q.    But missing shingles could just as

8    easily be caused by the disaster as by the --

9         A.    Yes.  And as described, they would

10   look at whether or not additional damages

11   occurred as those new shingles blew off,

12   caused by the event that created other damage.

13        Q.    Now, this cracking and buckling or

14   blistering of shingles, are those things that

15   could be caused by a hurricane?

16        A.    You might.  You get some cracking,

17   possibly.  You get some lift.  But typically

18   when an older shingle appears, it's kind of

19   buckled around the edge.  It's curled.  You

20   will get some blistering.  But, typically,

21   that is not a sign of new damage.  It's a sign

22   of an older shingle.

1        Q.    Now, an older shingle is more

2    susceptible to cracking when it's lifted up

3    than a newer shingle.  Right?

4        A.    Typically, because a shingle

5    becomes brittle over time, more brittle over

6    time.

7        Q.    Right.  But the lifting up of the

8    shingle is something that the storm could do.

9    Right?

10       A.    Yes.

11       Q.    And so the cracking of the shingle

12   could have been caused by the storm even

13   though it was old.

14       A.    Potentially, yes.

15       Q.    And FEMA would still call that a

16   deferred maintenance roof because the shingle

17   was brittle to start off with because it was

18   old.

19       A.    I don't know that.  If the

20   shingles were worsened, if they were torn off,

21   if they were lifted and cracked and pulled

22   back that was evidence of new damage, then

1    FEMA would look at the replacement of shingles

2    of that particular area if it created a

3    habitability issue for the applicant.  They

4    wouldn't go in and replace the entire roof

5    which may be a 30-year-old roof.

6         Q.    But you agree that this takes some

7    real investigation to determine on these roofs

8    what was the damage that was caused by the

9    storm and what was the damage that was

10   preexisting.

11        A.    I can speak for myself in terms of

12   it's evident.  I mean it's not -- a trained

13   inspector can look at it and say, "That is an

14   older roof" or "That is a newer roof."  So I

15   mean it depends on the type of damage that

16   occurred as to how much investigation has to

17   go on to determine the actual cause of damage

18   or whether or not it was preexisting.

19        Q.    And I'm just asking you to go into

20   detail about what kinds of things that you

21   look for to determine whether it's preexisting

22   or disaster-caused.

1          MS. WELLS:  I'm going to object

2     because it's been asked and answered.

3          THE WITNESS:  Again, I would look

4     at whether or not there is buckling, cracking,

5     lifting, blistering, curled edges, shrinkage

6     of the shingle.  That's what I would look at

7     to estimate whether or not that is an older

8     roof.

9          BY MR. WESEVICH:

10         Q.    All of these things that you just

11    listed are easily documented by a photograph.

12    Correct?

13         A.    Possibly.  It depends.  It depends

14    on the angle of the photograph.  It depends on

15    the clarity of the photograph.  It could

16    depend on several things.  If you get a very

17    close-up picture of the roof, you could

18    probably make that distinction.

19         Q.    But can you see it with your eye

20    from far away then?

21         A.    How far away?  If it's a single

22    story house --

1          Q.    I mean if you can see it enough to

2     make the judgment call as to deferred

3     maintenance, then why can't you photograph it?

4          A.    As I say, I don't know the clarity

5     of the camera they're using, how far away they

6     are.  Certainly if I was there and I can see

7     it, I can make a call.  If I make a picture of

8     it and it's a dark roof, you're just going to

9     see gray, you're just going to see dark.

10    You're not going to see detail.

11         Q.    Does FEMA ever do anything to

12    consult roofing experts about how inspectors

13    ought to be trained to discern which roofs are

14    to be categorized as deferred maintenance?

15         A.    I'm not aware of how Inspection

16    Services reaches out to any of the industry

17    experts.  I don't know.

18         Q.    FEMA doesn't have an area of

19    deferred maintenance for roofs.  Correct?

20              MS. WELLS:  Object to the form of

21    the question.

22              BY MR. WESEVICH:

1          Q.    I'm sorry.  I wasn't specific

2    enough.  On the ACE pen tablet it lists

3    several areas of deferred maintenance.

4          A.    Yes.

5          Q.    And one of them, roofs is not

6    among them.

7          A.    I'm not sure.  I'd have to verify

8    that.  They're broken up into different

9    categories.

10         Q.    I'm looking at Page 5042.

11         A.    Yes.

12         Q.    This lists on the pen tablet

13   screen all the areas of deferred maintenance.

14         A.    Yes.

15         Q.    Are you able to tell me whether

16   one of those is roof?

17         A.    I'm not quite sure.  It's hidden

18   by the square as to whether or not there is

19   any additional categories where it's broken up

20   by windows and doors.

21         Q.    So if you have a disaster where

22   you're expecting a lot of roof damage claims,

**1**   does FEMA do anything special to train the

**2**   inspectors regarding roofs?

**3**        A.   No.  They are trained to, if they

**4**   know that -- they're trained to go out and

**5**   capture the disaster-related damage.  If we

**6**   know that in a particular disaster certain

**7**   elements might be more evident, they would

**8**   highlight that for the inspector, saying, "Pay

**9**   more attention to foundations.  Pay more

**10**  attention to the type of structure."  But

**11**  there's nothing that would tell them to do

**12**  things necessarily differently.  It would

**13**  bring to their attention areas of interest

**14**  that they may want to emphasize more of.

**15**       Q.   Looking at Page 5131 under the

**16**  heading of "General," that was filed as

**17**  Document 78-10.

**18**       A.   Excuse me.  You want me to take a

**19**  look at the general?

**20**       Q.   The paragraph under the heading

**21**  "General."

**22**       A.   Yes.

1           Q.    Are you familiar with this

2     language?

3           A.    I'm familiar with the concept.

4     These were written by PaRR for the inspectors.

5           Q.    This is actually a FEMA document.

6     Right?  A FEMA-written document.

7           A.    I'm sure it was done in

8     conjunction with FEMA.  I don't know.  This is

9     for the PaRR inspectors.

10          Q.    I think you've turned ahead.  If

11    you look at Page 1 of that document, it's a

12    FEMA-written document by the NPSC.

13          A.    Oh.  I apologize.

14          Q.    You need to turn two more pages --

15    this way.

16          A.    Sorry about that.

17          Q.    That's a FEMA-published document.

18    Correct?

19          A.    These are inspection guidelines

20    that are specific for the disaster which was

21    based upon the inspector's manual.  So this is

22    the specific document for that disaster on

1    providing instruction to the inspectors, yes.

2          Q.    And how did this language, how was

3    this language developed under "General"?

4    Based on what was it developed and by who?

5          A.    It's developed at the NPSC through

6    Inspection Services.  I don't know who the

7    actual author is.  It's probably done in

8    conjunction with several individuals,

9    including inspection supervisors, inspection

10   program.  But it's just the general

11   instruction to inspectors for this particular

12   event.

13         Q.    But this document is approved by

14   Headquarters, the template for this document.

15   Right?

16         A.    It's approved by FEMA, yes.  I

17   couldn't say it's approved by Headquarters.

18   Headquarters participates in the Inspection

19   Services calls that take place for the event.

20   And so we're familiar with the document as it

21   is laid out for the inspectors for that event.

22         Q.    Let's look at Page 5395.  And this

1    is the same kind of template of the document

2    that you're looking at that has the language

3    under the heading "General" which was filed as

4    document 78-10.  This Page 5395 is the same

5    document that you looked at as 78-10.  It's

6    just that this is a template that has been

7    subject to a management review on the bottom

8    left-hand corner, and it has a date 08/31/11.

9         A.    Yes.

10        Q.    What does that mean?

11        A.    That would mean that this is

12   produced at the Virginia National Processing

13   Services Center, and the management review

14   would have been through the Inspection

15   Services staff who manage the Inspection

16   Services.  This is the template document for

17   the inspectors that is filled out for any

18   particular event declared of which the

19   inspections would be issued to the contract

20   inspectors.

21             MS. WELLS:  May I just clarify.

22   Was this Exhibit A, again?

1              MR. WESEVICH:  That's Exhibit B.

2              MS. WELLS:  Exhibit B, okay.

3    Thank you.

4              BY MR. WESEVICH:

5        Q.    This document you keep at the

6    ready at FEMA in case there's a disaster.

7    Then you fill in all the blanks for this

8    document.  Correct?

9        A.    With Inspection Services at the

10   NPSC, yes.

11       Q.    Getting back to this language in

12   "General" that we were discussing on Page

13   5131, you write, "It's not uncommon for new

14   leaks to occur through older deferred

15   maintenance roofs, to be blown up under

16   shingles, through vents, et cetera."

17       A.    Yes.

18       Q.    But new leaks would be caused by

19   the disaster.  Correct?

20       A.    It could be.  But if the new leaks

21   were because the roof was deferred, it may not

22   affect the habitability of the home.  And I

1     can't talk damage without habitability because

2     FEMA only awards assistance based on the

3     habitability of the home.

4          Q.    Right.  So to get repair

5     assistance, you have to meet these elements.

6     Number 1, it has to, the home has to be an

7     owner-occupied primary residence.

8          A.    (Nodding.)

9          Q.    Number 2, the damages have to be

10    disaster related.

11         A.    Yes.

12         Q.    Number 3, the repairs must be

13    necessary to make the home safe, sanitary and

14    functional.

15         A.    Correct.

16         Q.    If you meet all of those criteria,

17    you get disaster assistance.  Correct?  You

18    get repair assistance.  Correct?

19         A.    That's the basic criteria, that,

20    yes, you have to pass what they refer to as

21    IDV, identification verification.  It has to

22    be a primary residence and you have to

1    demonstrate occupancy.  You have to have

2    sustained disaster-related damage.  And then

3    you also have to, the third one was they have

4    to have sustained the damage.

5         Q.    Safe, sanitary and functional.

6         A.    Safe, sanitary and functional,

7    which is a -- yes.

8         Q.    So is it your testimony that

9    habitability is a fourth criteria that you

10   have to meet in every case?

11        A.    No.

12        Q.    Because if repairs are necessary

13   to make the home safe, sanitary and

14   functional, then habitability repair is

15   required.

16        A.    Yes.  Habitability.  Safe,

17   sanitary and functional is a characteristic of

18   habitability.  It's part of the definition of

19   "habitability."

20        Q.    Right.  Habitability is defined as

21   three criteria.  Either public utilities are

22   out, the home is inaccessible or repairs are

                    FEDER REPORTING COMPANY
                 (202) 863-0000    (800) 956-8996

1    necessary to make the home safe, sanitary and

2    functional.

3              A.    Correct.

4              Q.    Getting back to this example on

5    "General" --

6              A.    Yes.

7              Q.    -- if there are new leaks,

8    necessarily the disaster-related element that

9    we just discussed of the repair eligibility

10   criteria, that's met if there's a new leak

11   that causes damage inside the house.

12             A.    Not if it's habitable.  What this

13   is saying is do not record the roof covering

14   replace, which is your entire roof, put new

15   shingles on the entire roof, if there is

16   deferred maintenance, because it's not

17   uncommon for new leaks to occur through older

18   deferred maintenance roofs, to be blown up

19   under shingles through vents.  If there's

20   damage to that roof, in other words, shingles

21   were blown off of that roof and you had leaks

22   as a result of those shingles being blown off,

1      then FEMA would repair the section of

2      blown-off roof, not replace roof covering.

3                  So it's a matter of, again, what

4      this is saying is that just because you may

5      have new areas in the room of water damage but

6      there's no evidence that the roof was further

7      damaged or shingles blew off, then you

8      wouldn't replace that entire roof.

9          Q.    So I understood you to say earlier

10     that a lot of inspectors out there are

11     naturally inclined to favor the applicants.

12         A.    Yes.

13         Q.    So if an inspector goes out to a

14     roof and says, "I don't know whether this is

15     preexisting, you know, or whether the disaster

16     messed up this roof.  I just don't know.  I

17     think it's more likely than not that the

18     disaster did it," does FEMA approve the

19     inspector's not recording deferred maintenance

20     and going ahead and recording the roof cover

21     replace?

22                  MS. WELLS:  I'm going to object to

1        the form of the question.

2                    Go ahead.

3                    THE WITNESS:  If there is evidence

4        that the roof was damaged, in other words, if

5        there is evidence that the roof is old and

6        there's no damages caused by the disaster,

7        then the inspector would mark that as

8        ineligible because it's deferred maintenance,

9        there is no evidence of new damage to that

10       roof.  So that's why it becomes the judgment

11       call.  Now, again, if there's damage to the

12       roof on an older roof, the inspector would

13       mark that damage as new damage, and they could

14       become eligible for assistance.

15                    BY MR. WESEVICH:

16       Q.        My question is only about the

17       judgment call.  Inspector drives up, sees

18       cracks on the shingles but says, "Those cracks

19       are because the wind of this hurricane, you

20       know, blew those shingles up and it cracked.

21       The wind from the hurricane cracked them.  And

22       it's my judgment as an inspector that more

1    likely than not, I don't know for certain one

2    way or the other whether those cracks existed

3    before or whether the disaster was what made

4    those cracks in the roof, but my guess is more

5    likely than not that the disaster caused it."

6    Does FEMA allow that inspector to go ahead and

7    record that roof recover, replace as real

8    property damage, as real property line items

9    to be compensated?

10                   MS. WELLS:  Object to the form.

11                   THE WITNESS:  If the inspector

12   determines that the new damage to the roof,

13   the cracks to the shingles, the uplift of the

14   shingles was caused by the event, then the

15   inspector would record that as new damage.  So

16   I mean --

17                   BY MR. WESEVICH:

18        Q.    Well, you said was caused, if the

19   inspector concludes that it was caused.  My

20   hypothetical is the inspector doesn't know.

21   The inspector thinks more likely than not it

22   was caused by the disaster.

1           A.       I don't know what the difference

2      is.   If you are saying that the judgment call

3      of the inspector is that he goes out and says,

4      "This looks like new damage to me.  I'm going

5      to record it as new damage" versus, you know,

6      if there's no damage, no additional damage to

7      the roof, if water came in on that one section

8      but the rest of the roof, again, had no damage

9      and there's no cracking or the entire roof is

10     cracked, then, again, it would be is that a

11     call on the inspector to determine is that

12     preexisting condition.  Now, again, if the

13     inspector goes out and doesn't know and says,

14     "That looks like new damage to me," he would

15     mark it as new damage.

16          Q.       And FEMA would allow that to be

17     paid, that new damage that you just described.

18          A.       If it affected the habitability of

19     the home.

20          Q.       Even if the inspector was not sure

21     that it was new damage, if the inspector just

22     thought more likely than not.

                    FEDER REPORTING COMPANY
                (202) 863-0000    (800) 956-8996

1           A.    My response to that would be FEMA

2    wouldn't know at the time what the inspector

3    thought or didn't think.  The inspector

4    recorded it as new damage and FEMA is going to

5    process based upon the inspector's report that

6    it's new damage.

7           Q.    Are all old roofs deferred

8    maintenance roofs?

9           A.    No.  I couldn't say that 100

10   percent certain.

11          Q.    So if a roof has a 30-year

12   guarantee, FEMA would agree that it's possible

13   for the roof to still be fully functional as

14   it approaches that 30 years?

15               MS. WELLS:  Object to the form of

16   the question.

17               BY MR. WESEVICH:

18          Q.    Prior to the disaster.

19          A.    Potentially.  If it's serving as a

20   roof, yes.  In other words, it's still in good

21   condition and there's been no adverse impact

22   to that roof that would otherwise indicate

1        that it can't stand up to the weather.

2                Q.    FEMA is not going to know one way

3        or another simply by knowing the age of the

4        roof is my question.

5                A.    It would be the condition of the

6        roof.

7                Q.    You would have to look at

8        something in addition to the age of the roof

9        to judge it a deferred maintenance roof.

10               A.    Yes, yes.  For clarity, you could

11       have a fairly new roof on a very inexpensive

12       shingle that within several years it could be,

13       based upon the location, the temperature, the

14       moisture and everything else, have

15       deteriorated.  So shingles come in various

16       grades on how long they're expected to last

17       under normal conditions.  Conditions can vary

18       which would impact the condition of the roof.

19               Q.    And the installation could also

20       impact the condition of the roof as well.

21       Correct?

22               A.    That is correct.

1          Q.    Shingles are nailed in.  Right?

2          A.    Typically, yes.

3          Q.    And if the pressure of the nail

4     that goes in, that drives the shingle in is

5     set too high, that nail will drive through the

6     shingle and compromise its structural

7     integrity, correct?

8          A.    Typically, it could do that, yes.

9          Q.    But FEMA doesn't ever go up on

10    roofs.

11         A.    No.

12         Q.    So it would have no -- FEMA

13    inspectors never go up on roofs.

14         A.    Correct.

15         Q.    There's a categorical prohibition

16    for FEMA inspectors to go up on roofs.

17         A.    Correct.

18         Q.    So they would have no idea about

19    whether a roof's structural integrity had been

20    compromised by the way that the nails were

21    installed in the roof.

22         A.    No.  They would not look at it in

1    that respect.  They would look at it in terms

2    of the damage that was caused by the event.

3    We wouldn't get into whether or not that roof

4    was put on or applied according to the

5    manufacturer's specifications.

6              Q.    And it's not only the pressure of

7    the nail that I just described that could

8    compromise the integrity.  It's also the

9    placement of the nails and the shingles.

10             A.    It could, yes.

11             Q.    That could compromise the efficacy

12   of that roof.

13             A.    It could, yes.

14             Q.    But FEMA has no way to distinguish

15   whether the roof was installed correctly.  It

16   has no way to tell.

17             A.    It has no way to tell.  There's no

18   guidance as to what to tell the inspectors to

19   go out and determine whether or not it was

20   applied correctly.

21             Q.    So you have no idea when you make

22   a deferred maintenance decision about whether

1    the roof had been installed correctly in the

2    first place.

3              A.    No.  It's based upon the condition

4    at the time the inspector is out there.

5              Q.    To be clear --

6              A.    And a judgment call.

7              Q.    -- it's only based on a ground

8    level eyeball of what the roof looks like.

9              A.    That would be what the inspector

10   would look at, yes, yes.  Now, if I were an

11   inspector, I would also ask the question how

12   old is the roof.  But it doesn't necessarily

13   render a decision one way or another.  What it

14   does is it puts some perspective as to how old

15   that roof is based upon the condition of what

16   the inspector is viewing.

17             Q.    But the inspectors do not record

18   what they understand the age of the roof to

19   be.

20             A.    No, they don't.  They're not

21   required to.

22             Q.    And they're not recording the type

1    of roof it is, whether it's a tile roof or a

2    shingle roof, what have you.

3            A.    I don't know if that is a current

4    requirement.  Typically, when I was inspecting

5    -- I did a lot of inspections in Florida,

6    which are tile roofs.  Some were asphalt

7    roofs.  And I would put in comments, "It's a

8    clay tile roof."

9            Q.    Right.  You can put anything you

10   want.  You can put anything you want.

11           A.    Absolutely.  There is no

12   requirement, to my knowledge.

13           Q.    And there's no place to record the

14   type of roof.

15           A.    Not specific, no.

16           Q.    But there is a place to record the

17   type of foundation of the house.

18           A.    Yes, because foundations will vary

19   according to structure and everything else,

20   yes.  However, in the line items, I believe

21   there are several different categories of roof

22   covering, whether or not it's asphalt, clay

1    tile, slate.  There is line items that I

2    believe get into more detail that if the

3    inspector views damage to that roof that was

4    disaster related, he would pick the line item

5    to best describe what that roof composition is

6    and award however much damage he observed, he

7    or she observed.

8              Q.    But if the judgment was deferred

9    maintenance, the only thing that the ACE pen

10   tablet allows to be recorded is a check on the

11   word "general."  There is no check on the word

12   "roof."  There is no description of the type

13   of roof.  There is no description of the age

14   of the roof.  There is no description of the

15   reason for the deferred maintenance judgment.

16   Correct?  All that's true, right?

17              MS. WELLS:  Object to the form.

18              THE WITNESS:  As I say, I don't

19   know.  I thought I read somewhere in the

20   inspection guidelines that roof was identified

21   as an area of deferred maintenance.  However,

22   I did not see it in that box, but I don't

1     know.  It was blocked by another block to

2     determine whether or not there was additional

3     categories underneath as you scrolled down in

4     that box.

5                    BY MR. WESEVICH:

6          Q.    Well, FEMA has paper forms that

7     are used by inspectors in case the pen tablets

8     stop functioning.  Correct?

9          A.    Yes.

10         Q.    And you produced those right here.

11    And I'm looking at Pages 589 through 96.  And

12    this would list out all the categories that

13    are listed in deferred maintenance here on

14    Page 591.  Right?

15         A.    Yes.  I would assume that that

16    is--

17         Q.    Right here in the areas of

18    deferred maintenance, this list on Page 591.

19         A.    Yes.

20         Q.    Okay.  So this document, 591,

21    indicates that there's not even a category for

22    roof for deferred maintenance.

1          A.    Yes.

2          Q.    That's correct, right?

3          A.    It does indicate that, yes.

4          Q.    So as I understand your testimony,

5    if disaster-related damages are found in the

6    judgment of the inspector, then the roof type

7    might be recorded.  But if in the inspector's

8    judgment the roof was in poor condition prior

9    to the disaster, then FEMA does not know what

10   type of roof it is, does not even know that

11   the roof was found to be deferred maintenance,

12   does not know the reason why the inspector

13   said the roof was deferred maintenance, knows

14   nothing about it at all.  Correct?

15         A.    According to this.  There is no

16   indication on the roof type or anything else

17   or an indication of area deferred maintenance

18   for roof.

19               MR. WESEVICH:  I think this might

20   be a good time to take a break for lunch.

21               (Whereupon, at 12:28 p.m., the

22   deposition was recessed, to reconvene at 1:15

1    p.m., the same day.)

2                 AFTERNOON SESSION 1:24 p.m.

3                 BY MR. WESEVICH:

4         Q.    Mr. Carleton, does FEMA spend less

5    repair money if it tells inspectors, "Write

6    deferred maintenance unless you're sure that

7    it's not" as compared to if they tell

8    inspectors, "You can find deferred maintenance

9    on a more likely than not standard?"

10                MS. WELLS:  Object to the form of

11   the question.

12                THE WITNESS:  I'm not sure if I

13   understand your question, because the

14   instructions to the inspectors are to go out

15   and record disaster-related damage as well as

16   identify other damage that exists.  So it's

17   not -- FEMA doesn't give instructions to

18   inspectors on how they would determine

19   eligibility.  An inspector's job is to go out

20   and record what they see.

21                BY MR. WESEVICH:

22        Q.    But the inspectors are told this

1     on Page 104, right?  This is what they're

2     told, right?  Under that heading "Deferred

3     Maintenance," that is what the inspectors are

4     told, right?

5              MS. WELLS:  Object to the form of

6     the question.  Told what?  Told what he said

7     or told what you said?

8              BY MR. WESEVICH:

9         Q.   Are the inspectors told what is

10    written under the heading "Deferred

11    Maintenance"?

12        A.   That is part of their training.

13    So I am sure it is covered as well as it is in

14    the inspector manual.  But that doesn't have

15    anything to do with eligibility for

16    assistance.  That is how to record damage that

17    they see at the time that could be referred to

18    as deferred maintenance.

19        Q.   And the way that they record the

20    damage that they see at the time is used to

21    decide eligibility.  Correct?

22        A.   They don't make that decision.

                FEDER REPORTING COMPANY
             (202) 863-0000    (800) 956-8996

1          Q.    Right.  But the way that they

2     record that -- the eligibility determination

3     is based on the information that they do

4     record.

5          A.    That is correct.

6          Q.    And this tells them how to record

7     the information.  Correct?

8          A.    This tells them what the examples

9     of what deferred maintenance is and what

10    categorizes deferred maintenance, yes.

11         Q.    This tells them whether to check

12    one of the boxes on the ACE 3 pen tablet under

13    "Deferred Maintenance" or whether to record

14    damages under line items.  Correct?

15         A.    No, this does not say that.  What

16    they are instructed to do is to go out and

17    record damages.  And their focus is to record

18    damages that are caused by the event.  If they

19    are to capture the full inspection of that

20    property, they are to record other damage as

21    they see that is not caused by the event which

22    can refer to as preexisting condition or

1    deferred maintenance.  But they are not told

2    to actually go out and look for the deferred

3    maintenance.  If it exists, they will record

4    it.  If it doesn't exist and they only have

5    disaster-related damage, they would record

6    that.

7         Q.    So that the record is clear, when

8    you said the word "event" during this entire

9    deposition you've meant the disaster.  Right?

10        A.    The disaster declaration, yes.

11        Q.    It's a common Agency usage, right,

12   that you call the disaster the event?  Right?

13        A.    Yes.

14        Q.    But this paragraph that we've been

15   talking about on Page 104, it talks about how

16   to record deferred maintenance.  Correct?

17        A.    It does say when to record it and

18   gives some examples of what that is referring

19   to.

20        Q.    That's the only question.  It does

21   say how to record deferred maintenance,

22   correct?  And it also says --

1              MS. WELLS:  Objection.  That is

2     not what he testified.  That mischaracterizes

3     his testimony.

4              BY MR. WESEVICH:

5         Q.   Okay.  Does this tell you how to

6     record deferred maintenance?

7         A.   How to?  It describes what it is

8     and it describes when to categorize certain

9     examples that are mentioned here as deferred

10    maintenance.  So it doesn't tell them.  It

11    just gives examples of how to do it when they

12    come across it.

13        Q.   When you just testified that it

14    describes what it is, the word "it" is

15    deferred maintenance, it describes what

16    deferred maintenance is.

17        A.   In some examples that are provided

18    in that paragraph, yes, which is not inclusive

19    of everything.

20        Q.   Okay.  And where it says, "The

21    listing of deferred maintenance items worsened

22    by the storm should never be speculative," do

1      you see that, the very last sentence?

2            A.    I do see that.

3            Q.    When you say the listing, do you

4      mean the listing on the real property line

5      items?

6            A.    I believe what they are referring

7      to is the listing of the deferred maintenance

8      as it appears in the box on the ACE 3

9      software, the general, the categories of it.

10     So in other words, you should never guess.

11     You have to try to verify that was the damage

12     caused by the event and if it wasn't, was it a

13     result of preexisting condition or deferred

14     maintenance.

15           Q.    But this last sentence, it's

16     talking about items that were worsened by the

17     disaster.  Correct?  It's not talking about

18     deferred maintenance.

19           A.    Right.  So if it's worsened by the

20     event, then they could be eligible for the

21     assistance if it affected the habitability of

22     the home.  So in other words, you wouldn't see

1    deferred maintenance and yet record damages

2    for the same item.  It's either eligible or

3    not eligible based upon the habitability of

4    the home.

5         Q.    Does FEMA authorize inspectors to

6    list items under the real property line items

7    in the ACE 3 tablet if they were more likely

8    than not disaster related?

9         A.    Could you clarify?

10        Q.    If the inspector believes, if the

11   inspector is not certain as to whether

12   something was preexisting, a damage item is

13   preexisting, does FEMA authorize them to list

14   that item on the real property line items?

15        A.    As potential eligible items for

16   repair?

17        Q.    Yes.

18        A.    Is that what you are referring to?

19        Q.    Yes.

20        A.    Yes.  If it is the opinion of the

21   inspector that that item was damaged as a

22   direct result or made worsened by the

1      disaster.

2              Q.     Made significantly worsened by.

3              A.     Yes.

4              Q.     When are the inspectors told that?

5              A.     It is part of their training.  It

6      is part of their background.  In other words,

7      the inspector is to go out and look at, in

8      their judgment of what was disaster-related

9      damage or not disaster-related damage.  We've

10     seen through much of this manual in terms of

11     what is considered deferred maintenance or

12     what would be considered eligible line items.

13     What determines whether or not FEMA is going

14     to award will be based upon the overall

15     habitability of the call for the home, because

16     you may suffer damage in a home but your home

17     is still habitable and FEMA would not award on

18     that assistance.

19                     If I could clarify.  If an

20     inspector identifies line items that in his

21     opinion were damaged by the event, he's going

22     to record that.  And if the overall

                    FEDER REPORTING COMPANY
               (202) 863-0000    (800) 956-8996

1    habitability of the home is no, FEMA would pay

2    that out and not know what went on in the mind

3    of the inspector.  The inspector only recorded

4    that damage as he or she saw fit and

5    identified it as being disaster related or

6    significantly made worsened by the event,

7    therefore, could be eligible for assistance

8    when FEMA makes that determination.

9         Q.    So as I understand your testimony,

10   FEMA does authorize inspectors to list real

11   property items as eligible for repair payment

12   if the inspector is unsure about whether the

13   disaster caused the damage or whether the

14   damage was preexisting.

15             MS. WELLS:  Object to the form of

16   the question.

17             THE WITNESS:  FEMA is not going to

18   know what goes on in the mind of the inspector

19   when the inspector is making that call.  FEMA

20   is going to go by what is recorded by the

21   inspector as being disaster-related damage or

22   not.

1              BY MR. WESEVICH:

2          Q.    I understand that the software

3    that FEMA has developed does not record this

4    information.  My question is what does FEMA

5    authorize the inspectors to do?  Are the

6    inspectors allowed by FEMA to record an item

7    in the real property line items as eligible

8    for repair assistance if the inspector is

9    unsure as to whether that item is preexisting

10   or was made significantly worse by the

11   disaster?

12              MS. WELLS:  I'm going to object to

13   the form, again.

14              THE WITNESS:  It's not a

15   determination of does FEMA authorize it.  FEMA

16   is not going to know.  The inspector is making

17   a call and the inspector has already made the

18   call that in his or her opinion that damage

19   was caused by the event and is going to mark

20   it as such.  And, therefore, FEMA would award

21   if the overall habitability call is no.  So in

22   other words, the line item doesn't say, "Is

1    this your best guess or not?"  It's basically

2    this is what they saw as damage.  And if the

3    home is uninhabitable, FEMA would award based

4    upon what that inspector saw.

5                  BY MR. WESEVICH:

6        Q.    Does FEMA tell the inspectors

7    anything else other than what's recorded on

8    Page 104 under the heading "Deferred

9    Maintenance," does FEMA tell the inspectors

10   anything else about how to record damage that

11   they see?

12       A.    Not that I'm aware of.  If this

13   comes from the inspector's manual, I know that

14   there is additional information in the

15   training material that goes into different

16   examples of this.  But there is no other

17   written guidance that I'm aware of that would

18   tell inspectors what to do in recording

19   disaster-related damage.

20       Q.    And does FEMA expect inspectors to

21   apply that standard that's written there under

22   the heading "Deferred Maintenance" on Page

1        104?

2                        MS. WELLS:  Object to the form.

3                        THE WITNESS:  They would expect

4        inspectors who have received the training to

5        be able to go out and understand what would be

6        disaster-related damage and what would be

7        preexisting or deferred maintenance.

8                        BY MR. WESEVICH:

9              Q.    Now, you had mentioned that a lot

10       of the inspectors have a construction

11       background.  Is that correct?

12             A.    To the best of my knowledge, yes.

13             Q.    How many of them?  What

14       percentage?

15             A.    I don't know.

16             Q.    Is any type of construction

17       background a requirement for becoming a FEMA

18       inspector?

19             A.    Not that I'm aware of.  But they

20       do look for people that have a background in

21       construction or, you know, knowledge of

22       construction.

1          Q.    How?

2          A.    Pardon me?

3          Q.    How?  When you say "they," you're

4    talking about PaRR and Parsons Bickerstaff,

5    the two contractors.  So it's PaRR and PB?

6          A.    PB, Parsons Brinckerhoff.

7          Q.    Oh, I'm sorry.  So those are the

8    people who actually hire the individual

9    inspectors who go out to houses.  Correct?

10         A.    Yes, they do.

11         Q.    And how do you know that that's

12   what they look for?

13         A.    I don't know.  I do know that when

14   I was an inspector, they were looking for

15   people that had construction background.  I do

16   know that they look at the experience of the

17   people that they are hiring, but it's up to

18   the inspection contractors to hire those

19   inspectors.

20         Q.    But you have no idea about what

21   qualifications they require of the applicants?

22         A.    No.  I do not know what standards

1    they apply.

2         Q.    Are the inspectors required to be

3    licensed contractors?

4         A.    No, not to my knowledge, no.

5         Q.    Because that's a pretty high

6    standard.  Right?

7         A.    That is high standard, and it also

8    varies from state to state.

9         Q.    If an inspector determines that a

10   damaged part of a home is to be classified as

11   deferred maintenance, the only thing that's

12   recorded is a check box in that areas of

13   deferred maintenance.  Is that correct?

14        A.    That would be required, and then

15   further explanation can be provided in

16   comments.

17        Q.    But there's not a method other

18   than comments for the inspector to say what

19   the reason for the deferred maintenance

20   decision was.

21        A.    No.  The reason being is that the

22   inspector is there to record the damage that

1      was the direct result of the disaster.  If

2      there is additional damage there to complete

3      the inspection, he or she would record other

4      damage that they viewed and determine whether

5      or not it was a result of the disaster.  So

6      they're not specifically going out looking for

7      deferred maintenance or preexisting condition.

8      Their job is to go out and look for

9      disaster-related damage.  And if other damage

10     exists, then they have to apply whether or not

11     based on their judgment it was caused or made

12     worsened by the disaster.

13            Q.    Who decides appeals?  Describe for

14     me how appeals are decided when an applicant

15     is dissatisfied with FEMA's repair decision.

16            A.    The applicant writes an appeal to

17     FEMA and it goes to an appeals group, an

18     appeals group, I believe, made up of your

19     managers, supervisors and caseworkers.  And

20     that appeal is reviewed.  And it's all manual

21     at that point.  And when I say manual, the

22     case is reviewed, all the notes are reviewed,

1     the inspection is reviewed and the

2     determination is reviewed, and that is done

3     manually.

4                 And then a decision is rendered,

5     sent up to the -- I don't know if they're

6     referred to as team lead or supervisor, who

7     then approves and then the appeal is either

8     overturned or granted.  So it's a separate

9     group that handles appeals.

10         Q.    Now, when you say that appeals are

11     manually determined as opposed to

12     auto-determined by the computer, the initial

13     decisions, some of them are manually

14     determined and then some of them are

15     auto-determined by NEMIS.  Correct?

16         A.    The majority of initial decisions

17     are based upon auto-determination.  I don't

18     know what the current rate of approval is on

19     auto-determinations.  I do know that it is in

20     the mid-90 percentile of cases that are

21     auto-determined.  Only in cases that get hung

22     up in the computer where something wasn't

1      correct or got hung up or jammed in the

2      computer would that case be reviewed manually

3      to be processed.

4           Q.    As I understand, what you say is

5      NEMIS is set up to issue an auto-determination

6      in all cases, but some of them get hung up

7      among the various business rules in NEMIS and

8      those cases are manual-determined.

9           A.    Yes.  In other words, they would

10     go into a special handling queue.  If

11     something were to be looked at that didn't fit

12     the current business rule, it would go into

13     another queue to be manually reviewed and

14     processed.  It would either get hung up or

15     there was missing information or something

16     that was different in that system.

17               So we would also sometimes run a

18     special handling queue if something else were

19     to change during the disaster and we needed to

20     go into the system, manipulate the system.

21     Then that would maybe go into a different

22     special handling queue for those cases if a

1        certain question was answered away so that it

2        would be manually reviewed.  But NEMIS is set

3        up to auto-determine as much information as

4        possible.

5               Q.    And there's a flag that the

6        inspector can check to request manual

7        determination even on the initial decision.

8        Is that correct?

9               A.    That's correct.  And I believe it

10       goes back to the contractor's host.  In other

11       words, that's before it enters into NEMIS.

12       The inspector can flag for someone in the

13       Inspection Services to take a look at it

14       before it gets entered back into NEMIS.

15              Q.    When you talk about Inspection

16       Services, are you talking about somebody at

17       PaRR to look at it or are you talking about

18       somebody in FEMA to look at?

19              A.    Someone in PaRR.

20              Q.    So when the inspector checks a

21       manual flag, that inspector is telling PaRR

22       that before this inspection is sent to FEMA,

1        somebody in PaRR management should look at

2        this inspection.

3               A.     Typically, yes.

4               Q.     Are there rules for when that

5        manual checked flag should be used?

6               A.     It would depend on the

7        circumstances of the disaster.  In other

8        words, in some large events a new decision

9        might come down or we're not going to process

10       a certain, a particular instance.  We may ask

11       the inspector to flag for review.  If the

12       other situation might be that the inspector

13       just wants another set of eyes to take a look

14       at the information being gathered before it's

15       sent in, the inspector could flag that for

16       supervisory review.

17              Q.     Was anything ever published saying

18       that inspectors in Disaster 1780 were supposed

19       to flag certain cases for PaRR review?

20              A.     Not that I'm familiar with.  I've

21       read the Inspection Services guidelines for

22       that particular disaster, but I do not recall

1    anything being in there on specifically

2    indicating when a case should be reviewed,

3    manually flagged.

4         Q.    And the Inspection Services

5    guidelines that you are referring to, is that

6    Page 5124?

7         A.    Yes, that is.

8         Q.    That's the document.  And if there

9    were specific instructions to flag certain

10   items for review, they would appear in this

11   document?

12        A.    Not necessarily.  If there is an

13   overarching decision that they're waiting for

14   Headquarters to make and we're saying, you

15   know, "Hold these before so that we can, you

16   know, render a policy or a decision or

17   something to that disaster," they may ask to

18   flag them.  But typically it doesn't show up

19   in this particular document.  It may be a

20   verbal to the inspectors or a memo to the

21   inspectors, you know, "Headquarters is looking

22   at this particular issue.  Before sending on

1      to NEMIS, you know, flag for host review."

2      And it could be for any number of reasons.

3              Q.    And there could be addenda to this

4      document.  Correct?

5              A.    There could be addenda to this

6      document, yes.

7              Q.    And in most disasters there do end

8      up being addenda to these documents.

9              A.    Yes, there are.

10             Q.    And where are the addenda to this

11     document for Disaster 1780?

12             A.    I'm not sure if any were issued.

13             Q.    Do you know definitively yes or no

14     whether addenda were issued in this disaster?

15             A.    I do not know definitively.

16             Q.    How would you find out?

17             A.    I would have to call out to the

18     Inspection Services group at the Virginia NPSC

19     to determine if any additional addenda were

20     provided.

21             Q.    Did anybody do that prior to this

22     deposition?

1          A.     I did not.

2          Q.     Do you know if anybody did?

3          A.     I do not know.

4          Q.     In Interrogatory 11, in your

5     response to Interrogatory 11 you list several

6     people who helped you prepare documents for

7     this.  Do you know whether any of those people

8     -- well, here, let me show you the answer.

9     You can tell me whether any of these people

10    did.  I'm looking at Page 5335.  And you'd

11    indicated that Cindy Atkins, David Ritchie,

12    Chip Pinckney and Todd Milliron helped you

13    gather documents that were responsive to our

14    document requests.

15         A.     Yes.

16         Q.     Do you know if any of them tried

17    to locate all the addenda?

18         A.     Yes.  I'm sure of it because of

19    the fact that you have some Inspection

20    Services supervisor and task monitors

21    associated with it.  And if the request was

22    made for all documentation, they would have

1    pulled every documentation available regarding

2    this disaster.  Cindy Atkins is also a program

3    specialist at the NPSC unassociated with the

4    Inspection Services group and she, too, would

5    have also made sure that all documentation was

6    gathered.

7         Q.    Verbal instructions are given to

8    inspectors pretty much daily.  Right?

9         A.    It's given to them when

10   information needs to be exchanged with them.

11   Sometimes it doesn't happen daily.  Sometimes

12   it happens frequently if there is a

13   circumstance within that disaster that needs

14   attention or correction or something of that

15   nature.

16        Q.    And where are those recorded,

17   those daily transmissions to inspectors?

18             MS. WELLS:  I'm going to object to

19   the form.  Verbal communications and

20   transmissions aren't necessarily the same,

21   but.

22             THE WITNESS:  And I was going to

1    say that would have been communicated through

2    the Inspection Services.  I don't know if

3    anything would have been issued in memo or

4    not.  I don't know that.

5                  BY MR. WESEVICH:

6         Q.    So going back to the appeals

7    group, how many people were in the appeals

8    group for Disaster 1780?

9         A.    That I don't know.  I would have

10   to find out.

11        Q.    It wouldn't be 1,000 people?

12        A.    No.

13        Q.    Would it be 100 people?

14        A.    Not that I'm aware of, no.

15        Q.    Roughly, how many, would you say?

16        A.    I would say depending upon the

17   other activity and if it's going to be

18   specific to 1780, 20, less than 20.  I'm not

19   exactly sure.

20        Q.    And do these people have other

21   jobs or were they just appeals officers?

22        A.    They may have other jobs but if

                FEDER REPORTING COMPANY
             (202) 863-0000    (800) 956-8996

1     appeals come in, I mean they are -- there's a

2     lot of movement within the NPSC depending upon

3     the workload.  So there are dedicated people

4     that do appeals when appeals come in.  But

5     they may in slower times have other positions

6     that they can work on.

7          Q.    You mentioned a team leader for

8     the appeals.

9          A.    I wasn't sure of how they

10    categorize what their job titles are anymore,

11    but there's usually a supervisor or a team

12    lead overseeing a group of people doing

13    appeals.

14         Q.    Do you know who that person was

15    for Disaster 1780?

16         A.    No, I don't.

17         Q.    How would you find out?

18         A.    I would have to call out and find

19    out who it was for that disaster, who it was

20    at the time.  There has been turnover in the

21    NPSC since 2008, so I'd have to find out who

22    it was.

1          Q.    Describe for me what happens when

2    someone sends in a letter saying, "The

3    disaster damaged my home but I didn't get

4    repair assistance."  How does the appeals

5    process work in that?

6          A.    Well, in the initial letter, the

7    award letter that goes out, it would indicate

8    what they were eligible to receive in

9    assistance.  And that letter describes if you

10   disagree with FEMA's decision, here's what you

11   need to do.  And it provides some information

12   that they would need to provide back to FEMA

13   in an appeal for FEMA to look at their case

14   and review what they're looking for.

15               Typically, if they did not receive

16   funds for damages that they claimed, they

17   would also ask for inspectors, an estimate

18   from a licensed contractor and indication that

19   it was caused by the event, and then they

20   would look at that information, that

21   additional supplemental information and look

22   at the case, look at the notes, look at the

**1**    inspector's report, and determine whether or

**2**    not something was either overlooked or it was

**3**    addressed in the initial report.

**4**              And if, in fact, there's a

**5**    discrepancy in what the individual is claiming

**6**    versus what was in the inspection report, more

**7**    often than not the Inspection Services would

**8**    issue the inspection to another inspector to

**9**    go out and complete a new inspection.  That

**10**   inspection will come in and would be compared

**11**   to the first inspection.  And if there is

**12**   discrepancy, they could award additional funds

**13**   based upon the new inspection.

**14**        Q.    But what happens if the applicant

**15**   writes in, "The disaster damaged my roof," but

**16**   that the "General" check box is checked for

**17**   deferred maintenance?  What happens then?

**18**        A.    General.  It depends.  If the

**19**   individual writes in saying that "I have roof

**20**   damage," but in the inspection notes it would

**21**   have "General," and then if they looked in

**22**   comments, it says "Roof was deferred

1    maintenance," then the individual would not,

2    that appeal would not be overturned.  The

3    initial decision would not be overturned.

4            If the individual submitted

5    documentation from a contractor indicating

6    that there is roof damage and it was caused by

7    the event, then another inspector would have

8    been sent out to determine and try to verify

9    that again.  Now, again, since an inspector

10   does not get up on the roof, they would look

11   for any residual damage as a result of that

12   roof being damaged.  And that's when I

13   described earlier which would be the inspector

14   would be looking inside the house for any

15   damage that may have occurred based upon the

16   condition of that roof.

17           Q.    Now, does FEMA require an estimate

18   from a licensed contractor?

19           A.    It says from a licensed

20   contractor.  I believe it does say licensed.

21   It can also require an estimate or an opinion

22   from a local official.  In other words, local

1    officials might be able to determine that

2    "Yes, it blew through here and, yes, there is

3    sufficient damage to this house.  It's been

4    tagged.  A person can't be living here until

5    repairs are made."  Then that would implement

6    or suggest a new inspection if something was

7    overlooked in the initial inspection.

8         Q.    Right, but official inspections

9    are not available to all disaster survivors.

10   Right?  I mean many local governments just

11   don't have that capacity.  Correct?

12        A.    That's right.

13        Q.    So in that case the only way that

14   an applicant could challenge a deferred

15   maintenance finding by a FEMA inspector is to

16   hire a local contractor.

17        A.    Potentially, but they wouldn't

18   have -- the call would have been insufficient

19   damage, not a call of deferred maintenance,

20   because the code, the eligibility code would

21   be insufficient damage because the inspector

22   did not find habitability damages that would

1    render that person eligible.  So the call

2    would be insufficient damage from FEMA, and it

3    could include minor damage caused by the event

4    as well as damage that was preexisting or by

5    deferred maintenance.

6            Q.    Right.  The letter that is sent to

7    applicants when a deferred maintenance finding

8    has been made by an inspector, that letter

9    never mentions deferred maintenance.

10           A.    No, it doesn't.

11           Q.    All it says is, as you described,

12   insufficient damage which could mean, as I

13   understand, one of three things.  It could

14   mean that the damage was not substantial

15   enough, that it didn't meet the $50 rule or it

16   could mean deferred maintenance or it could

17   mean that even though the disaster caused

18   damages, they didn't affect the safe, sanitary

19   and functional capacity of the house.  Right?

20           A.    You're leaving out habitability.

21           Q.    But that's safe, sanitary and

22   functional.

1      A.     But there's an overall

2    habitability call which takes into account the

3    damages that was viewed which would include

4    those categories that you just described,

5    either minor damage, deferred maintenance or

6    -- minor damage would be defined as it didn't

7    meet the threshold of $50 and it did not

8    affect the habitability of the home as well as

9    the deferred maintenance as well as the safe,

10   sanitary and functional criteria.  So those

11   are reflective in an overall habitability

12   determination as to whether or not FEMA would

13   grant that award.

14      Q.    So the letter that's sent to the

15   applicants, it doesn't distinguish among any

16   of those.  Correct?

17      A.     No.  It does distinguish and it

18   does mention that it does not affect the

19   habitability of your home.

20      Q.    But by reading -- well, let's look

21   at the letter.  Let's look at Page 2956.

22      A.     Yes.

1          Q.    This is the letter that we've been

2     discussing.  Correct?

3          A.    Yes.

4          Q.    And it doesn't tell the applicant

5     whether deferred maintenance affected their

6     eligibility.

7          A.    No, it does not.

8          Q.    It does not tell the applicant

9     whether a finding of deferred maintenance was

10    made.

11         A.    That is correct.

12         Q.    It doesn't suggest anything about

13    deferred maintenance to the applicant.

14         A.    No.

15              MS. WELLS:  Objection; asked and

16    answered.

17              THE WITNESS:  No, it does not

18    because this has to do with eligibility

19    determination not necessarily focusing in on

20    the elements that were preexisting.  In other

21    words, ineligible, insufficient damage is a

22    call being made based upon disaster-related

**1**     damages that were not found at this home.

**2**     There may have been other damages but this is

**3**     based upon the regulation of which FEMA would

**4**     only provide assistance to individuals who

**5**     suffered disaster-related damages.  Based upon

**6**     the inspection, the inspector did not find any

**7**     disaster-related damages that would render the

**8**     home unsafe.

**9**          Q.    But the letter does not inform

**10**    applicants that in an inspector's judgment the

**11**    damage that was suffered by the house was

**12**    preexisting.

**13**         A.    No, because that is not what FEMA

**14**    pays on and that is not the intent of the

**15**    program.  The program is to pay on elements

**16**    that were damaged as a direct result of the

**17**    disaster.

**18**         Q.    Right.  But the inspectors do make

**19**    a judgment about whether damages are

**20**    preexisting and the letter does not inform the

**21**    applicants anything about what judgment was

**22**    made by the inspector in the case.

1                    MS. WELLS:  Object to the form of

2          the question.

3                    THE WITNESS:  Again, the inspector

4          is to go out and determine what is disaster

5          related and what is not.  So an inspector is

6          instructed to go out and make sure that they

7          look at the entire structure and record what

8          they see and make a determination and judgment

9          as to whether or not it was disaster related,

10         preexisting or deferred maintenance.

11                   Our letters are based upon our

12         eligibility criteria.  In order to be

13         eligible, it has to be disaster-related

14         damage.  So we have codes in here that are

15         specific to disaster-related damage.  And what

16         this is saying, there is insufficient damage,

17         meaning that there is insufficient damage

18         caused by the event that rendered you

19         ineligible.

20              Q.    But why wouldn't FEMA include a

21         notice to the applicants saying, you know, "In

22         the inspector's judgment whatever damages

1     happened to your house, they preexisted"?  Why

2     wouldn't FEMA tell applicants that much?

3                 MS. WELLS:  Object to the form of

4     the question.

5                 THE WITNESS:  I also don't think

6     we're required to.  What we are required to do

7     is provide information as it was directly

8     resulted from the event, from the disaster.

9     So FEMA is to go out and record and make an

10    eligibility determination based upon what was

11    a direct result of the disaster.  We would

12    have to develop all new sets of criteria, sets

13    of letters informing them of everything that

14    the inspector saw that wasn't disaster

15    related; whereas, our focus is to provide

16    assistance on damages that were caused by the

17    disaster.  So we have all these inserts

18    written based upon our eligibility

19    determination not on our ineligibility for

20    other reason type information.

21                 I don't know if I'm making myself

22    clear, but through the law and through the

                    FEDER REPORTING COMPANY
                 (202) 863-0000    (800) 956-8996

**1**    regulations, that sets forth on what we can

**2**    pay and what we can determine as habitable

**3**    eligible items.  So our letters are written

**4**    based upon what our regulations call for which

**5**    is is it disaster-related damage.  IID, as

**6**    mentioned, is insufficient damage because the

**7**    inspector did not find damage that affected

**8**    the habitability of which they could be

**9**    eligible to receive assistance for.

**10**            Q.    You read the sworn declarations of

**11**    the Plaintiffs in this case that were

**12**    submitted in the case, right, where they swear

**13**    that they were sitting in their house when the

**14**    storm blew through and caused damage to their

**15**    homes?

**16**            A.    Yes.

**17**            Q.    Right?  And they provided

**18**    pictures?

**19**            A.    Yes.

**20**            Q.    I mean aren't there disaster

**21**    survivors all over the country that are in the

**22**    same boat and wondering, "Why is it that I saw

1        the damages caused by the storm, why is it

2        that FEMA is not paying me?"  Don't you think

3        that there are people all around like the

4        disaster survivors that really want to know,

5        "Why is it that I'm getting repair money or

6        I'm not getting repair money"?

7                    MS. WELLS:  Object to the form of

8        the question.

9                    THE WITNESS:  It's also very clear

10       in the information that is sent to the

11       applicant after they register for FEMA

12       assistance in terms of what FEMA would

13       consider eligible damage.  And that's in the

14       Help After the Disaster Guide.  And it talks

15       about what's eligible, what isn't eligible.

16       And it makes reference throughout the document

17       that it has to be disaster-related damage.

18       And that is what the inspector's purpose is is

19       to determine what is disaster related and what

20       is not disaster related.

21                    BY MR. WESEVICH:

22            Q.    And FEMA's position is that the

1    explanation for the decision that is provided

2    in that letter is sufficient to inform people

3    of the basis for FEMA's actions.

4         A.    I think it's sufficient to

5    indicate that there was insufficient damage by

6    the event to indicate that they were not

7    eligible and had not affected the safety of

8    their home to be lived in.  It also goes on to

9    talk about if they file an appeal what they

10   need to do for their appeal to be considered.

11        For instance, in this particular

12   letter where it talks about insufficient

13   damage, it also indicates that "Please send us

14   documents such as statements from local

15   officials, contractor estimates" -- so it does

16   not say licensed contractor, et cetera, -- "to

17   show that damage to your home was caused by

18   the disaster and has caused unsafe or

19   unlivable conditions."

20        So, again, it's a two-pronged

21   determination.  It's a determination of

22   damages and unsafe conditions or habitability

1    conditions.  It goes hand-in-glove with one

2    another.  In other words, you can have damages

3    that doesn't affect your habitability and it

4    could still be insufficient damage.

5         Q.   Sure.  If you have a statue

6    outside right next to your house and the storm

7    blows it over, that doesn't affect the

8    habitability of the home.  Right?

9         A.   Correct.

10        Q.   So FEMA would never pay for that

11   --

12        A.   It depends.

13        Q.   -- no matter how much damage the

14   storm did to the --

15        A.   No.  If it affected ingress and

16   egress of the home such that it would make it

17   difficult to gain access to the home, FEMA

18   could pay for that debris removal, to clear

19   that and make the home accessible, make the

20   home, allow for ingress and egress.

21        Q.   Okay.  But you would agree that

22   people need to know the reasons for FEMA's

1    decision on repair assistance so that they can

2    make intelligent decisions about whether and

3    how to appeal.

4         A.    It's clear as to how to appeal.

5         Q.    Right.  But people don't know

6    whether to appeal unless they know the reason

7    for the adverse decision against them.

8         A.    If we get very specific, we'd

9    probably have less appeals.  This is just

10   basically saying, "If you don't agree with our

11   decision, you know, you can appeal.  And in

12   order to appeal, we're going to be asking you

13   to provide us additional information to

14   support your appeal."

15        Q.    Okay.  And the letter that's sent

16   to applicants, it doesn't tell them that a

17   licensed contractor is required.

18        A.    No.  It just says contractor

19   estimates.

20        Q.    And the letter sent to applicants,

21   it doesn't tell them that a contractor's

22   estimate or a city's damages estimate is

1       required.  It just says that's additional

2       information that you could submit with your

3       appeal.  Correct?

4              A.     It says that that's what we will

5       be looking for in their appeal as additional

6       documentation.  What that would be looked at

7       is depending upon what is received as

8       additional supporting documentation.  If those

9       elements that are identified in the appeal

10      were not addressed in the initial inspection,

11      a new inspector would be sent out with

12      specific instructions to, "Look at this entire

13      structure.  Record all damages but pay

14      attention to X, Y & Z as these were identified

15      in the appeal itself as not being addressed."

16             Q.     But as I understand the appeal

17      procedures that are in the documents, if

18      somebody does not send in a contractor

19      estimate, their appeal would be denied?

20             A.     Not just an estimate.  If they

21      have not submitted any additional supporting

22      documentation or evidence that something was

**1**      overlooked in the initial inspection, then it

**2**      would be denied because there's nothing for

**3**      FEMA to render a different decision on based

**4**      upon someone simply saying, "I didn't get

**5**      enough money."  There's nothing for FEMA to

**6**      weigh that against.

**7**              Q.    But what about the applicant's

**8**      letter saying these damages existed only as a

**9**      result of the disaster?  What if that letter

**10**     is inconsistent with what the inspector says?

**11**     The inspector says, "In my judgment, it was

**12**     deferred maintenance."

**13**             A.    And if the applicant says, "The

**14**     inspector didn't address my foundation because

**15**     I didn't get any money for it and I know it

**16**     suffered damages," if the person at the NPSC

**17**     reviewing the case goes in and looks up in the

**18**     information provided by the inspector and sees

**19**     that the basement was addressed, well, this

**20**     person has provided us no additional

**21**     information to overturn our decision because

**22**     the inspector went in and verified that that

1     damage may not have been disaster related.

2              You see my point?  The applicant

3     says that they can just appeal, but tell us

4     why and show some supporting documentation for

5     us to review so that we can make a

6     determination as to whether or not we overturn

7     it or do we simply have to send it out, was it

8     not addressed and we have to send out a new

9     inspector to do another inspection.

10             Q.   Well, the concern is, and this is

11    what I'm trying to get at, is whether the

12    documentation that you require, a contractor's

13    estimate, is too difficult for poor people to

14    be able to get, as a practical matter.  Does

15    FEMA know anything about the access that poor

16    people are going to have to getting contractor

17    estimates?

18             A.   No, but they could also go to

19    local officials.  Local officials can refer

20    them to contractor estimates.  It doesn't

21    specify other than a contractor's estimate or

22    local official statement, something that would

1      be a supporting document for FEMA to review to

2      make a determination.

3          Q.    But if they can't get a

4      contractor's estimate or a local government to

5      inspect, they're out of luck.  Correct?

6          A.    If they cannot provide us

7      documentation for us to render a different

8      decision, then we would not change our initial

9      determination.  I can't comment on one's

10     ability or access to something that may or may

11     not exist.  I don't know how to answer that.

12         Q.    Inspector goes to a house, sees

13     that the roof is old, and in the inspector's

14     judgment the roof is a deferred maintenance

15     roof and is not going to pay for any of that.

16     So from your testimony, my understanding is

17     all the inspector would write down is

18     "Deferred Maintenance, General," or may add a

19     comment that "This was the roof" on there, and

20     that's all the information that FEMA has.

21         A.    No, that's not all the information

22     FEMA has.

1              Q.      What other information does it

2       have?

3              A.      A habitability call.

4              Q.      Anything else?

5              A.      Yeah.   All the other information

6       that the inspector collects out in the field.

7       They validate and verify their name, address,

8       Social Security, their insurance, potential

9       insurance coverage, members of the household.

10      That's the standard stuff that we talked about

11      earlier this morning that the inspector has to

12      go out and asks very specific questions to

13      validate the information that the individual

14      provided.

15              During the inspection, the

16      inspector is going to go out and record

17      whatever damages he or she sees at the time,

18      whether it's deferred maintenance, preexisting

19      condition or disaster related.  And then after

20      that inspection is done, the last thing that

21      the inspection does is make a habitability

22      call.  So it's not one piece of information at

184

1    a time.  They're combined with other pieces of

2    information.

3         Q.    But the only information that's

4    recorded, if the judgment of that inspector

5    was this is a deferred maintenance roof, the

6    only information about the roof that is

7    recorded is a check mark on "Deferred

8    Maintenance" that says, and at most a comment

9    that says "Roof."

10             MS. WELLS:  Object to the form.

11             BY MR. WESEVICH:

12        Q.    Right?  There's no other

13   information about what the basis of the

14   deferred maintenance was.

15        A.    Through deductive reasoning, it

16   would also mean that there was no

17   disaster-related damage as a result of having

18   a deferred maintenance roof.

19        Q.    Okay.  In that situation let's say

20   -- and the inspector in this hypothetical, the

21   only basis for the judgment is he looked at

22   the roof and it looked very old and that's why

                 FEDER REPORTING COMPANY
                 (202) 863-0000    (800) 956-8996

1    the inspector said deferred maintenance.  What

2    if the owner had a receipt for having just put

3    in the roof two years ago?  How would the

4    owner know to send in that receipt to FEMA?

5    It's documentation.  It's not anything that

6    has to do with a contractor estimate or a city

7    review of it.  What is it in that letter

8    you're looking at at 2956 that would tell the

9    applicant, "I should send in this receipt that

10   says I just got this roof put on"?

11        A.    What you haven't articulated is

12   whether or not there was any damage as a

13   result of that deferred maintenance roof.

14   Your scenario is that the inspector goes out

15   and sees an old roof and denies the person

16   assistance.  Does the person have any physical

17   damage outside of the fact that it's an old

18   roof.  Has the person suffered any damages as

19   a result of the disaster.

20        Q.    If the person is saying that "My

21   roof leaks, my roof leaks" --

22        A.    There will be evidence of that.

1   There will be evidence of that.  And the

2   inspector is to go in and look at each of the

3   rooms and record damages in each room.  So if

4   there is damages as a result of that and the

5   person says, "My roof leaks, there is the leak

6   marks there," the inspector is going to make a

7   determination as to whether or not that was a

8   preexisting condition or does it look as

9   though it's fresh and it's something that may

10  have been a result of the disaster.  That

11  damage may be recorded or it may just be

12  recorded that he also observed that it's a

13  very old roof that is in ill repair.  So he's

14  going to make that call.

15              Now, after he goes into each room

16  and if he records no damage, he's going to

17  record no damage.  But then at the end, he

18  will make a determination as to whether or not

19  the home is habitable.  And that's the last

20  thing that the inspector does.

21              So it's a combination of what he

22  or she views as damage, an interpretation as

1    to whether or not it was disaster related and

2    a determination as to whether or not the

3    people can live in their home based upon the

4    habitability criteria.  So I can't answer

5    without giving the whole picture, because it's

6    several things that take place at the same

7    time.

8            If an inspector goes out and

9    simply looks at a roof and says, "That's an

10   old roof," marks "Deferred Maintenance" and

11   walks away, that's a bad inspection.

12       Q.    But you'd agree that all the

13   applicant sees is the inspector comes in and

14   looks around at the house, and then next

15   thing, the applicant gets that letter that

16   begins on 2956.

17       A.    Yes.  And it says here that the

18   FEMA decision was you are ineligible because

19   of insufficient damage.  If I don't agree with

20   that, I'm going to write FEMA a letter saying

21   that I don't agree with it and here is why.

22   And, again, you need to, if you do not agree,

1    write an appeal.  An appeal says that you must

2    explain what it is you are appealing and then

3    provide additional documentation to support

4    what you are saying.

5          Q.    If an applicant sends in a

6    contractor estimate, what happens then?

7          A.    The estimate is reviewed by the

8    appeals folks, staff.  And what they do is

9    they review the entire case and look at what

10   is the person appealing to see whether or not

11   it was addressed in the inspector's report.

12   If it wasn't addressed, most often it would be

13   sent out for a reinspection.

14         Q.    And if it was addressed?

15         A.    If it was addressed and if it was

16   addressed as deferred maintenance, it would

17   come back to say that "We uphold our original

18   decision that you have insufficient damage."

19         Q.    Even though there was a contractor

20   estimate sent in?

21         A.    Did the contractor estimate

22   indicate that it was something other than

**1**    deferred maintenance?  Again, if the

**2**    contractor's inspector just comes in and says

**3**    the person received damage to their roof,

**4**    okay, they can go in, the inspector's palm pad

**5**    would indicate or the inspector's report would

**6**    indicate what was deferred maintenance, what

**7**    was preexisting, damages that existed interior

**8**    to the rooms or if no damages were recorded.

**9**              And then if a contractor sends in

**10**   saying that "Damages occurred as a result of

**11**   the disaster and here's my estimate," if it

**12**   was not covered in the initial inspection, a

**13**   new inspector would go out and inspect the

**14**   roof.  Even if it was identified as deferred

**15**   maintenance, there's a good chance that if the

**16**   cost estimate from a contractor indicates that

**17**   it was disaster related, most likely they

**18**   would send out another inspector because it

**19**   contradicts what was in the initial

**20**   inspector's report.

**21**              Q.   What if the contractor providing

**22**   the estimate says, "I don't know.  I don't

1    know whether this was disaster related or

2    preexisting," then what does the appeals

3    officer do with that estimate?

4              MS. WELLS:  Object to the form.

5              THE WITNESS:  They would also

6    determine whether or not the issue that was

7    being addressed by the contractor, was it

8    addressed in the initial inspection.  In that

9    case since we rely upon FEMA inspectors to

10   provide us all the information on damage that

11   is verifiable based upon the disaster, it

12   would be overruled.  The contractor's estimate

13   would be overruled saying it was addressed in

14   our initial inspection.

15              BY MR. WESEVICH:

16        Q.    So if FEMA's inspector said that

17   the roof was deferred maintenance and a

18   contractor went and looked at it and said, "I

19   don't know whether the disaster caused this or

20   whether it was preexisting," then FEMA's

21   appeals officer would uphold the original FEMA

22   inspector decision.

1            A.    If it was addressed in the initial

2       inspector's report, yes.

3            Q.    When you say addressed, you mean

4       that -- when you say that the FEMA inspector

5       addressed that item, you mean that it was

6       checked off in the areas of Deferred

7       Maintenance.

8            A.    Yes, or comments were reviewed in

9       the comments field.

10                 Again, I'd like to just go back to

11      this letter here where we talk about the

12      insert that reads as IID, Ineligible,

13      Insufficient Damage.  It says, "If you do not

14      agree with our decision, you have the right to

15      appeal."  If you go to the next page --

16           Q.    That's 2957?

17           A.    Yes.  At the very top as a

18      continuation of that it also says, "Explain in

19      writing why you disagree with FEMA's decision.

20      And please send any new or additional

21      information and documentation that you have

22      supporting your appeal."  So that would be

1    anything that would be an official document,

2    official statements.  But they also have to

3    identify what it is that they are appealing.

4              So if in fact they're saying that

5    "My roof leaks" and they provide us a document

6    from a contractor to say that the roof

7    continues to leak and it was caused by the

8    event but it was addressed as deferred

9    maintenance, chances are we're going to send

10   another inspector out there to confirm either

11   what was originally stated as deferred

12   maintenance or to support whatever that

13   contractor has provided as estimates.

14        Q.    But how would the applicant know

15   to ask the contractor to make this deferred

16   maintenance versus disaster related

17   distinction?

18        A.    They're most likely not going to

19   know that.  But they do know that they don't

20   agree with FEMA's decision.

21        Q.    Describe what the team leader of

22   the appeals section does.  Does that person

1    review every decision by an appeals officer

2    before it's finalized?  Or describe what role

3    that person has.

4              A.    The team itself?

5              Q.    The team leader.

6              A.    The team leader or supervisor?

7              Q.    Yes, sir.

8              A.    Typically that would be overseeing

9    and answering any questions that may come up

10   regarding any appeal that comes in, assisting

11   the staff and reviewing their case, clarifying

12   any questions that may arise.  And typically

13   the caseworker would review the case, render a

14   decision, coordinate it with the supervisor.

15   I'm not 100 percent sure if the supervisor

16   signs off on every single appeal, but it's

17   usually worked out because appeals are tricky.

18              You know, appeals are looking at

19   all documentation, trying to determine what

20   the individual is actually appealing, looking

21   at the inspection material, all of the

22   comments.  So it's a constant exchange of, you

1    know, "I have a question here.  Can you look

2    at this?  Can you verify that?  Is this

3    sufficient?"  It's a constant exchange.

4         Q.    Does somebody have to approve each

5    appeal decision besides the person who

6    recommends that decision?  In other words, are

7    there two people who review each appeal

8    decision before it's finalized?

9         A.    That I'm not 100 percent sure of.

10   I don't know if -- the appeals person is

11   someone else.  If it was manually reviewed

12   before isn't the same person.  It's different

13   people that review it.  I do believe it is a

14   two-step process, but I would have to verify

15   that.  I know that we've been streamlining

16   that throughout the years.  So I don't know

17   what it currently is, if it's two or more

18   people that actually go through the approval

19   process for it.

20        Q.    If a judgment of deferred

21   maintenance is made by the initial inspector,

22   the only way that that judgment can be

1          overturned is if there is an appeal inspection

2          ordered by the appeals officer.  Is that

3          accurate?

4                A.    There's no -- I mean the judgment

5          takes place in the field.  The call, the

6          eligibility call takes place at the processing

7          center.  So the call wouldn't be deferred

8          maintenance.  The call would be IID or

9          insufficient damage.

10               Q.    Ineligible for insufficient

11         damage.

12               A.    Ineligible for insufficient

13         damage.  That is the eligibility

14         determination.  Now, what would feed into that

15         determination is the inspection report.  And

16         if the inspection report only indicated that

17         there was deferred maintenance, then the

18         person would have to appeal and provide

19         additional documentation to support what they

20         are appealing, and then a determination would

21         be made to send out another inspector.

22               Q.    But the only way that a deferred

**1**    maintenance determination by the inspector

**2**    could be overturned is if a second inspection

**3**    is ordered.

**4**           A.    Not all the time.  And, again, if

**5**    the inspector sees on the roof that the roof

**6**    is deferred maintenance but there was actual

**7**    damage to the roof and estimates that there's

**8**    20 square feet of shingles that need to be

**9**    replaced or repaired on the roof and a

**10**   contractor submits an estimate saying that

**11**   there is 35 square feet of shingles that need

**12**   to be replaced, they may not send out an

**13**   inspector.  They may just simply grant the

**14**   additional 15 square feet of shingles.  So

**15**   it's not 100 percent one way or the other.

**16**   It's a call determined based upon what they're

**17**   appealing and how they're appealing and what

**18**   documentation they provided to appeal.

**19**           If I can add another example of

**20**   that.  Most often when there's basements

**21**   involved and utilities, furnace, hot water

**22**   heater is damaged but the inspector can't

1    determine how severely it's damaged, the

2    inspector is going to provide a

3    clean-and-sanitize or a clean-and-test for

4    that utility.  Then the person is going to

5    call in a contractor and say, "I got money

6    from FEMA.  I need to have this cleaned and

7    repaired."  And that person then says, "Well,

8    this is damaged a lot more once I got into it.

9    It's really damaged."  They can submit an

10   appeal with an estimate and FEMA could award

11   on that appeal.

12              It's the same type of premise.  We

13   may not have to send an inspector out to

14   verify on something that was already addressed

15   but not addressed fully.

16        Q.    And when you say addressed but not

17   addressed fully, you mean by the initial

18   inspector.

19        A.    That is correct.

20        Q.    Are appeals ever auto-determined?

21        A.    No.

22        Q.    I show you Pages 5006 and 5007.

1          A.    Yes.

2          Q.    Have you had a chance to review

3     those?

4          A.    Yes, I have.

5          Q.    In your Code of Federal

6     Regulations right there, this book --

7          A.    Yes.

8          Q.    -- could you look at 206.111.

9          A.    Yes.

10         Q.    206.111 has a bunch of

11    definitions.  Correct?

12         A.    Yes.

13         Q.    One of those definitions is

14    "safe"?

15         A.    Correct.

16         Q.    Okay.  The definition of "safe"

17    that appears in 206.111 is less specific than

18    the definition of "safe" that appears on Pages

19    5006 and 5007.  Correct?

20              MS. WELLS:  Object to the form.

21              THE WITNESS:  I'm not sure if I

22    would categorize it as less specific.  It's

1    different in the sense that in the Code of

2    Federal Regulations which is based upon FEMA's

3    authority to provide assistance for

4    disaster-related damages, "safe" is defined as

5    means secured from disaster-related hazards or

6    threats to occupants.

7              You now need to take what that is

8    saying and how is that to be viewed when you

9    go out and look at a structure.  And so this

10   sets the parameter for what this is

11   articulating -- when I say "this," it's Page

12   5006 -- for habitability characteristics in

13   terms of what does this particular "safe" mean

14   to an inspector in the field.

15              BY MR. WESEVICH:

16        Q.    As I understand what you are

17   saying, what's written on Pages 5006 and 5007

18   is consistent with what is in the Code of

19   Federal Regulations.  It's just more useful in

20   applying it when you go out in the field to

21   inspect a home.  Is that correct?

22        A.    That is correct.  That's correct.

1          Q.      Now, when judging whether

2    disaster-related damages has caused a safety

3    hazard, does FEMA have any standards for how

4    immediate the safety hazard has to be, how

5    likelihood, the likelihood of there being a

6    danger or how severe the danger is going to be

7    to someone?  In other words, beyond what's

8    written here on Pages 5006 and 5007, does FEMA

9    have any other standards for saying what is

10   safe, what repairs are necessary to make a

11   home safe?

12         A.      There is additional information

13   when it comes to imminent danger that would

14   affect the habitability, not specifically to

15   items as it relates to safety.  And I say that

16   because there is, for instance, imminent

17   danger where the house may not have suffered

18   any damage but is on the side of a cliff that

19   is eroding.  That places a house in imminent

20   danger which would affect the habitability of

21   the home which could also mean the home isn't

22   safe in its certain condition, in its current

1    location that close to the cliff.

2         Q.    Now, both the statute, the

3    Stafford Act and the regulations refer to

4    these terms, "safe, sanitary and functional."

5    Correct?

6         A.    Correct.

7         Q.    Does FEMA tell contractors to

8    distinguish safe from sanitary from functional

9    or do they all basically meld into one

10   concept?

11        A.    No.

12        Q.    There --

13        A.    Go ahead.  I'm sorry.

14        Q.    The question is do you tell

15   contractors how to distinguish among safe,

16   sanitary and functional?

17        A.    It has to do with the line items

18   associated with the Inspection Services.  In

19   other words, it all is a function of

20   habitability.  So if there are unsafe

21   conditions -- and there are examples, I

22   believe, that are described in some of the

1      training materials.  It also describes what

2      functional is.  "Safe" is described as it is

3      here and as you have described on a previous

4      page on the screen, what to look at when

5      looking at safety items.

6           Q.   Okay.  We're looking at 4290 here.

7      Do you recognize what that document is?

8           A.   Yes, I do.

9           Q.   Would you describe it?

10          A.   It's an ineligibility report

11     produced from the NEMIS system on all the

12     different categories of why an applicant is

13     ineligible.

14          Q.   And are those produced real time

15     for FEMA Headquarters in each disaster?

16          A.   It will vary but yes, we can call

17     up the NPSC and have them pull a report at any

18     time and they can produce a report like this.

19          Q.   Do they send those reports to you

20     daily during the first days of any major

21     disaster?

22          A.   Not in Headquarters.  It's

1    something that is typically monitored in the

2    joint field office by the Individual

3    Assistance staff at the joint field office.

4    And it's typically not going to come about

5    immediately following the disaster.  It will

6    come about when requested by the staff, and

7    then the staff would request however often

8    they want the reports sent to them.

9         Q.    When you say staff will request a

10   report, are you talking about field staff or

11   are you talking about NPSC staff?

12        A.    Field staff.  Field staff in terms

13   of the Individual Assistance staff that's in

14   the field.  Most often the NPSC will also send

15   out a NPSC liaison to support the Individual

16   Assistance staff in the field who can also

17   monitor a lot of this activity that's going on

18   at the processing center.

19        Q.    Now, this is the ineligible

20   housing assistance report.  Is this part of a

21   larger document that would include a report

22   concerning the eligible housing assistance?

1          A.    There are numerous, numerous

2     reports that can be pulled.  And it depends on

3     what information you are seeking.  But it can

4     be part of a larger report or it could be a

5     stand-alone report.  It depends on what

6     information you are requesting NPSC to pull.

7          Q.    But what information is pulled and

8     reported from the field to the NPSC and then

9     from the NPSC to Headquarters regarding a

10    disaster?

11         A.    They will look at eligibility

12    rates.  They will look at dollar amounts

13    disbursed.  They will look at how many

14    applications had been received, how many are

15    eligible, how many are ineligible.  But again,

16    there could be a category of ineligible.  And

17    then if there is high numbers, we would want

18    to look at a breakdown, which is what this

19    report is is a breakdown of those ineligible

20    applicants.  It can vary depending upon who is

21    seeking what information.

22              We could also get information and

**1**    reports on the Inspection Services, how well

**2**    are they receiving work and sending work back

**3**    to the NPSC, what is the time frame it's

**4**    taking them, average turn-around from an

**5**    applicant.  There's just hundreds of ways you

**6**    can ask for information and receive it.

**7**         Q.    And my question is specifically on

**8**    Disaster 1780.  What was the ongoing

**9**    monitoring that was conducted by the NPSC in

**10**   the field and by Headquarters of NPSC in the

**11**   field?

**12**        A.    I couldn't be sure.  I mean it's

**13**   standard that there is constant monitoring.

**14**   Prior to coming to Headquarters, I spent 15

**15**   years doing disaster work, probably have over

**16**   50 disasters that I've worked on.  Most of

**17**   those disasters, I was a Human Services Branch

**18**   Chief.  I would ask for these reports on an

**19**   ongoing basis just to get a feel for where we

**20**   stand within that disaster.

**21**             So this gives me a good indication

**22**   as to how many inspections, not this report

1    but any series of reports that I would

2    request, depending upon the information I am

3    seeking, how far along are we on this

4    disaster, how many inspections have been

5    issued, how many are pending, what's the

6    estimate of which we initially set for how

7    many inspections we would anticipate to know

8    whether or not X percentage through this

9    disaster.

10                I would also look at the dollar

11   amounts, the eligibility rates.  It's a

12   constant ongoing.  It's never something that

13   is potentially set 100 percent of the time

14   with the exception of some of this data would

15   appear in the daily situational report.  The

16   daily situational report is at the request of

17   the FCO.  And that gets shared with

18   Headquarters, but it doesn't typically get

19   into this type of detail.  It may have an

20   overall, what we would refer to as dashboard

21   or synopsis of the disaster, how many

22   registrations we have, how many are eligible,

1    how many ineligible, what's the dollar amount,

2    how many inspectors are in the field, how many

3    inspections have been completed, how many are

4    pending.

5              Information like that which is

6    overall information could appear in this daily

7    situational report.  As time goes on and the

8    disaster starts to slow down, become more

9    routine, the situational report may become

10   every other day, every third day, once a week,

11   once every two weeks, depending upon the

12   activity in the field.

13       Q.    When you mentioned FCO, by that

14   you mean Federal Contracting Officer?

15       A.    Federal Coordinating Officer.  I'm

16   sorry.  Yes.

17       Q.    As Human Services coordinator,

18   where were you located?

19       A.    I was based out of Boston in FEMA

20   Region 1, but I worked disasters all over the

21   country.

22       Q.    So as I understand, the monitoring

1    of the disaster response is done from the

2    regions?

3         A.    It happens at different levels.  I

4    do know when a disaster is ongoing at the

5    NPSC, they have continual monitoring of the

6    disaster because they are actually doing the

7    processing.  These are all processing reports.

8    So that is done on a, you know, all-the-time

9    basis.

10              For me in the field, I may not

11   need this information initially and I may

12   request it two weeks into the disaster so that

13   I can -- you know, once I'm able to sit and

14   digest all the information that's coming in, I

15   may want to see, "Okay, where are we in this

16   disaster?  I can see that the eligibility rate

17   is only 67 percent.  Why are people

18   ineligible?"  I would ask for this report

19   which would give me a complete breakdown of

20   why people are ineligible.

21        Q.    Is it your experience that the

22   applications start off slow, they ramp up very

1    high, and then they level off, and then they

2    drop precipitously?  Is that generally the way

3    that disasters go?

4         A.    Generally.  Generally.  People

5    will apply within the first several days of

6    the disaster.  The Inspection Services is

7    ramped up real quickly so that they could

8    literally be out in a matter of 24, 48 hours,

9    be in the field, start receiving work.  And

10   then we start monitoring, you know, how fast

11   is that work being sent back and completed to

12   the NPSC.  So it does generally look like a

13   bell curve.  And it's usually up front where

14   it peaks rather quickly and then it trails

15   off.

16        Q.    And then there's a three-day turn

17   around requirement on inspections.  Correct?

18        A.    For the overall task order, yes.

19        Q.    So the inspections, most of them

20   are done within the first two or three weeks

21   after the disaster.

22        A.    Depending upon the size of the

1    disaster.  But for other than very large

2    events, they're usually pretty much on target.

3    And what I mention is it's for the entire task

4    order that they have an average turn around

5    time of three days.  That's something that,

6    quite honestly, a Federal Coordinating Officer

7    is interested in because they want to make

8    sure that assistance is going out in a timely

9    manner.  So they will start asking the Human

10   Services Branch Chief or the Individual

11   Assistance Branch Chief, "How are the

12   inspectors doing?"  And we can pull those

13   reports to see what the average turn around

14   times are.  We can monitor that.

15                 If it is a very widespread

16   disaster where people are scattered throughout

17   the area, they may be more than initially

18   three-day turn around, because people have to

19   make contact with the individual, meet the

20   individual and look at their damage.  But if

21   it's a concentrated area where they can do

22   multiple inspections one right after another

1    and get in contact with the individual and

2    meet them, you know, the average might be less

3    than three days.  But they look for that

4    three-day average for the entire task order.

5            Q.    Do you know what efforts were made

6    to find all these general reporting documents

7    for 1780?  Because we have these ineligible

8    reports but we don't have any reports saying

9    that these are the dollar amounts that were

10   recorded or any reports that were made from

11   the FCO to Headquarters or anything like that.

12           So my question is do you know what

13   efforts were made to find the statistical

14   reports that were shared within FEMA on this

15   particular disaster?

16           A.    No, I don't.  But I do know as

17   mentioned, having produced many situational

18   reports, we typically will report out concerns

19   for the disaster, where we are in the

20   disaster.  And we'd always report out, and it

21   may not be in a report form like this but we

22   report out eligibility rate.  We would report

1     out the dollar amounts that have been

2     disbursed and the amount of registrations

3     we've received.  That is also typically

4     articulated and explained in the daily

5     briefings that the FCOs have.  And I say it

6     starts out daily and then it may go twice a

7     week, three times a week, and that will trail

8     off as the disaster goes on.

9              Q.    Because FEMA doesn't just give the

10    task order to PaRR and say, "Bring us back

11    these inspections and then we'll process

12    them."  It's watching the data that is

13    building with respect to applications and how

14    they're being processed all the time in each

15    disaster and it's doing that real time.

16    Correct?

17             A.    That is correct.

18             Q.    How is it that FEMA shares

19    information with various components at NPSC,

20    at Headquarters, on the field?  Is it done by

21    e-mail?  Is it done by -- do you have carrier

22    pigeons?  Do you have the mail service?  How

1       is it that that information is shared?

2               A.      Typically, there's reports

3       officers in the joint field office.  And

4       typically, I would have a reports officer

5       assigned to Human Services in Individual

6       Assistance.  And we could ask for what's known

7       as the WEBI reports.  It's W-E-B-I.  I can't

8       remember exactly what that is.  It's a WEBI

9       report and you can ask through the WEBI

10      report.  They have canned reports and ad hoc

11      reports, but they're standard reports that are

12      produced through WEBI.  And it will give all

13      the data statistics of that disaster.

14              So I could go to my reports

15      officer and say, "Can you pull me the

16      ineligibility report," or "Could you pull me

17      the disbursement report?  Can you pull me the

18      Inspection Services report," the owner report,

19      the housing report.  I mean there's numerous,

20      just volumes of reporting that we do.

21              Q.      Would you go to that person's

22      office and ask them orally or would you send

1    them an e-mail saying, "I need this report?"

2          A.    Typically, it would be done

3    orally.

4          Q.    Are all the reports that have been

5    requested and provided saved in a particular

6    file?

7          A.    It's all within NEMIS.  So you can

8    still pull reports from NEMIS for the

9    disaster.

10          Q.    But how can you tell what reports

11    were pulled by whom and when while the

12    disaster was going on?

13          A.    It can be pulled from -- any

14    number of requests can be made to pull a

15    report.  So it would be very difficult to say

16    what report was pulled for what reason by

17    someone's request for that information.

18          Q.    And where are the requests

19    recorded?

20          A.    The requests could be orally, but

21    the reports are generated through WEBI.  I

22    don't know if WEBI actually tracks how many

1    different reports.  It's a database.  You can

2    just simply go in and pull the information

3    from the database.  I don't know if it says,

4    "Okay, on this day, at this time, you pulled

5    this information."

6                    A lot of times what we do to meet

7    the sit. rep. report, situational report, is

8    we will set a time at 5:00 o'clock every

9    night.  If the report is generated for 7:00

10   o'clock in the morning, it means it has to be

11   written at night.  So we want to cut off every

12   day at 4:00 o'clock, provide the reports folks

13   a report that they will then put into the

14   situational report.

15                   So it could be set up once to say,

16   "Give us this until otherwise noted," or I can

17   go to my reports person at any time and say,

18   "I need a report today, right now on

19   Inspection Services.  I have to go meet with

20   the Federal Coordinating Officer.  He has

21   questions on them."  And I can pull it right

22   there, have someone pull the report.

1              And that can be pulled from the

2      Federal Coordinating Officer.  It can be

3      pulled from NPSC Headquarters.  I'm sure it's

4      pulled all the time at the NPSC.  It can be

5      pulled from External Affairs, Congressional

6      Affairs.  The request can come from any number

7      of sources.

8          Q.    But the type of real time

9      monitoring and the questions that were asked

10     at FEMA Headquarters and at NPSC about 1780,

11     I'm asking what records are made of that real

12     time monitoring process besides -- I hear the

13     WEBI is one potential source of that

14     information.  What are the other potential

15     sources of that information?

16         A.    NEMIS.  I mean NEMIS is the

17     official records keeper for the Agency.  So

18     all the data is kept in there, and you can

19     access the reports through WEBI.

20         Q.    That's going to tell us the

21     information but it's not going to tell us what

22     real time monitoring was done by FEMA

1    Headquarters.

2            A.     That's right, because it just

3    happens all the time.  And as I mentioned,

4    where processing takes place, they have more

5    monitoring taking place on an ongoing basis

6    than, say, the disaster field office or

7    Headquarters.  So, again, they're looking at

8    queue monitoring.  They're looking at any

9    backups in the system.  So they're monitoring

10   activity level in NEMIS for any particular

11   disaster on a daily basis.  But that may not

12   be generating a report.  It's managing the

13   system.  So it's constant.

14           Q.     You see in this Page 4290 that

15   there were 14,900 insufficient damage denials

16   as of September the 3rd, 2008.

17           A.     Yes.

18           Q.     And if I told you that there were

19   33,900 total applications and that this was

20   roughly about, what, that's about 45 percent,

21   something like that, of just the insufficient

22   damage denials, would that strike you as a

1    high number?

2         A.    It's situational.

3         Q.    You mean disaster specific when

4    you say situational?

5         A.    Yeah.  It could be something that,

6    you know, it's situational based upon the type

7    of event, the severity of the damages, the --

8    I mean we get very high spikes of

9    ineligibility in different parts of the

10   country for various reasons.  But, again, it's

11   going to be based upon the inspector going out

12   and validating that damage.

13        Q.    When you get those spikes, do you

14   at FEMA Headquarters try to understand the

15   reason behind those spikes at the time of the

16   disaster?

17        A.    If it's elevated to Headquarters,

18   it's something that's typically going to be

19   brought up in the disaster field office of

20   which they have their Human Services staff

21   there who would monitor and try to find out

22   what's the situation.  At least that's what I

1    did when I was a Human Services Branch Chief.

2         Q.    But if the field sees a spike, is

3    an attempt made by someone at FEMA, whether

4    it's Headquarters or NPSC, to understand the

5    reason behind it?

6         A.    Yes, typically.

7         Q.    And would this be considered a

8    spike, 14,900 of 33,000-some total

9    applications?

10        A.    I would consider it to be raising

11   an issue that I would want to know more about.

12        Q.    And would you expect Headquarters

13   and NPSC to have looked into this?

14        A.    I would expect the field office to

15   have looked into it and get a better

16   understanding as to what is driving this

17   ineligibility for insufficient damage.

18        Q.    And what reports would you expect

19   them to generate?

20        A.    They may not generate a report,

21   but they would look into it and try to find

22   out what is the situation surrounding a high

1      percentage of insufficient damage.  So it

2      could be a coordination back to the NPSC which

3      could be verbal to say, "We're seeing a lot of

4      insufficient damage due to..." X, Y & Z

5      reasons.  And it may be good enough or they

6      may want to say, "Can you look into that."

7                    And as you can see, there are any

8      number, there are several different reasons

9      why people are ineligible there.  So in any

10     one of those, they may want to look into any

11     number of those reasons as to why this number

12     is this; you know, "Can you give me more

13     information?  What are you finding?  What are

14     the inspectors finding?"  Because the IID is

15     an insufficient damage call.  It's an

16     inspector call.

17                    So they may want to reach back out

18     to find out what is the inspector finding out

19     there?  Why do we have such a high percentage

20     rate?  That is a typical reaction if I were to

21     review this report and I were in the field.

22     Again, there are many different people out

1      there who would do things differently.  My

2      experience, when I see high numbers, I want to

3      know a little more.  I would call the NPSC and

4      I would ask them, "Can you look into this?"

5              Q.    But my question is what was done

6      in 1780 to look into it?

7              A.    I don't know.  It could have been

8      verbal.

9              Q.    Have you tried to find out?

10             A.    I was aware that there were a lot

11     of insufficient damage but I wasn't aware at

12     the time of 1780.  This was done in 2008.  I'm

13     not 100 percent sure if I was aware or not.

14     But, again, this is something that is

15     monitored in the field.

16             Q.    Right, but you haven't looked into

17     it to prepare for this deposition to look into

18     whether anything was done to learn the reason

19     behind that number.

20             A.    No, because I'm aware that there

21     was an awful lot of deferred maintenance and

22     preexisting condition that resulted in an

1          insufficient call.

2                    Q.    How are you aware of that?

3                    A.    From reading the material and when

4          I was first questioned about what's my

5          knowledge of this back in 2010, 2011,

6          somewhere in that time frame.

7                    Q.    Now, the first bullet point that's

8          written on this report says "Most of

9          ineligible HA cases are IID decisions that

10         consist of deferred maintenance, and damages

11         that do not affect habitability are the top

12         reasons."  What information in NEMIS would you

13         look at to distinguish how many of the 14,900

14         were deferred maintenance and how many of them

15         were habitability?

16                   A.    It comes from the Inspection

17         Services report and what they capture as

18         damage.  And if they indicate that it's

19         deferred maintenance, that is the call that

20         the inspector makes.  Habitability is

21         determined based upon the FEMA decision and

22         its processing system.

1           So, again, it's by the inspector

2    who says it's habitable, the overall condition

3    of the home is habitable or not inhabitable,

4    uninhabitable.  And whether or not it's going

5    to be processed for any assistance is

6    determined, the actual eligibility is

7    determined by the system.  So I don't know if

8    I explained that clear enough.  But also

9    clearly for someone to come up with a report

10   with those bullets underneath, they did some

11   analysis to determine.  So this was monitored.

12           Q.    And you had said that you can go

13   back to NEMIS and it's got all the data in it

14   and you can ask it all the questions and

15   generate all the reports that you want.

16           A.    All the different reports.

17           Q.    So my question is could you go

18   back in now and say, "Well, how many of those

19   14,900 applications were insufficient damage

20   as a result of deferred maintenance and how

21   many of them were the result of habitability"?

22   Could you go back and find those numbers?

1          A.     It should be there, yes.

2                 (Recessed from 3:14 to 3:29 p.m.)

3                 BY MR. WESEVICH:

4          Q.     Back on.  Now, three percent of

5    the inspections in each disaster are supposed

6    to be checked for quality control.  Correct?

7          A.     Correct.

8          Q.     And FEMA's purpose in doing that

9    is to make sure that inspections are

10   conforming to FEMA's policy.

11         A.     In the Inspection Services

12   guidelines, correct.

13         Q.     Because FEMA wants there to be

14   consistent administration of the IA Program.

15   Right?

16         A.     That's correct.

17         Q.     You want people who have basically

18   the same facts to get the same repairman.

19         A.     Yes, that's correct.

20         Q.     No matter who their inspector is.

21         A.     That's correct.

22         Q.     And a FEMA correction is when FEMA

1       orders the contractor to change an inspection

2       or to take a certain action with respect to

3       one of its inspectors.  Is that accurate?

4              A.    It's accurate in terms that FEMA

5       would notice an error in the report and ask

6       for it to be corrected.  They can also monitor

7       those errors.  They can also monitor the

8       actual inspectors by inspector number to know

9       whether or not is it an error that's made by

10      one inspector or is it something that is

11      systemic that needs correction.  So yes, there

12      is a process of which FEMA can send back an

13      inspection for correction.

14             Q.    Because not only is FEMA

15      monitoring the overall statistics for disaster

16      assistance applications real time, it's also

17      monitoring each application and how that data

18      is, the validity of that data according to

19      FEMA standards.

20             A.    Yes.  They will do a sampling of

21      all the inspections.  And contractually

22      they're to review three percent of those QCs.

1    They do quality control inspections on that

2    minimal three percent.  So it's a sampling.

3         Q.    And would you say that F-corrs are

4    unusual in any disaster?

5         A.    F-corrs?

6         Q.    FEMA corrections.

7         A.    Oh, FEMA corrections.

8         Q.    Are those commonly referred to as

9    F-corrs?

10        A.    I don't know for sure.  I don't

11   know for sure.  That's language that's

12   typically used through Inspection Services.

13   So I don't know.  It wasn't used when I did

14   inspections.  It's plausible.  But yeah, FEMA

15   corrections are done.

16        Q.    But are they unusual in any

17   disaster?

18        A.    No, no, they're not unusual.

19        Q.    So if there were 345 FEMA

20   corrections out of 1,444 QC inspections, that

21   would be about 25 percent.  Correct?

22        A.    Yes.

1          Q.    300 divided by 1,444 --

2          A.    Yes.

3          Q.    -- is roughly 25 percent.

4          A.    Roughly.

5          Q.    So what that would say is that in

6    a quarter of all times that FEMA reviewed what

7    PaRR did with inspections, that FEMA disagreed

8    with it.  Isn't that what it means?

9          A.    It may not be a disagreement.  It

10   may be a correction.  And a correction could

11   be for any number of reasons, you know.  And I

12   couldn't even begin to articulate all the

13   reasons, but there are several.  There's

14   numerous reasons that would be kicked back as

15   a correction.  And, again, it's usually based

16   upon the processing established throughout the

17   system and then the Inspection Services

18   guidelines.

19         Q.    Is a 25 percent correction rate

20   high?

21         A.    I don't know.  I haven't compared

22   it to other disasters.

1          Q.    Is that something that FEMA would

2     want to know the reason for if they were

3     issuing that rate of corrections?

4          A.    It's something that Inspection

5     Services would monitor and Inspection Services

6     would want to track, because it also affects

7     the accuracy of the inspections and the

8     contract itself.  So in other words, it's a

9     performance-based contract and they watch for

10    error rates and everything else, and that

11    would affect the contract itself.

12         Q.    And are there target error rates

13    set in the contract?

14         A.    That I don't know.  I don't know.

15    I have not reviewed a contract in a very long

16    time.

17         Q.    But when you say Inspection

18    Services -- you used that term several times

19    -- I want to be clear about exactly who that

20    is.

21         A.    Steve Ells at the Virginia NPSC is

22    the project supervisor, program supervisor

1     overseeing Inspection Services.  He's a

2     manager out there.

3          Q.    He oversees all of the PaRR and PB

4     contracts?

5          A.    He oversees the contracts for PaRR

6     and PB, yes.

7          Q.    And so he would be the one to say

8     whether 25 percent was an unusually high FEMA

9     correction percentage for QC inspections.

10         A.    He would be my point of contact.

11    If I asked him to give me some samplings of so

12    many disasters of what the error rate was, he

13    would be my point of contact that I would go

14    to.

15         Q.    And he would be the one to

16    investigate the reason for, the reasons behind

17    the need for FEMA corrections?

18         A.    He could be one, yes.  He would be

19    the primary person.  But there are several

20    people that work for him because there is also

21    task monitors, project monitors, disaster

22    monitors.  So I would know who is the

1          Inspection Services coordinator assigned to

2          that specific disaster and I may go to that

3          person for that disaster to say, "Can you look

4          into this?"

5                Q.    And do you know who the people

6          were who would have been responsible for

7          Disaster 1780?

8                A.    No, I don't.  I would have to look

9          that up to find out who was assigned as the

10         Inspection Services coordinator.

11               Q.    How would you look that up?

12               A.    I would go to Steve Ells.  Steve

13         Ells is the supervisor/manager for Inspection

14         Services.  He would be the one, through other

15         individuals as well, to assign a particular

16         disaster to one of the project monitors.

17               Q.    You had mentioned that one of the

18         things that the FCO, one of the data elements

19         that the FCO sends to FEMA Headquarters on a

20         real time basis during a disaster is the

21         amount of dollars awarded.

22               A.    He sends an entire situational

1      report, commonly referred to as a sit. rep.,

2      which is a report inclusive of all of the

3      activities ongoing for that disaster.  There

4      is a section in that report assigned for

5      Individual Assistance.  And that information

6      is typically reported up from the Individual

7      Assistance officer, Branch Chief, Branch

8      Director, whoever is in charge of Individual

9      Assistance at the JFO.  That information is

10     provided into the situational report, the sit.

11     Rep.

12          Q.    And one of the numbers that's

13     reported regarding Individual Assistance is

14     the total number of dollars that had been

15     awarded in the disaster.

16          A.    Typically.  Typically, it is.

17          Q.    And is it broken down in the

18     situational report by repair assistance,

19     rental assistance, replacement assistance?

20          A.    It can be.  It can be.  If the FCO

21     or if there is people wanting to know how it's

22     broken down, we can break it down.  A lot of

1    times it's, you know, we're ten days into the

2    disaster.  FEMA has issued $13 million in

3    assistance for individual assistance.

4    Sometimes it's just the overarching amounts.

5    If someone says, "How is that broken down,"

6    then we can provide that information.

7           Q.    Who are the consumers of those

8    situation reports?

9           A.    A lot of times they'll go to the

10   state.  It goes to FEMA Headquarters for

11   senior management to be aware of the situation

12   ongoing in the field.  It can be provided.

13   Since the information is produced in the field

14   office, a lot of times the other sections

15   within the field office may want to look at

16   those reports to see what's going on in, for

17   instance, Public Assistance or Community

18   Relations or External Affairs.  So it's a

19   broad audience.

20          Q.    Would Deborah Ingram be one of the

21   ones to get those reports or the person in her

22   position?

1          A.     She would have access to those

2     reports, yes.

3          Q.     But would she look at them for a

4     major disaster on a daily basis, do you know?

5          A.     Possibly.  The reason why I say

6     possibly is that we also set up conference

7     calls on a major disaster on a daily basis for

8     coordination efforts.  And we will ask

9     questions.  We'll coordinate.  We coordinate

10    with the region.  So maybe she gets her

11    information from some other source.  But the

12    information is typically provided in the

13    situational report, sit. rep. report.  Whether

14    or not she reads it, I couldn't tell you.

15         Q.     Would you look at that document.

16    We're looking at Page 5948.

17                 Is it clear enough?

18                 MS. WELLS:  Can you tell us if

19    this is the entire document or does it

20    continue on another page?

21                 MR. WESEVICH:  It does continue

22    on.  That's the only other page.  If the

1          footnote is a little hard to read, I can...

2                    THE WITNESS:  I've read it.

3                    BY MR. WESEVICH:

4          Q.    Do you know what that document is?

5          A.    No, I don't.

6          Q.    Do you know what the form of the

7     document is?

8          A.    No, I don't.  It looks as though

9     it's a summary sheet of the preliminary damage

10    assessment information and the declaration

11    information.  But I don't know in what

12    reference this document was produced.

13         Q.    Is there a preliminary damage

14    assessment that's done for most disasters?

15         A.    Yes.  They are done for the

16    majority of disasters.  Even after if it's a

17    catastrophic event where it's inevitable that

18    it's going to be declared, sometimes the

19    President at his or her discretion -- his

20    discretion -- will declare the event.  But we

21    always do a damage assessment after the event

22    so we know the scope and magnitude and the

1    required resources to respond to that

2    disaster.

3              Most typically, a preliminary

4    damage assessment is to support the state's

5    request in requesting a declaration from the

6    President.  So in other words, FEMA regional

7    offices will coordinate with the state and

8    deploy teams to get together with the state

9    personnel and go out and assess damages before

10   a declaration is granted.  That information is

11   collected, coordinated with the state.  And

12   then the state, based upon that information,

13   would make a request for the President to

14   declare an event.

15        Q.    The President declares roughly

16   like a hundred disasters a year.  Correct?

17        A.    Correct.

18        Q.    And maybe ten of those are so big

19   there's no real question that it's going to be

20   declared a disaster and it's mostly known in

21   advance and driven from the Federal Government

22   as far as the Presidential disaster

236

1    declaration.

2         A.    It's never driven from the Federal

3    Government.  It's always at the request of the

4    state.

5         Q.    Very well.  Who prepares the

6    preliminary damage assessment?

7         A.    The preliminary damage assessment

8    is comprised of a team, typically, of regional

9    staff, disaster employee reservists, disaster

10   assistance employees that are called up by the

11   region to conduct a preliminary damage

12   assessment.  They will usually have a

13   refresher course of what to look for in those

14   damages.

15             The state will usually give

16   indication as to what to look for in that

17   event.  And I call it event because it's not

18   declared yet.  And then typically the state

19   will indicate where the teams of PDA staff

20   need to go to collect damage information.

21             Typically, when the state and the

22   team go to a community, the first stop is with

1    the community officials to get a better

2    indication from the community officials where

3    to look for damage.  And then it's merely a

4    preliminary damage assessment to look at the

5    damage size, magnitude and scope of that

6    disaster.

7                So the inspector is going to go

8    out, look at the homes that were damaged.

9    They don't go in and do a detailed inspection.

10   They go in and make a determination whether or

11   not it was major, minor or destroyed damage

12   based upon what they see.  That information is

13   then coordinated with the state because the

14   state is in partnership all along throughout

15   this process.  And then the state will make a

16   determination as to make a request for

17   declaration from the President.

18           Q.   Do you know who the PDA team was

19   that went out to investigate for Disaster

20   1780?

21           A.   I do not know.

22           Q.   How would you find out?

1          A.      I would have to call down to

2    Region 6 of which is the region overseeing the

3    State of Texas and find out who headed up that

4    team, how many teams were deployed and the

5    areas that they visited.  I do know that they

6    visited the three counties that were declared,

7    and that was supported by the request from the

8    state.

9          Q.      Please look at Document 5122 and

10   23.  I want to begin by just asking whether

11   you know what this form of document is.  It

12   should be in -- you filed it as 78-9.  And I

13   think it's also in, another version of it is

14   around Page 100 of your Bates numbers.  But

15   that's slightly different than this one.  It

16   probably won't matter.

17         A.      I've reviewed this document.

18         Q.      Do you know what the document is

19   that is at 5122 and 5123?

20         A.      I believe this is a summary sheet

21   produced for the contractors' briefing that

22   gives all the particulars for this event and

1     sets a course in terms of, I mean it talks

2     about what was declared, are they anticipating

3     any additional areas to be declared, what are

4     some of the potential concerns, are there

5     language concerns.  It's a snapshot of what

6     was looked at through the PDA process and then

7     the declaration process.

8                   It also says here that the

9     declared date was July 24th but IA, Individual

10    Assistance, programs was added on July 31st

11    which would mean that Public Assistance was

12    most likely declared first, and then because

13    the preliminary damage assessments weren't

14    completed or the states hadn't made a request

15    for IA that they did an additional preliminary

16    damage assessment to support the state's

17    request to add IA programs.

18         Q.    So that document that's Page 5123

19    was produced after the PDA was done.

20         A.    Typically, yes, because it's

21    typically produced when the disaster is

22    declared.  So it's not produced because the

1    PDA is done.  It's produced when the disaster

2    was declared to give a snapshot of the

3    information that's been gathered through PDA,

4    through the region.  And it also says down

5    here, I believe, you know, who was assigned

6    for the inspections.  This was produced by the

7    contractor, the Inspection Services folks for

8    the contractors' briefing.

9         Q.    What documents are created to

10   describe the PDA?

11        A.    There is a PDA manual that

12   describes how to conduct a PDA.  There is

13   also, the process for a PDA is that if an

14   event happens in a state and the state feels

15   as though it's beyond their capability, the

16   state will coordinate with the region to say

17   that "We want to send out PDA teams."  The

18   region would say, "Are you looking at Public

19   Assistance or Individual Assistance," because

20   they would be different teams that would be

21   going out.

22              And if the state would say that

1    "We want to set up teams to go out and look at

2    three counties.  We may look at more.  We're

3    still collecting information.  So I'm looking

4    for three teams and they'll begin on this

5    coming Monday and could you have three teams

6    ready to support us in this preliminary damage

7    assessment," the region would say, "Yes, and

8    where would you want to meet?"  And then they

9    would meet up with the state, go over the

10   particulars for what the state knows at that

11   time.

12              Typically, they're going to also

13   ask the state, "We're here to look at all

14   damages."  And a lot of times the state may

15   say, "Well, we're still receiving reports from

16   several counties but right now we want to go

17   out and look at these particular counties,"

18   and the teams would meet up with the state.

19   They would all go out to the affected county,

20   meet up with the local person, get more

21   information about the types of damages that

22   they've seen, where to go, where the locations

1      were, and then they would all go out to view

2      that damage.

3                  Once that damage is collected,

4      it's collected on like tick sheets.  We used

5      to call them tick sheets which would indicate

6      category of damage, whether or not it was a

7      single family home, a mobile home,

8      condominium, multifamily home, the address,

9      the location, and then the category of damage.

10     And I say category because it's not an

11     inspection on the particulars to that

12     structure.  It's basically a category of

13     damage of major, minor or destroyed or

14     inaccessible.  And if they can't get to the

15     area, it would be marked as inaccessible.

16                 All of that would then be gathered

17     however long the PDA process takes.  Sometimes

18     it might take one to three days.  Other times

19     it might take longer.  If the state wants to

20     look at other counties or other areas of

21     damage, that's an ongoing process while the

22     PDA team is out.  And then all the information

1       is put together and the information is

2       provided to the state.

3                   The state would do a write-up to

4       the President or to the region asking for --

5       to the President but asking for a major

6       declaration.  They would describe the event,

7       the duration of the event, the beginning of

8       the event and whether or not the event is

9       continuing or if there was an end date to the

10      event, what counties they're looking for, and

11      what assistance they're looking for.

12                  That goes to the region.  That

13      goes to Headquarters and goes to the region.

14      The region then writes up a report on their

15      recommendation based upon the state's request

16      and then it gets forwarded to Headquarters of

17      which it then goes through a whole other

18      process through the declarations unit.

19                  It's also reviewed by the programs

20      to determine whether or not it is supported by

21      Headquarters on whether or not to support the

22      recommendation from the region based upon the

1    request of the state.

2         Q.    The state has the option of

3    involving the regional teams in preparing the

4    PDA.  Correct?

5         A.    It's not so much an option.  The

6    information needs to be collected.  And it's

7    collected jointly to support the state's

8    request.  So in other words, and according to

9    the 44 CFR on the declarations process, the

10   state needs to verify the damages in order to

11   make a request.  And what they do is they do a

12   preliminary damage assessment.  And they will

13   seek assistance from FEMA to also conduct that

14   preliminary damage assessment.  FEMA then

15   typically also involves the Small Business

16   Administration to look at business damages

17   since FEMA does not cover business damages.

18        Q.    So it's not accurate to say that

19   in smaller disasters the states will do the

20   PDA themselves and send them to the President.

21   They'll always involve FEMA to do the PDA even

22   in the smaller disasters.

1           A.     It would still need some

2    validation from FEMA before it goes to the

3    President for determination.

4           Q.     Now, deferred maintenance is also

5    an issue in Public Assistance.  Correct?

6           A.     I'm not familiar.  I mean I

7    mentioned earlier that I worked in Public

8    Assistance.  It was in 1993.  So a lot of

9    things have changed in Public Assistance since

10   then.  So I'm not as familiar anymore with how

11   they conduct their business in Public

12   Assistance.

13          Q.     So you don't know how deferred

14   maintenance is considered in what Public

15   Assistance can be provided in repairing public

16   buildings.

17          A.     Correct.

18          Q.     Is it accurate to say that

19   buildings, whether they're private or public

20   that are not individual residences, office

21   buildings, shopping centers, courthouses, all

22   kinds of buildings, they typically have

1     maintenance records associated with them

2     because they've got supervision that's more

3     formal than an individual's residence?  Is

4     that accurate?

5          A.    I would say that's accurate.

6          Q.    Now, some insurance companies

7     require like a building maintenance log as a

8     condition of insurance.  Right?

9          A.    I believe so.

10         Q.    In the preliminary damage

11    assessment based on the population of the

12    counties for which assistance is requested or

13    the declaration is requested, and based on the

14    number of minor homes damaged and homes

15    suffering major damage, does FEMA come up with

16    an amount that it expects to spend in IA?

17         A.    In terms of dollar amount?

18         Q.    Yes.

19         A.    There is formulas that are

20    identified in the Code of Federal Regulations

21    and the declaration that are guidelines.

22    They're dated.  I believe they're from 1990.

1     But FEMA does not put, necessarily put dollar

2     amounts.  That is part of the regional

3     write-up.  But there is no threshold or

4     standard of which FEMA would apply a dollar

5     amount for Individual Assistance.

6                Public Assistance, according to

7     the Code of Federal Regulations, does set

8     guidelines for dollar amount thresholds per

9     capita costs.  Individual Assistance does not

10    provide such per capita dollar amounts.

11       Q.    When you say threshold, do you

12    mean like a quota as far as an amount that

13    FEMA expects to pay for Individual Assistance

14    for this disaster?

15       A.    No, no.  It's not a quota.  It's

16    not a threshold.  For Individual Assistance

17    based upon the major/minor destroyed damage,

18    we start looking at what some of the potential

19    program costs could be.  That is no way

20    binding in any way.  It's a benchmark for how

21    big we think the disaster is going to be and

22    the expected Federal assistance required to

1    support the recovery of individuals.  It is

2    not binding in any way.

3            Q.    But that's a number that FEMA

4    Headquarters is very interested in for a major

5    disaster, right?  They want to know what their

6    exposure is and whether they're going to have

7    to go to Congress for appropriations, right?

8            A.    Well, they want to know but it's

9    not -- what's more important is the magnitude

10   of the disaster, the homes destroyed, what is

11   it that Federal Government can bring to assist

12   in the recovery.  So I mean this information

13   is required.  It's in the templates that are

14   provided that we need to come up with what the

15   estimated program costs are.

16                The reason why we look for that is

17   because it also helps FEMA to know how to

18   staff that disaster.  If we know that we're

19   going to have an awful lot of people that are

20   eligible for other needs assistance, you know,

21   is it also helps the state.  The Other Needs

22   Assistance Program can be administered

1    different ways.  And if there's going to be an

2    awful lot of people eligible for the Other

3    Needs Assistance Program and it happens to be

4    a state-run program, that information would be

5    used to support the state and what some of the

6    staffing requirements would be.  It's a

7    benchmark.  It's an indicator to know how we

8    should manage that disaster.

9         Q.   And are statistics prepared that

10   compare disasters to one another?  For

11   example, this many people lived in the

12   declared counties and this was the average

13   amount that was provided on a per capita

14   basis.  Are those types of statistics

15   maintained by disaster?

16        A.   Not on a per capita basis.  In

17   other words, there is information -- again,

18   are we talking preliminary damage

19   determination or post-declaration, post-award?

20        Q.   Actually, thank you for that

21   clarification because I did mean post, actual

22   performance.  And the question is, broadly,

1    after the disaster is concluded, what

2    statistics are maintained to compare payments

3    by disaster, across disasters?

4         A.    I'm carefully picking this only

5    because, are you talking about comparison of

6    disaster to disaster or comparison of that

7    disaster as it related to the preliminary

8    damage assessment for that event?

9         Q.    Both.

10        A.    Okay.  Because FEMA has been doing

11   a lot of work in trying to look at improving

12   our PDA process so that in an event that was

13   declared, we are now looking at what's the end

14   result of that disaster in terms of the amount

15   of people that applied for assistance, the

16   category of damage, the dollar amount, how

17   does that compare to the preliminary damage

18   information that actually was used for the

19   state to request their declaration.

20              We are doing some of those

21   comparisons now.  We typically don't look at

22   comparison of post-disaster to post-disaster

1      statistics.  We don't say, "Okay, you know,

2      these three counties in California compared to

3      these three counties in West Virginia."  We

4      don't necessarily do those comparisons.

5                  What we do do, however, is if

6      there are repeat disasters within the same

7      state, we would want to know what counties

8      were declared in previous events.  And one of

9      the reasons for doing that is we have certain

10     requirements of which some requirements for

11     assistance would be placed on the individuals

12     such as if they are in a special flood hazard

13     area, they have to purchase and maintain flood

14     insurance.  If they do not maintain flood

15     insurance, they are not going to be eligible

16     for any future disaster assistance for

17     insurable items.

18                 So we would want to know in

19     comparison when was the last disaster declared

20     so that we can start comparing how many flood

21     insurance policies were issued and things of

22     that nature.  But we typically don't say,

1          "Well, how much did they get last time versus

2      how much are they going to get this time?"

3      It's very disaster specific.

4          Q.   One of the maps that PaRR

5      generated, it shows a geographic map of the

6      declared areas and it shows dots where all the

7      inspections were performed.  What other maps

8      are maintained about the disaster?  For

9      example, is there a map that shows where money

10     was provided, the houses where repair

11     assistance was provided?

12         A.   In terms of a standard map?

13         Q.   Is it something that FEMA

14     generally produces?  Like do you have a map,

15     "These dots are the areas where we provided

16     assistance."  Let me find this other map and

17     I'll see if I can be clear.

18         A.   The reason I asked the question is

19     because my experience working in the field is

20     that where the Federal Coordinating Officer

21     holds his daily briefings with all of his

22     management staff along with the state, they

**1**    usually like to decorate the walls with

**2**    various types of maps that would show any

**3**    number of different informational points.  In

**4**    other words, they could put red dots to show

**5**    where the inspections have taken place.  They

**6**    could also indicate dollar amounts disbursed,

**7**    inspectors out there.

**8**              That's a typical map that we may

**9**    see in the senior conference room for the FCO,

**10**   so that it provides a visual to see where the

**11**   concentrated inspections are going to be.

**12**   This is something that is not standard.  It

**13**   could be done.  It's done often, but the

**14**   information being requested is going to change

**15**   depending upon what the FCO would like to see

**16**   hung up in the conference room.

**17**        Q.    And when you say "that," you're

**18**   looking at Page 1901.

**19**        A.    I'm sorry.  Yes.

**20**        Q.    Now, just to be clear, you are

**21**   saying that the FCO could ask for a map like

**22**   this one in 1901 that provided a geographic

1      breakdown of where assistance was denied and

2      where assistance was provided.

3              A.    It's typically where it's

4      provided.  And I say that because that's what

5      FEMA is interested in based upon our

6      regulations, how much assistance was provided

7      for eligible categories of damage.  So I'm

8      trying to recall if I've ever seen a map

9      simply identifying where assistance is denied.

10     I don't recall that, seeing maps like that.

11             Q.    But presumably if NEMIS could

12     generate the data that would be necessary to

13     provide a map of where assistance was

14     provided, they could do it on ineligibles as

15     well.

16             A.    It could be provided.  I've just

17     never seen one.

18             MS. WELLS:  Let me just clarify

19     for the record that the map that's shown in

20     Document 1901 is not either of the maps that

21     you've just been talking about, right?  This

22     shows something else.

1           MR. WESEVICH:  The map in 1901, as

2   I understand, from Page 1900, that this shows

3   where inspections were conducted.

4           MS. WELLS:  Right.  It doesn't

5   show who received benefits and who didn't.

6           MR. WESEVICH:  Correct.

7           MS. WELLS:  Yeah.

8           THE WITNESS:  I might also add

9   that different maps are produced for different

10  reasons.  If we see a concentration of

11  applications -- and that is another map I see

12  frequently is where are people applying from,

13  what counties.

14          A lot of times that information

15  might be used in community services, community

16  relations because we have teams of people

17  going out to the affected communities and

18  reaching out to the individuals, asking them

19  to apply, finding out how they are doing, have

20  they received assistance, have they contacted

21  the voluntary organizations, and point them in

22  the system in different directions.

256

1              If we see areas where there's a

2       concentration of registrations and we haven't

3       sent teams out there, some maps are used to be

4       able to point people in different directions,

5       saying that could you go visit, you know, this

6       area of the community where we didn't have

7       teams out there yet.

8              So there's various reasons why

9       different maps uphold.  It primarily shows up

10      in the FCO conference room, though, Federal

11      Coordinating Office's conference room.

12      Q.    And where would that be?

13      A.    In the joint field office

14      established out in the field within the

15      affected area to run that disaster.

16      Q.    Because before, we had looked at

17      the September 3 ineligibles report where it

18      said that there were 14,900 ineligibles that

19      could be habitability or deferred maintenance.

20      The question is if you wanted to know where

21      all those deferred maintenance denials were

22      concentrated, could you have made a map?

1              MS. WELLS:  Object to the form of

2        the question.

3              THE WITNESS:  Yes, but it would be

4        based upon the ineligibility call.

5              BY MR. WESEVICH:

6        Q.    Correct.

7        A.    So in other words, we could ask

8        that information, but I guess my question

9        would be why.

10       Q.    Is one reason why FEMA might want

11       that information so that it could send out

12       someone from the field office -- and we'll

13       talk about who in a minute -- to check in high

14       concentration areas whether this is deferred

15       maintenance?

16       A.    No.  We've already sent our

17       inspector out there who made that

18       determination that it was either ineligible

19       for insufficient damage or deferred

20       maintenance.  So we've already sent out the

21       subject matter expert to go out and look at

22       that.  Now, we would have, typically already,

1      have had community relations staff throughout

2      the areas, you know, assisting people in

3      applying, telling them how to apply, and

4      explaining basic steps of what to expect once

5      they apply.

6                  But we wouldn't send anyone else

7      out to try to second-guess what an inspector

8      has already determined based upon their

9      expertise of going in and actually viewing the

10     damage, meeting with the applicant and going

11     into every room and looking at the house in

12     its entirety for habitability issues.

13          Q.    But if FEMA was concerned about

14     the high incidence of deferred maintenance

15     denials, it would have an easy way to find out

16     where those denials were concentrated.

17                  MS. WELLS:  Object to the form of

18     the question.

19                  THE WITNESS:  There is a way that

20     it could be depicted on a map if that's what

21     you are asking.

22                  BY MR. WESEVICH:

1           Q.     This is hard to read.  We're

2      looking at Page 597.  Let me see if I can blow

3      it up some.

4                  Do you know why there were 29,000

5      initial inspections out of 38,000

6      applications, why there would have been 9,000

7      applications without an initial inspection?

8           A.     There is a report that would tell

9      me if I asked for the report.  There's any

10     number of reasons why they may not have been

11     issued for an inspection.

12          Q.     Renters being the primary one.

13          A.     No.  Renters would be inspected.

14     A business may call up.  They wouldn't get an

15     inspection.  If they were outside a designated

16     area, as I mentioned previously this morning

17     that a registration would be taken but it

18     wouldn't go into the queue for processing or

19     inspection.  So there are any number of

20     reasons why -- and it's pretty typical that we

21     have more applications than we have

22     inspections.

260

1           Q.    By 30 percent?

2           A.    It depends on the area.  It

3     depends on the type of event.  It depends on

4     the designated areas.

5           Q.    Okay.  So the 14,900 IID denials,

6     that would mean that it's half of all the

7     people who are eligible for repair assistance

8     since there were only 28,000 initial

9     inspections.  Is that accurate?

10                MS. WELLS:  Object to the form of

11    the question.

12                MR. WESEVICH:  I'm sorry?

13                MS. WELLS:  I'm going to object to

14    the form of the question.  You said that half

15    the people who were eligible for repair

16    assistance.

17                MR. WESEVICH:  I misspoke.  I

18    apologize.

19                MS. WELLS:  Okay.

20                BY MR. WESEVICH:

21          Q.    So you see that this indicates

22    that there were 8,500 people who were found

                  FEDER REPORTING COMPANY
               (202) 863-0000    (800) 956-8996

1     initially eligible for home repair out of

2     28,000 of initial inspections.  I'm looking at

3     Items L and C.

4              A.     Number of initial home repair,

5     8,550, and you are comparing it to C?

6              Q.     Yes, sir.

7              A.     The number of initial inspections,

8     28,000.  Yes, that is correct.

9              Q.     And does that number strike you,

10    that 22 percent of applicants would be found

11    initially eligible for home repair, does that

12    strike you as a low number?

13             A.     Potentially.  But I've also seen

14    other disasters where numbers are extremely

15    low for any number of reasons as well.  So I

16    mean it's something that it might be but until

17    I know the reasons why, which was identified

18    in the ineligibility report, it may or may not

19    raise a lot of red flags.

20             Q.     But it would raise enough red

21    flags to get FEMA to try to understand what

22    the reason was.

1          A.    As I say, that would be typically

2     reviewed at the field office of which

3     monitoring does take place.  And they would be

4     contacting the NPSC to find out, "Why do we

5     have such a high ineligibility rate?"

6          Q.    Is that a yes?  My only question

7     is would this number, 8500 out of 28,000

8     initial inspections be enough of itself to

9     raise red flags to cause FEMA to try to

10    understand why?

11         A.    Potentially.  It's not a yes or

12    no.  If I were out there and I was overseeing

13    Individual Assistance, it may raise enough red

14    flags that I would make calls to find out why

15    it's ineligible.  Now, we did show up here

16    earlier an ineligibility report that's

17    available to the field office.  And whether or

18    not they questioned it, I don't know.

19         Q.    Okay.  You've had 21 years

20    experience at FEMA?

21         A.    Yes, I have.

22         Q.    So for you would this raise a red

1    flag and cause you to find out why?

2         A.    I would find out why.  And that

3    could be articulated verbally.

4         Q.    On the next page on 598, it says

5    that zero were marked as the cause of damage

6    due to deferred maintenance.

7         A.    That's what it says, yes.

8         Q.    Okay.  Now, deferred maintenance

9    is one of the lists, one of the causes of

10   damages in the line items.

11        A.    Yes.

12        Q.    Is that correct?

13        A.    I believe, yes.  In the ACE

14   software system, yes.

15        Q.    And is this something that's

16   separate from the areas of deferred

17   maintenance?

18        A.    No.

19        Q.    That's the only place where it's

20   listed.

21        A.    That's my knowledge, yes.

22        Q.    So is this number reporting that

                  FEDER REPORTING COMPANY
                (202) 863-0000    (800) 956-8996

1    no deferred maintenance was checked on the

2    individual applications?

3         A.    No.  It's saying here that -- it's

4    saying that they didn't describe it as the

5    cause of damage which doesn't mean that they

6    didn't have deferred maintenance.  The typical

7    causes of damage is going to be tornado,

8    severe weather, hurricane, wind-driven rain.

9    Those are your typical causes of damage.

10        Q.    If you look at the Item N, it says

11   11 appeals resulted in eligibility for

12   repairs?  That's at the top of 598.

13        A.    Yes.

14        Q.    Does that number strike you as

15   low, 11 appeals secured repair assistance out

16   of 28,000 initial inspections?

17        A.    No, it wouldn't, only because if

18   the inspector did a thorough job, it simply

19   means that in 11 cases that were appealed,

20   there was sufficient information either

21   provided by the applicant to warrant a second

22   inspection which overturned the first

1    inspection or found additional damages that

2    could still have found deferred maintenance

3    but found additional damages that was

4    overlooked by the initial inspection.

5              So what this actually tells me is

6    that the inspectors did a thorough job.

7         Q.    But would this raise any red flags

8    for you, seeing 11 changes?

9         A.    No.  If anything, it would raise

10   the issue that the inspectors did a thorough

11   job.  I would be more concerned if I saw an

12   awful lot of appeals overturned.  That would

13   raise an issue to say what was missed, what

14   was not considered when the inspectors went

15   out.  But with a very low number of overturned

16   appeals tells me that the inspectors did their

17   job.

18        Q.    Is the task monitor in charge of

19   the field office?

20        A.    No.  They are in charge of the

21   task order to the contract, contractors.

22        Q.    Is the FCO in charge of the field

1      office?

2              A.     The Federal Coordinating Officer

3      is in charge of the field office along with

4      the state coordinating officer.

5              Q.     This is that screen that you had

6      referred to earlier, the areas of deferred

7      maintenance.  We're looking at Page 621.  This

8      does not have the bar over here that you had

9      talked about.

10             A.     Yes.

11             Q.     It doesn't have that.  But roof

12     isn't listed as an area of deferred

13     maintenance on this Page 622, is it?

14             A.     No, it isn't because, again, we

15     don't require inspectors to get up on the

16     roof.  They would look at what damages from

17     the interior that could weigh decision on what

18     the roof is that we explained earlier between,

19     you know, any water intrusion, age of the

20     water spots, and things of that nature.  But

21     we do not require an inspector to get up on

22     the roof.

1          Q.    Does this list ever change of

2     areas of deferred maintenance?

3          A.    I haven't seen -- no. it's pretty

4     static.  I don't recall it changing since it's

5     been added to the ACE software.  I mean there

6     was the big change when it was added to the

7     ACE software as a separate window as opposed

8     to being in comments.  I don't recall it

9     changing since then because those were

10    overarching areas associated with a structure.

11    So those typically would not change.

12         Q.    Well, these are, the areas of

13    deferred maintenance is that they are the

14    headings, as far as I can tell, they are the

15    headings of the real property line items.

16         A.    That's correct.

17         Q.    I'm looking at Page 614.  See

18    these, and I'm pointing to the inspection item

19    category.  They're all under headings, and

20    those correspond to the areas of deferred

21    maintenance.

22         A.    Typically, yes, because these are

1    the headings that, under each of these

2    headings there is several different line items

3    that would relate to that particular heading.

4    So when you're looking at deferred maintenance

5    you're not looking at line item deferred

6    maintenance.  You're looking at the general

7    category and area of deferred maintenance.  So

8    they take the headings to know what typically

9    falls under that heading as an area of

10   deferred maintenance.

11           Q.    And those areas are the same as

12   the inspection item categories on Page 614, as

13   shown in 614.

14           A.    Pretty much the same.  I also see

15   in this heading "Speed Estimating," which is

16   not a heading in the deferred maintenance

17   area.  But they are generally the same

18   headings.

19           Q.    The line items that are listed

20   under "Inspection Items"?

21           A.    Yes.

22           Q.    Are those the items that are

1     further described by this document 1094,

2     that's before and after ten-ninety -- the IHP

3     line item descriptions that begin at 1081 and

4     1082?

5              A.    Yes.  Those line item descriptions

6     correlate to the line items within those

7     categories identified on the previous page.

8              Q.    Page 621.

9              A.    Yes.

10             Q.    How does the inspector access

11    these line item descriptions?

12             A.    I believe there are drop-down

13    menus now built into the palm pad that gives a

14    description of that particular line item.

15    There's a help screen or a drop-down that

16    allows that.

17             Q.    Let's see if we can see it.

18             A.    There was a help box if you want

19    to go back a couple.

20             Q.    This is on the calculator.  This

21    is on the line items.  We were talking about

22    Page 614.  Where is the help box?  Oh, is it

1    right here?

2            A.    Yes.

3            Q.    And that's where you would access

4    the line item descriptions that we saw in

5    1081?

6            A.    I believe so.  I do know that they

7    have added those line item descriptions that

8    if the inspector is having trouble to remember

9    exactly what a particular line item is, it is

10   available on the palm pad.

11           Q.    But you believe that it's where it

12   says "Help" in the upper left-hand corner of

13   the Windows screen that's on Page 614?

14           A.    Yes.  But also, you'd have to go

15   into the rooms themselves and then you would

16   be able to access what line items would be

17   there.  But yes, you could do that.

18           Q.    But I'm just saying if you wanted

19   the broader descriptions of the line items

20   that are contained in that list that begins on

21   Page 1081, you would go to this "Help" or to

22   some button that's on this Page 614.

1          A.     You would go to some button within

2     this ACE software and find that information.

3     I believe there's also a "Help" button down in

4     that corner.  That may also get you to that

5     particular area for further description.  It's

6     covered by the FEMA 000614.  I believe there's

7     another button that will allow us to seek help

8     in describing what some of these line items

9     may be.

10         Q.     You're looking at Page 6415.  You

11    don't have that in your printed documents.

12    Could you look at this and I'll ask a couple

13    questions about it.  There's another page to

14    it, so if you'd let me know when you finished

15    reading this 6415, I'll flip the page.

16         A.     Okay.

17         Q.     Have you had a chance to read that

18    article?

19         A.     Yes, I have.

20         Q.     FEMA watches the press.  Correct?

21         A.     Correct.

22         Q.     And you've got press officers that

1      see what's written about FEMA.

2              A.    Correct.

3              Q.    And you've seen that in disasters

4      across the country people have complained

5      about the vagueness of this deferred

6      maintenance standard.  Is that accurate?

7                   MS. WELLS:  Object to the form of

8      the question.

9                   THE WITNESS:  That's what's being

10     articulated in this article, yes.

11                  BY MR. WESEVICH:

12             Q.    But have you seen that from across

13     the nation, that these complaints have come in

14     about people not understanding how this

15     deferred maintenance idea works?

16             A.    I've seen many different articles,

17     some of which just described that FEMA denied

18     assistance not particular to deferred

19     maintenance.  This particular article really

20     focuses in on deferred maintenance which

21     doesn't go out in any of our letters.  So

22     where they're getting their information on

1       deferred maintenance, I'm not aware of.

2              Q.    You see in the beginning of the

3       article, 6415, it says, in the fifth paragraph

4       down the applicant states that "They said they

5       couldn't tell what was damaged before and

6       after, so they denied assistance based on

7       deferred maintenance."  Is that the way you

8       understand that it works?

9              A.    No, it isn't.

10             Q.    Does FEMA think that its

11      procedures for discerning deferred maintenance

12      are adequate and does it intend to look at

13      this question about how to do a better job of

14      discerning what is deferred maintenance?

15             A.    Yes.  Yes, we are, because

16      deferred maintenance is a term typically used

17      in the building trades.  We're trying to

18      better describe what it is that FEMA does by

19      staying with what the actual language is

20      within the 44 CFRs, which is typically was it

21      disaster related; and if it wasn't disaster

22      related, then it wasn't disaster related or

1       made worse by the event.

2                   So FEMA is trying to clarify more

3       of what the intent of FEMA programs are as

4       opposed to using terms such as "deferred

5       maintenance" or "preexisting condition."

6       Everything in the 44 CFR and in the authority

7       itself only determines what FEMA would pay for

8       based upon eligibility and based upon

9       habitability and based upon disaster-related

10      damages.  So we are trying to improve the way

11      we describe disaster-related damages and the

12      damages that weren't disaster related.

13          Q.    I hear you saying that FEMA

14      believes it's necessary to better describe

15      what it does.  Is that accurate?

16          A.    Yes.  FEMA is always trying to

17      improve on communication and articulation as

18      to what it is FEMA actually can provide.  It's

19      an evolving, constant improvement that we try

20      to impose and implement.

21          Q.    And does FEMA believe -- I mean is

22      FEMA reviewing its methods for discerning what

1     is a preexisting condition and what is

2     disaster related when there's dual causation?

3          A.    Dual causation as it refers to?

4          Q.    When it's not clear what was

5     preexisting and what was disaster related.

6               MS. WELLS:  I'm going to object to

7     the form.

8               THE WITNESS:  FEMA is always

9     trying to improve how we articulate what it is

10    people can be eligible for.  In other words,

11    all the regulations and all of our guidance is

12    trying to stick with what FEMA will pay for.

13    Years ago FEMA didn't necessarily do an

14    inspection of an entire house.  They simply

15    went to where damages occurred and captured

16    those damages.

17               Now FEMA is requiring all

18    inspectors to do a thorough inspection of the

19    house, a complete inspection, go into every

20    bedroom, every hallway, you know, kitchens,

21    bathrooms, basements, to capture whether or

22    not damages occurred as a result of the

1   disaster so that it will cut down on appeals

2   or second inspections based upon appeals if

3   people say, "You didn't address my bedroom in

4   the back."  FEMA can now say, "Yes, we had an

5   inspector go in and recorded no damages."

6            So we are always trying to improve

7   how we capture information and how we

8   articulate information in the correspondence

9   letters that go out to individuals based upon

10  what FEMA's programs are intended for.

11            BY MR. WESEVICH:

12       Q.   Please look at Page 4605.

13       A.   What document is that?

14       Q.   You guys filed it as document

15  36 --

16            MS. WELLS:  It's not going to be

17  in there, I don't think.

18            MR. WESEVICH:  -- 36-3 and 36-4.

19  The Court stamp is not on that one.  I don't

20  know why.  I think the page service started to

21  stamp all those documents.

22            THE WITNESS:  Yes.

1                   BY MR. WESEVICH:

2          Q.    So you've had a chance to read

3    Pages 4605 and 06?

4          A.    Yes, I have.

5          Q.    At least in 2009, some efforts

6    were underway at FEMA to refine the policies

7    that are used to administer individual

8    assistance.

9          A.    It was to rewrite the regulations

10   in support of Section 408, yes.

11         Q.    And that has not been done yet.

12   Correct?

13         A.    It's still being pursued.

14         Q.    And my only question is is the way

15   that inspectors are expected to judge deferred

16   maintenance one of the items that's to be

17   addressed in those regulations?

18         A.    Not in this particular regulation.

19   This is the overall IHP regulation, the rule.

20   And this is based upon the current regulations

21   that were considered interim regulations

22   published in 2002.  So this is a complete

1      rewrite of those regulations to also address

2      the Post-Katrina Emergency Management Reform

3      Act issues that were raised.  So this is the

4      overarching document in support of rewriting

5      our entire regulation, Section 206.

6              Q.    Correct.  And there were statutory

7      changes that were required by the

8      Post-Katrina--

9              A.    Correct.

10             Q.    -- statute.  But the question is

11     as part of that, are any policy changes

12     included in that for the way that deferred

13     maintenance is judged?

14             A.    No, since deferred maintenance is

15     not part of the regulation.

16             Q.    We've said several times that

17     FEMA's instructions to contractors are that a

18     preexisting condition has to be significantly

19     worsened by the disaster for it to be recorded

20     as a line item that FEMA will pay for.  That's

21     correct?

22             A.    If it affects the habitability of

                  FEDER REPORTING COMPANY
               (202) 863-0000    (800) 956-8996

1      the home, yes.

2            Q.    Yes.  But FEMA doesn't provide

3      contractors with any guidance at all anywhere

4      about how to judge what is significantly

5      worsened.

6            A.    No.  What it does is it provides

7      the guidelines on looking at the

8      disaster-caused damage, disaster-related

9      damage caused by the event and if there is

10     damage that exists that is caused by the

11     event, then the inspector will record that.

12     It does not get into the opposite of that

13     which is to look at deferred maintenance and

14     make a judgment call.  It's to focus on what

15     they're supposed to be doing in categorizing,

16     in verifying disaster-related damage.

17                 MR. WESEVICH:  Can I take about

18     ten minutes?  I think that we're almost done.

19                 (Recessed from 4:51 to 5:09 p.m.)

20                 BY MR. WESEVICH:

21            Q.    I just have a very few follow-up

22     questions.

1              We had talked about those numbered

2    policies at the very beginning, that there was

3    one central location for the PA policies, but

4    there wasn't for the IA policies.  And as I

5    recall, your answer was that you would go to

6    the Intranet, someplace on the Intranet to

7    find the IA policies.

8         A.    Yes.

9         Q.    The complete group of them.

10        A.    Yes.  They could be found on the

11   Intranet.

12        Q.    And do you believe that you know

13   where to look for all of them?

14        A.    My primary source for that for

15   individual policies affecting what we've been

16   talking about today, which is 408 assistance,

17   would be the NPSC website.  That would be my

18   primary location.  There are several other

19   locations that I could go through through our

20   policy and planning folks, going through our

21   other staff who maintain them.  But if I am at

22   my computer and I need it quickly and if I

1    don't already have it on my computer, I would

2    go to the Virginia NPSC website.

3         Q.    But if you wanted to be sure that

4    you had all of them, where would you go?

5         A.    I would actually go to another

6    section because we've been through a routine

7    over the past year and a half of collecting

8    all of our disaster-specific guidance and

9    policy documents, because we're in the process

10   of trying to update those and rescind and

11   sunset some of the disaster-specific guidance

12   policies.  So we've gone through over the past

13   year an effort of consolidating all of the

14   policy and guidance descriptors in one

15   location.  And that's in our Policy, Planning

16   and Doctrine Branch within Individual

17   Assistance.

18        Q.    How many are there of those

19   policies?  Are there 10,000 or are there

20   1,000?

21        A.    I can't remember what the last

22   count was.  Again, this is everything that

1      we've had.  And it was well over 100 different

2      policies.

3          Q.    And the PA guide that we looked at

4      earlier today there were something like

5      250-some, on that order.

6          A.    Yes.  I think there might even be

7      more than that under Individual Assistance.

8          Q.    But all of those policies have not

9      been produced yet in the documents in this

10     case.  Right?

11         A.    Some of them may not pertain to

12     Section 408 assistance because we have other

13     policies that pertain to other sections of the

14     Stafford Act.  We have policies that reiterate

15     Part 9 regarding Executive Orders 11988 and

16     11990 which deals with flood plain management.

17     So they're not all particular to Section 408

18     assistance, individual assistance.

19         Q.    And is it your testimony that

20     you're sure that you've produced already all

21     of the policies that do pertain to 408?

22         A.    Yes.  To the best of my knowledge,

1       everything's been produced.

2               Q.      How are you sure of that?

3               A.      Because it was requested, and

4       there aren't too many policies particular to

5       Section 408.  Most of our guidance is

6       projected from the 44 CFR.  So there is an

7       awful lot -- there are policies.  As you can

8       see, those are some of the dated policies.  As

9       you see, that's a Disaster Recovery Center

10      services provider's policy on Page 30 which

11      doesn't necessarily reflect 408 assistance.

12      But that is where people go to seek questions

13      regarding Section 408 and the assistance

14      provided.

15                      So that has been provided even

16      though it doesn't affect one's eligibility or

17      one's determination for eligibility.  It

18      simply identifies that FEMA can set up these

19      disaster recovery policies for individuals to

20      go in and seek questions, answers, and talk to

21      other Federal partners as well as state

22      agencies to seek assistance.  So everything

1    that was associated with Section 408, to the

2    best of my recollection, has been provided.

3         Q.    And is there anywhere that has a

4    Table of Contents for all of these numbered

5    policies in the 9400 series, the

6    DAP94-blank-blank?

7              MS. WELLS:  Objection; asked and

8    answered.

9              THE WITNESS:  Yeah, there is.  I

10   don't know where I could get my fingers on it

11   because as we have also seen in previous

12   documents, there were policy issues that do

13   not have the numbering system on it.  So we do

14   have a listing of policies but they're not all

15   of this format.

16             BY MR. WESEVICH:

17        Q.    I show you what's been marked as

18   5411.  This appears to be an interim handbook

19   that was published November 2nd, 2002.  Do you

20   know whether such a handbook still exists?

21        A.    I don't believe it's been updated.

22        Q.    Have you seen this document

1          before?

2                    A.     I do recall this document.  There

3          is now what's referred to as a tool kit that

4          is online in the Internet -- Intranet, that is

5          similar to this.  This basically evolved into

6          a tool kit which is a full description of the

7          IA programs.  So it talks a lot about IHP,

8          ONA, crisis counseling, case management, DRCs.

9          It's a tool kit that's involving every element

10         of the program.

11                   Q.     Who uses the tool kit?

12                   A.     It's used for field staff.  It's

13         maintained by both field staff and

14         Headquarters staff.  It is updated to the best

15         of our ability to update it.  Sometimes we're

16         not as diligent.  I know it was updated last

17         year, but we're not as diligent in making sure

18         that every time a decision is made we run in

19         and update that document.  But for the most

20         part it is updated.

21                   Q.     And it's available online where?

22                   A.     I believe it's on the Intranet and

1       it's available, I believe, on the website.

2       But it's also something that we can send a

3       link out to for individuals asking, you know,

4       for the field offices asking for this.  It's

5       there and it's available.

6              Q.    Who participates in updating it?

7              A.    I have staff that work for me that

8       work with the regions on issues to update.

9       Prior to Headquarters also getting involved in

10      maintaining and updating that, it used to be

11      updated by regional office staff in Region 8.

12             Q.    And as I understand your

13      testimony, this document here that was

14      published as an interim handbook on November

15      the 2nd, 2002 evolved into this field -- you

16      called it a?

17             A.    Tool kit.

18             Q.    Tool kit.

19             A.    Yes.  This was basically a

20      handbook of all the various programs'

21      processes, overarching descriptions of all the

22      programs.  The tool kit does the same thing.

1     And I believe that is -- this was prior to the

2     tool kit.

3              Q.    And the updates reflect policy

4     changes made at Headquarters, FEMA

5     Headquarters.

6              A.    Not just policy changes.  It's a

7     more descriptive, more description of what the

8     programs are, what the time lines are for the

9     programs, overarching goals of the programs.

10    It has checklists in there for setting up some

11    of these components, the joint field office,

12    the DRCs.  It's a tool kit.  It's getting into

13    more detail a little bit about how we operate

14    and where we operate and the components that

15    we operate under.

16             Q.    Is the tool kit available to PaRR

17    and to PB?

18             A.    I'm not sure if they ever asked.

19    If they asked, it would be.

20             Q.    What about to the public?

21             A.    Again, I don't know if it's ever

22    been asked.  I don't think anything's

1          proprietary that's in there.  And it is just

2          basically reiterating a lot of descriptors and

3          description of how we conduct business.  It

4          doesn't set policy or it doesn't set

5          regulation.  It's basically additional

6          guidance.

7                  Q.    Could you describe for me how it

8          can be that an inspector could record line

9          items of real property damage and yet repair

10         assistance not be awarded?  What are the

11         circumstances in which that can happen?

12                 MS. WELLS:  I'm going to object to

13         the form of the question.

14                 BY MR. WESEVICH:

15                 Q.    And I know you can't give me an

16         exhaustive list at this hour.

17                 A.    Right.  It's pretty much going

18         through everything we described.  Basically,

19         the inspector can record damages in line items

20         but still have a habitability call of no.  An

21         example of that that I've experienced is in

22         California when I did QC inspections in

1      1996-ish.  It was after one of the earthquakes

2      out there.  And it was also heavy rain that

3      accompanied.  It was just timing.

4              And many homes got flooded but

5      with only one inch of water.  It didn't affect

6      the habitability of the home but all the

7      carpet had to be replaced.  So there may have

8      been damage that was recorded in line items

9      but did it affect the overall habitability of

10     the home?  No.  So they were not awarded

11     assistance.

12         Q.   And would that kind of a global

13     call be made by somebody at FEMA Headquarters

14     or where?  That "These types of carpet damage

15     we're not going to end up paying for when

16     there's one inch of water."

17              MS. WELLS:  Object to the form of

18     the question.

19              THE WITNESS:  It's part of the

20     processing for that inspection.  So unless you

21     have tripping hazards as a result of the

22     carpet not being there, it will not affect the

1    habitability of the home.  So by replacing

2    carpet, it doesn't affect the habitability.

3    It could be a business rule that's established

4    in NEMIS.  It could be a rule that says,

5    "We're not going to pay for carpeting."

6                We don't pay for wall covering as

7    well.  If there is water stains on the wall,

8    we don't pay for paint because paint doesn't

9    affect the habitability of the home.  So there

10   are certain elements that we just won't pay

11   for because it doesn't affect the habitability

12   of the home.

13               That's why, as I mentioned, the

14   inspector is there to record damages.  That's

15   the main focus of what the inspector is to do.

16   He does not make eligibility calls.  He simply

17   records damages as he or she sees fit based on

18   what they are seeing in making the

19   determination as to whether or not it is

20   disaster related.

21               And then they make an overall

22   habitability call as to whether or not the

**1**    damages that they are viewing affects the

**2**    habitability of the home.  That gets

**3**    transmitted back up to NEMIS.  And NEMIS,

**4**    through auto-determination, will say that

**5**    they're not eligible because it's safe to live

**6**    in their home because it did not affect the

**7**    habitability of the home.

**8**              BY MR. WESEVICH:

**9**         Q.    We are looking at Page 269 here.

**10**   There is a series of these types of manuals

**11**   that have the large FEMA seal on the center of

**12**   them.  There's one on appeals.  There's one on

**13**   recoupment.  There's one on case management.

**14**   But it doesn't appear that we have the

**15**   complete manuals of any of them.  So can you

**16**   look through the documents around there and

**17**   tell me what are those manuals?  What are they

**18**   used for?

**19**         A.    It would appear that this manual

**20**   is part of a training manual.  The reason for

**21**   saying that is because it's saying that it's a

**22**   module with objectives, and it's identifying

1    what the objectives are and understanding what

2    this manual will do.  And this is produced, I

3    would assume, at the NPSC where recoupment is

4    part of the process in the processing of cases

5    or recouping funds based upon the case

6    reviews.

7         Q.    Is it accurate that many of the

8    NPSC employees are trained in multiple

9    functions?  Some of them are trained to handle

10   appeals, some of them are trained to handle

11   recoupment, some of them are trained to handle

12   call center operations?

13        A.    Yes.

14        Q.    So there's a series of manuals to

15   complete a training course in each of those

16   functions.  Right?

17        A.    Typically, yes.

18        Q.    And we do not have the complete

19   manuals in the documents that were produced.

20   We only have excerpts from those manuals.  Is

21   that right?

22        A.    I would have to look at all of the

293

1    different manuals to know whether or not it's

2    complete. And since these are produced at the

3    NPSC, I would probably need to -- here's

4    another one on appeals.

5         Q.    And what's the number, the chapter

6    number on appeals?

7         A.    Three.

8         Q.    That's an important one. So we

9    don't have anything. We don't have two or one

10   on appeals.

11        A.    No. This is in series. The

12   chapter on recoupment is two. The chapter on

13   appeals is three. So this appears to be in a

14   larger manual of training material used. And

15   these are the various sections within that.

16   That's what I would surmise.

17        Q.    Well, I wish you would look

18   through those and let me know the answer to

19   that because I think that there are several --

20   what's that one? See, there's another one for

21   supervisor review, and that's three. So it's

22   not four. Do you see? You would expect that

294

1      one -- what page is that one, Bates page is

2      that?

3            A.     320.

4            Q.     So you would expect Page 320 to

5      say four if the appeals one was part three.

6      So it's not clear to us whether we have those

7      complete training manuals.  And you can't tell

8      based on flipping through the documents.

9      Correct?

10           A.     No, no, I can't.

11           Q.     Are inspectors instructed to

12     record whether the owner constructed a house

13     that is under inspection?  Are owner-built

14     houses subject to -- is that fact recorded in

15     the inspection?

16           A.     No, it isn't.

17           Q.     They're not told to record that

18     fact?

19           A.     Not that I'm aware of, no.

20           Q.     I thank you for your time.

21           A.     Thank you.

22                  MR. WESEVICH:  Pass the witness.

                    FEDER REPORTING COMPANY
                 (202) 863-0000    (800) 956-8996

1          EXAMINATION BY COUNSEL FOR DEFENDANT

2               BY MS. WELLS:

3          Q.    Mr. Carleton, I have one follow-up

4     question.

5          A.    Sure.

6          Q.    I want to be clear for the record,

7     so I would ask you to please describe your

8     understanding of what constitutes an

9     inspection.

10         A.    What constitutes an inspection is

11    it would start with an individual applying for

12    FEMA assistance.  In that application, a

13    series of questions are going to be asked.

14    And if the individual indicates that they had

15    damage to their home, that would generate an

16    inspection.

17               That application, information from

18    that application would go over to the

19    inspectors.  It would then be issued to a

20    field inspector in the field on a pen tablet.

21    That inspector would then go and make an

22    appointment with the applicant, meet them at

1    their residence, ask a lot of questions to

2    verify information that they provided during

3    registration.

4            And then the inspector would do a

5    visual inspection of that entire house.  It

6    would be a complete inspection.  So they would

7    be required to look at the exterior, look at

8    the interior, go in each of the rooms to

9    include bedrooms, hallways, bathrooms,

10   kitchens, basements, and record whatever

11   damage they saw.  They would record damage and

12   make a call as to whether or not it was

13   preexisting damage or as a result of the

14   disaster itself.

15           They would then mark those line

16   items.  They would complete the inspection

17   report.  They would then make an overall

18   habitability call for the home.  And then that

19   information would get uploaded back to the

20   NPSC for processing in NEMIS.

21           NEMIS would actually determine

22   eligibility.  The inspector doesn't determine

1    eligibility.  The job of the inspector is only

2    to be the eyes and ears of FEMA to collect

3    information that would then be processed, and

4    an eligibility determination made.  Once that

5    inspection is completed, the inspector then

6    closes out that inspection and moves on to

7    another inspection.

8                   So it's all left in the hands of

9    the NPSC staff to process that information and

10   determine their eligibility.  And through the

11   system, it would then generate a letter to the

12   applicant describing what they are eligible or

13   not eligible for and also describe what the

14   appeal process is.

15                   MS. WELLS:  Thank you.  That's it.

16                   MR. WESEVICH:  Thank you, sir.

17                   (Whereupon, signature not having

18   been waived, the deposition concluded at 5:34

19   p.m.)

20                        + + +

21

22

298

1

2        CERTIFICATE FOR READING AND SIGNING

3

4                  I hereby certify that I have read

5        and examined the within transcript and the

6        same is a true and accurate record of the

7        testimony given by me.

8                  Any corrections I have listed on

9        the separate errata sheet enclosed, indicating

10       the page and line number of each correction.

11

12

13

14
                    _____
15                  John M. Carleton, Jr.

16
                    _____
17                  Date

18

19

20

21

22

                    FEDER REPORTING COMPANY
                 (202) 863-0000    (800) 956-8996

1            CERTIFICATE OF NOTARY PUBLIC

2                    I, Lynell C.S. Abbott, the officer

3        before whom the foregoing deposition was

4        taken, do hereby certify that the witness,

5        whose testimony appears in the foregoing

6        deposition, was duly sworn by me; that the

7        testimony of said witness was taken by me in

8        shorthand and thereafter reduced to computer

9        type under my direction; that said deposition

10       is a true record of the testimony given by

11       said witness; that I am neither counsel for,

12       related to, nor employed by any of the parties

13       to which this deposition was taken; and

14       further, that I am not a relative or employee

15       of any attorney or counsel employed by the

16       parties hereto, nor financially or otherwise

17       interested in the outcome of the action.

18

19                          _____
20                          Notary Public in and for
                            The District of Columbia

21       My Commission Expires:
         April 30, 2017
22

              FEDER REPORTING COMPANY
           (202) 863-0000    (800) 956-8996